**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

**EASTERN DIVISION**

Consumer Financial Protection Bureau,

        Plaintiff,

        v.

Intercept Corporation, d/b/a
InterceptEFT,

Bryan Smith, individually, and as owner
and president of Intercept Corporation,

Craig Dresser, individually, and as owner
and CEO of Intercept Corporation

        Defendants.

CIVIL ACTION

No. _____

## **COMPLAINT**

The Consumer Financial Protection Bureau (Bureau or Plaintiff) brings this

action against Intercept Corporation, d/b/a InterceptEFT (Intercept), Bryan Smith

(Smith), and Craig Dresser (Dresser) (collectively, Defendants) and alleges as follows:

### **Introduction**

1.      Intercept is a third-party payment processor that has systematically enabled its

clients to withdraw millions of dollars' worth of unauthorized or otherwise illegal

charges from consumers' bank accounts.

2.      Defendants have processed transactions for many clients when they knew or

consciously avoided knowing that many of the transactions initiated by those companies

were fraudulent or illegal. For years, Defendants have ignored numerous red flags about

the transactions they were processing, including repeated consumer complaints, warnings about potential fraud or illegality raised by banks involved in the transactions, unusually high return rates, and state and federal law enforcement actions against their clients. Defendants have performed only perfunctory due diligence regarding the legitimacy and legality of their clients' underlying transactions and have ignored indicia of fraud or illegality revealed through even their minimal due diligence. By providing these clients with access to the banking system and the means to extract money from consumers' bank accounts, Defendants have played a critical role in this unlawful conduct.

3.      The Bureau brings this action based on Defendants' violations of Sections 1031(a), 1036(a), and 1054(a) of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531(a), 5536(a), and 5564(a), in connection with their processing of credit and debit transactions for clients.

**Jurisdiction and Venue**

4.      This Court has subject-matter jurisdiction over this action because it is brought under Federal consumer financial law, 12 U.S.C. § 5565(a)(1); presents a federal question, 28 U.S.C. § 1331; and is brought by an agency of the United States, 28 U.S.C. § 1345.

5.      This Court has personal jurisdiction over the Defendants because the causes of action arose from Defendants' conduct of business in this District, and Smith and Dresser reside here. 12 U.S.C. § 5564(f).

6.      Venue is proper pursuant to 28 U.S.C. § 1391(b) and 12 U.S.C. § 5564(f) because Defendants do business in this District and reside here and the events or omissions giving rise to this Complaint substantially took place in this District.

## Parties

### *Plaintiff*

7.      The Bureau is an independent agency of the United States charged with regulating the offering and provision of consumer financial products or services under Federal consumer financial laws. 12 U.S.C. § 5491(a). The Bureau has independent litigating authority to enforce Federal consumer financial laws. 12 U.S.C. §§ 5481(14), 5564(a) and (b).

### *Defendants*

### Intercept Corporation

8.      Intercept is a privately held S-corporation, incorporated in North Dakota, with its principal place of business in Fargo, North Dakota. Intercept is a third-party payment processor that processes electronic funds transfers through the Automated Clearing House (ACH) network on behalf of its clients.

9.      Intercept is a covered person under the CFPA because it provides payments or other financial data processing products or services to consumers by technological means, including through a payments system or network used for processing payments data. 12 U.S.C. § 5481(15)(A)(vii).

10.     Intercept is also a service provider to covered persons, such as payday lenders, debt collectors, and auto title lenders, because it processes transactions relating to consumer financial products or services. 12 U.S.C. §§5481(26)(A)(ii).

11.     At all times material to this Complaint, Intercept transacts or has transacted business in this district and nationwide.

**Bryan Smith**

12.     Defendant Smith is the founder of Intercept and at all times material to this Complaint, Smith has been the president of Intercept. He is also a 50% shareholder in Intercept.

13.     As president of Intercept, Smith is involved in many different aspects of Intercept's operations, such as client management, bank relationships, operations, and product development.

14.     At all times material to this Complaint, acting alone or in concert with others, Smith has formulated, directed, controlled, participated, or otherwise engaged in the acts and practices set forth in this Complaint.

15.     Smith has been a director, officer, or employee charged with managerial responsibility at Intercept. Smith has also materially participated in the conduct of Intercept's affairs, including the development and approval of the practices complained of herein.

16.     Given his status as president of Intercept and material participation in Intercept's operation, Smith is a "related person" under the CFPA. 12 U.S.C. § 5481(25). Because of his status as a "related person" under the CFPA, Smith is a "covered person" under the CFPA. *Id.*

17.     Smith is also a "covered person" under the CFPA, 12 U.S.C. § 5481(15)(A)(vii) and 26(A), because he is engaged in providing payments or other financial data processing products or services to consumers by technological means, including through a payments system or network used for processing payments data. 12 U.S.C. § 5481(15)(A)(vii).

18.     At all times material to this Complaint, Smith has transacted business in this district. Additionally, Smith resides in North Dakota.

**Craig Dresser**

19.     At all times material to this Complaint, Defendant Dresser has been the CEO of Intercept. He is also a 50% shareholder in Intercept.

20.     As CEO, Dresser is involved in many different aspects of Intercept's operation, such as client management, bank relationship management, operations, and finances.

21.     At all times material to this Complaint, acting alone or in concert with others, Dresser has formulated, directed, controlled, participated, or otherwise engaged in the acts and practices set forth in this Complaint.

22.     Dresser has been a director, officer, or employee charged with managerial responsibility at Intercept. Dresser has also materially participated in the conduct of Intercept's affairs, including the development and approval of the practices complained of herein.

23.     Given his status as CEO of Intercept, Dresser is a "related person" under the CFPA. 12 U.S.C. § 5481(25). Because of his status as a "related person" under the CFPA, Dresser is a "covered person" under the CFPA. *Id.*

24.     Dresser is also a "covered person" under the CFPA, 12 U.S.C. § 5481(15)(A)(vii) and 26(A), because he is engaged in providing payments or other financial data processing products or services to consumers by technological means, including through a payments system or network used for processing payments data. 12 U.S.C. § 5481(15)(A)(vii).

25.     At all times material to this Complaint, Dresser has transacted business in this district. Additionally, Dresser resides in North Dakota.

## Factual Background

26.     As a third-party payment processor, Intercept provides its clients with access to banks to debit and credit funds electronically from consumers' bank accounts, using what is known as the ACH system. Intercept's clients have included consumer lenders such as payday lenders, auto title lenders, sales finance companies, and debt collectors, among others.

27.     The ACH system is an electronic payments network used to process financial transactions, such as credits or debits (deposits or withdrawals), instead of using paper checks.

28.     The ACH system can be used to transfer funds related to a variety of financial transactions, such as bill payments or loan advances.

29.     Businesses and individuals use third-party payment processors, such as Intercept, when they are unable to establish their own relationships with banking institutions or because it is administratively convenient for them.

30.     In the ACH system, the businesses and individuals that are Intercept's clients are known as "Originators."

31.     Originators send requests to Intercept to either credit or debit an individual's or business's bank account.

32.     Intercept conveys that request to its own bank, known as the "Originating Depository Financial Institution" (ODFI).

33.     The ODFI then sends the credit or debit request to an ACH Operator.

34.     The ACH Operator transmits the request to the recipient's bank, known as the "Receiving Depository Financial Institution" (RDFI).

35.     The RDFI then either credits the recipient's account, or in the case of a debit transaction, deducts the amount and sends the money back to Intercept through the ODFI.

36.     Intercept then remits the debit amount back to its client and charges the client a variety of fees for its services.

37.     In a typical transaction that Intercept undertakes on behalf of a lender or debt collector, the client instructs Intercept to withdraw loan repayments from a borrower's bank account, directing Intercept on which bank to contact, the payment schedule to use, and the amount to withdraw. Intercept instructs its bank to contact the borrower's bank to withdraw the money. The borrower's bank debits the account and remits it to Intercept's bank, and Intercept then transfers the money to its client.

38.     Industry rules and guidelines emphasize the responsibility of all ACH participants, including third party payment processors like Intercept, to monitor merchant return rates and other suspicious activity to detect and prevent fraud in the ACH network.

39.     Defendants, however, have processed payments for many clients even in the face of numerous indicators that those clients were engaged in fraudulent or illegal transactions.  Even though they knew or should have known of this illegal behavior, Defendants continued to process for these companies anyway. Defendants have ignored red flags, including concerns from ODFIs about the lawfulness of the transactions Intercept was processing, complaints from consumers, high return rates, and law enforcement actions against its clients. Intercept's due diligence procedures when signing up clients have also been perfunctory, and it has ignored indicia of problems that were revealed through even its minimal due diligence.

**Defendants have failed to heed warnings from banks and consumers.**

40.     Defendants have ignored warnings from ODFIs and consumers that some of Intercept's clients' business activities were likely illegal or that debits were not authorized by consumers.

41.     Intercept's ODFIs have expressed concerns to Intercept, Smith, and Dresser about potential indicia of fraud by certain of Intercept's clients, such as high return rates, discrepancies between the dates and amounts debited from consumers' accounts compared to what the consumer had authorized, changes in lender names from the initial loan agreements with the consumer, and missing telephone scripts for ACH transactions authorized by phone.

42.     For example, an ODFI complained to Defendants that one of its clients, an auto title lender, which was debiting varying amounts from consumers' accounts multiple times, did not have the contractual right or proper consumer authorization to do so, stating that it was "not ok [for the] merchant to us[e] the ACH to 'sneak' attack a consumer's account, [as] it will only draw regulatory attention."

43.     On numerous occasions, Smith and Dresser have been personally involved in responding to Intercept ODFIs when those banks expressed concerns about certain Intercept clients or transactions, including concerns about high transaction volumes, high return rates, loans being made to consumers in states where those loans were illegal, or complaints from consumers that they had not authorized withdrawals.

44.     If an ODFI raised concerns or terminated its relationship with Intercept, Smith and Dresser would find a new ODFI to process on behalf of Intercept for the same clients.  As a result, Intercept had relationships with eight different ODFIs between 2008 and 2014, sometimes processing through three different ODFIs at the same time.

45.     For example, in at least once instance, Intercept entered into a short-term or trial period with an ODFI to process a limited number of transactions through the bank, and then, instead, ran millions of dollars of ACH transactions through the bank, generating high volumes of returns in disputed transactions.

46.     The ODFI was initially reluctant to do business with Intercept due to Intercept's projected transaction volume and historical return rates for certain clients. Defendant Dresser responded to these concerns by urging the bank to continue processing for a trial period, stating that what made Intercept successful was its willingness to do business with companies that others would not, including companies that were not considered "clean business."

47.     The ODFI continued to express concerns about the number of returns generated by Intercept's ACH transactions, which exceeded the terms of their trial period, stating that the bank was receiving thousands of returns per day. The bank further warned Defendants that the return percentages were so high they could trigger an audit.

48.     Defendants did not investigate these concerns or re-evaluate their relationships with these clients. Instead, Dresser responded to the ODFI's concerns with assurances that Intercept was working to transition the same clients to another group of ODFIs.

49.      The bank later terminated its relationship with Intercept in part because of these high return rates. Yet, Defendants still did not investigate these concerns or re-evaluate their relationships with these clients; instead, they found a new ODFI to help them process these transactions.

50.     Consumers have also complained about Defendants' processing activities.

51.     One of Intercept's ODFIs received over 600 calls from consumers between June

and August 2012 complaining about Intercept's withdrawals from their personal accounts.

52.     At another ODFI, consumers disputed that they had authorized withdrawals on over 1,800 transactions initiated by Intercept between 2011 and 2014. These ODFIs brought these issues to Defendants' attention, but Intercept, Smith, and Dresser failed to conduct any meaningful investigation, or take any meaningful action, in response.

53.     For example, in May 2013, consumers residing in Georgia—a jurisdiction with strict regulations that effectively ban payday lending—disputed debits initiated by Defendants on behalf of short-term small dollar lenders at least 87 times. These complaints should have caused Defendants to investigate further, especially since Defendants had already learned in 2012 that one of their clients was ordered by the State of Georgia to cease and desist its payday lending activities. Defendants nevertheless failed to take any action to investigate or address the consumer disputes, including inquiring whether the relevant loans were illegal under Georgia law.

54.     Similarly, in May 2013, 346 Arkansas consumers complained to an ODFI about Intercept's consumer loan debits. Defendants took no action in response to this red flag. Again, if they had, they might have learned that consumer lending is strictly regulated in Arkansas such that some or all of the debits they were processing for the lenders that were the subjects of these complaints were illegal.

55.     Despite all of these warning signs from ODFIs and consumers, Defendants continued payment processing for these clients without investigation or consequence.

56.     Unlike Defendants, consumers lacked access to warning signs about Intercept's clients, such as  concerns expressed by ODFIs and other consumers.

**Defendants have failed to adequately monitor and respond to high return rates.**

57.     Defendants have also ignored the enormously high rates at which consumers and consumers' banks refused Intercept clients' attempts to withdraw payments.

58.     Many of the transactions Intercept processed on behalf of various lender and debt collector clients generated unusually high return rates.

59.     Transactions may be returned for a variety of reasons. For instance, a transaction may be returned due to insufficient funds in a consumer's account, invalid or closed accounts, or when a consumer explicitly rejects the transaction because he or she did not authorize it (known as "unauthorized" returns).

60.     A high number of returns, whether unauthorized or otherwise, for any particular client can be indicative of illegal or fraudulent activity surrounding the underlying transaction.

61.     NACHA, the trade association governing the use of the ACH system, establishes standards regarding return rates.

62.     NACHA assigns a code for each type of return and tracks the percentage of transactions returned for each code, as well as the percentage of all returned transactions for merchants, processors, and ODFIs using the ACH system—known as the "overall" return rate. High rates of return for certain individual return categories, such as "unauthorized" or "insufficient funds," as well as high "overall" return rates, are important indicators of potential fraud, deception, or illegality underlying a transaction.

63.     The NACHA rules and guidelines emphasize the responsibility of all ACH participants to monitor merchant return rates and other suspicious activity to detect and prevent fraud in the ACH network.

64.     For example, until September 2015, NACHA prohibited merchants from using the ACH system if they generated returns categorized as "unauthorized" in excess of 1%. NACHA recently reduced the "unauthorized" returns limit from 1% to 0.5%, and set a limit on overall returns of 15%.

65.     Many of Intercept's clients' unauthorized returns have generally hovered just at or below 1%, but only because Intercept created a program called "Xcelerated Returns" that stopped certain withdrawal attempts before they reached the ACH system, thereby shielding their clients from scrutiny for excessive return rates.

66.     Xcelerated Returns is a fee-based service that compares any new ACH transactions initiated by Intercept's clients with a database of transactions previously returned as "unauthorized."

67.     If a consumer's account number matches the account number of a transaction previously returned as unauthorized, Intercept will prevent the transaction from being processed through the ACH network, if so instructed by the client.

68.     Intercept then tracks what the client's unauthorized return rate would have been had the Xcelerated Returns program not identified the transaction and Intercept not prevented the transaction from occurring.

69.     Many times, the unauthorized return rate would have exceeded 1%, but for the Xcelerated Returns program.

70.     For example, one Intercept client generated unauthorized returns of just below or slightly over 1% in 2011 and 2012, respectively. But, without the Xcelerated Returns program, this client's true unauthorized return rate would have been 4.3% and 2.47% during this time period. Thus, Defendants knew that this client was attempting to process an unusually high rate of unauthorized transactions.

71.     Defendants did not take any appreciable steps to investigate or terminate their relationship with clients like this with high unauthorized return rates. In fact, Intercept used Xcelerated Returns to shield problem clients from excessive return rates so that it could continue processing for those clients and earning fees.

72.     If a client's true unauthorized return rate was over 1%, Intercept would simply request that the client reduce the rate during an annual review process, and increase the client's reserve amount deposited with Intercept. The increased reserve would protect Defendants from potential losses but would do nothing to protect consumers from fraud, theft, or other illegal conduct.

73.     This request would be repeated the following year if the client had not reduced its return rate.

74.     Defendants also have failed to investigate or terminate relationships with clients in response to high <u>overall</u> return rates.

75.     Returned transactions that are the result of a lack of consumer authorization often are characterized by consumers as reasons other than "unauthorized." For example, an unauthorized debit can be returned by the consumer's bank if the consumer's bank account has insufficient funds, if the bank account is closed or does not exist, or if the bank account number is invalid.

76.     In 2012, the average overall return rate for the payment processing industry was 1.5%.

77.     During the same time period, many of Intercept's clients generated annual overall return rates of 20% to 40%, over twenty times the industry average. On a monthly basis, some Intercept clients even experienced return rates as high as 70% to 80%.

78.     During this same time period, Intercept itself generated overall return rates as high as 21% for all of its payment processing activities combined—well in excess of industry averages of 1.5%.

79.     At one ODFI, Intercept's return activity represented from a quarter to over a third of all the return activity for all of that ODFI's clients in 2011 and 2012.

80.     Defendants, however, did little to address or respond to Intercept's above-average return rate or the high overall or unauthorized rates of its clients other than to limit Intercept's exposure by increasing clients' reserve requirements.

81.     Despite these warning signs, Defendants continued to process for clients with high rates of return without further inquiry or investigation. In fact, because Defendants charged higher fees for returned transactions, these returns represented a substantial source of income for Defendants.

82.     Unlike Defendants, consumers lacked knowledge of Intercept's clients' unusually high return rates and Defendants' efforts to shield their problem clients from scrutiny.

**Defendants have ignored law enforcement activity relating to its clients.**

83.     Defendants have ignored red flags, such as government law enforcement activity relating to its clients, failed to take action in response to learning about state and federal law enforcement actions against its clients, and continued to process for these clients despite this knowledge.

84.     For example, Defendants learned in the spring of 2012 that the FTC had filed a lawsuit against Scott Tucker (Tucker), AMG Services, Inc.,  and other related individuals and entities (collectively AMG) for unlawfully withdrawing undisclosed and inflated fees from consumers' accounts, unlawfully conditioning payday loans on recurring access to consumers' bank accounts so AMG could automatically initiate withdrawals, and then

engaging in illegal practices to collect on these loans, such as threatening consumers with lawsuits, arrest, and imprisonment. The FTC's lawsuit also alleged that AMG operated under a sham ownership structure, purporting to be owned and controlled by Native American tribes, in an effort to evade state and federal law.

85.    The FTC alleged that AMG misrepresented the total payments that AMG would withdraw to satisfy a loan, telling consumers that their payments would be withdrawn when the loan was due, when, in reality, AMG would initiate multiple withdrawals on multiple occasions and assess a new finance charge every time. According to documents filed by the FTC, AMG's illegal tactics had generated more than 7,500 complaints to law enforcement authorities over the previous five years.

86.    Defendants knew about this lawsuit in the spring of 2012. Tucker even personally provided court filings directly to Defendant Smith and other Intercept employees as early as July 2012.

87.    But although Defendants processed withdrawals described in the FTC suit for AMG, and knew AMG had been experiencing extremely high return rates, they took no meaningful steps to look into this client's business practices after the FTC filed suit. They similarly failed to investigate these red flags after the court entered a preliminary injunction against AMG in December 2012. That order, among other things, barred AMG from making false claims about what it was withdrawing from consumers' accounts and when those withdrawals would occur.

88.    In fact, Defendants Smith and Dresser were on notice of AMG's efforts to evade the law through the pretense of tribal ownership as early as 2011. For example, in September 2011, Dresser, Smith, and Intercept's Vice-President of Risk Management discussed a 2011 CBS investigative report on AMG's lending practices, including its use

of tribal affiliations to evade state laws against payday lending. The Vice-President of Risk Management wrote to Smith and Dresser, "I figured it was probably just a matter of time. *You can run, but you can't hide. Trying to take shelter behind a tribe, in my opinion, was just kind of a band-aid and wouldn't provide a long-term solution.*" Mr. Smith responded, "*True.* The article isn't totally accurate. In the end [the consumer] borrowed 400 and paid 495." (Emphases added).

89.     Notwithstanding this fact, Defendants continued to process for AMG and even submitted multiple ACH application requests to banks, identifying tribal entities as the owners of the AMG companies.

90.     Defendants were also aware of various state law enforcement actions involving their clients.

91.     For example, in 2012, Intercept learned that one of its clients was the subject of a cease and desist order from the State of Georgia regarding its consumer lending activities.

92.     In response to learning about the cease and desist order, Intercept's Vice President of Risk Management wrote, "[s]eems as though the more information we ask for, the more information we receive that I would prefer not knowing!!! Thus, the old saying be careful what you ask for!'"

93.     Despite its knowledge of the order, Defendants continued to process for this client without taking any meaningful steps to investigate the company's activities or prevent it from processing ACH transactions to Georgia consumers through Intercept.

94.     At the same time, the client continued to experience astronomically high monthly return rates ranging from 40% to 80%. Yet, Defendant still did not investigate the client's business activities or re-examine their relationship with the client.

16

95.     The State of Maine issued cease and desist orders to at least two other Intercept clients in 2011 and 2012. These publically-issued orders required the clients to immediately stop payday lending in Maine until properly licensed, to reimburse Maine consumers for any fees or interest collected, and to pay the cost of the investigation.

96.     Notwithstanding these orders, Defendants did not look into these companies' activities or prevent these clients' transactions with Maine consumers from being processed.

97.     Moreover, despite these cease and desist orders, Defendants did not change Intercept's due diligence procedures generally to inquire about whether clients' lending activities were lawful in the states where Intercept processed ACH transactions on their behalf.

**Defendants have failed to investigate red flags during the application process.**

98.     Defendants have ignored red flags apparent during the client application process that should have caused it to conduct further investigation or perform enhanced due diligence prior to accepting a client for processing.

99.     Intercept's application process was perfunctory. Rarely did it probe deeper in response to any information learned as part of the application process.

100.    For example, as part of its application process, Intercept would search a prospective client's name on a variety of internet databases.

101.    Troubling information Defendants learned from these sources frequently did not stop them from processing for those clients. For example, when Defendants learned about the FTC enforcement action against Tucker and AMG, they did not reassess their relationship with this client or investigate the activities of these entities further.

102.    Similarly, although Intercept's procedure is to review Better Business Bureau (BBB) ratings and complaints, such reviews rarely if ever triggered further investigation into the reasons or sources of the complaints or poor ratings.

103.    For example, many of Intercept's payday lending clients received an "F" rating from the BBB. In response to concern expressed by one of its ODFIs about poor BBB ratings, Intercept's Vice-President of Risk Management responded "My first thought about the BBB is that isn't every payday lender rated an F? I don't think this is unusual." Yet Defendants' standard practice was to not investigate or follow-up with clients when faced with evidence of poor BBB ratings to determine whether these clients were, in fact, engaged in illegal behavior.

104.    Intercept asked for basic information about the types of goods and services its clients provided to consumers, but did not request information designed to elicit whether such goods or services were lawful.

105.    Intercept did not require copies of a merchant's policies and procedures to ensure compliance with federal and state laws and regulations. Intercept would not ask for a description of loan terms, fees charged to consumers, a list of the web addresses used by the lender or lead generator, or whether a consumer lender possessed the requisite state lending licenses. This type of information would have alerted Intercept to possible fraudulent or illegal activity by its clients.

106.    Despite the presence of numerous red flags about its clients, Intercept did not begin to alter its application process to seek additional information until late 2012.

107.    For example, prior to 2012, Intercept did not ask about the states in which its consumer lender clients did business, whether lending on the offered terms was allowed in those states, or whether they possessed the requisite state lending licenses in those

states, even when the client provided loan agreements that included triple or quadruple digit APRs. And even when Intercept did begin collecting more information during its application process, in numerous instances, it ignored indicia of illegality in those materials.

108.    If Intercept's due diligence revealed that a lender was unlicensed, that should have been a red flag that prompted further inquiry.

109.    But Intercept's policy was to not take further steps even though it was simultaneously on notice of complaints about unlicensed and unlawful lending and other problems with its current clients from ODFIs, consumers, and law enforcement.

110.    In fact, red flags discovered during the application process and yearly review process seemed to have next to no impact on Intercept's business decisions at all.

111.    Instead, Intercept's decision to accept a new client, or continue processing for an existing client, was based entirely on a "risk assessment" known as the "5 Star-Risk Level Rating."

112.    The sole stated purpose of this underwriting exercise was to assist Intercept in determining a client's ability to pay in the event of a loss.

113.    Intercept did not include in its 5 Star-Risk Level Rating indicators of fraud or illegal activity such as consumer disputes, poor BBB ratings, state or federal law enforcement actions, high return rates, rates of requests for proofs of authorization, or the failure to supply satisfactory information in the company's application. Intercept would frequently assign high ratings to clients with high returns, "F" ratings from the BBB, or who were subject to law enforcement activity related to their underlying business. For example, Intercept assigned a rating of 4 out of 5 stars to a company,

whose unauthorized return rate was over 1%, noting that "the reserve is way more than sufficient."

## Role of Individual Defendant Smith

114.    In his role as president of Intercept, Smith has also individually engaged in unfair acts and practices by actively ignoring numerous red flags related to Intercept's payment processing activities and substantially assisting Intercept in its commission of unfair acts and practices by continuing to process ACH transactions in the face of indicia of fraud and illegality on the part of numerous clients.

115.    Smith has been materially involved in Intercept's day-to-day business operations and client and banking relationships, and has been aware of the numerous red flags raised by Intercept's clients' business activities, including high return rates, warning from banks, consumer complaints, and law enforcement actions.  In response, Smith did not meaningfully investigate or re-evaluate the relationships with these clients, but rather actively ignored this information, tried to allay the banks' concerns, and when that did not work, entered into new ODFI arrangements so that Intercept could continue processing payments for these clients.

116.    Smith has received personal financial gain from the illegal practices discussed herein. As a 50% shareholder in Intercept, Smith has received millions of dollars in distributions from the revenue generated by Intercept's payment processing activities.

**Role of Individual Defendant Dresser**

117.     In his role as CEO of Intercept, Dresser has also individually engaged in unfair

acts and practices by actively ignoring numerous red flags related to Intercept's payment

processing activities and substantially assisting Intercept in its commission of unfair

acts and practices by continuing to process ACH transactions in the face of indicia of

fraud and illegality on the part of numerous clients.

118.     Dresser has been materially involved in Intercept's day-to-day business

operations, client and banking relationships and has been directly aware of and on

notice of the numerous red flags raised by Intercept's clients' business activities,

including high return rates, warning from banks, consumer complaints, and law

enforcement actions.  In response, Dresser did not meaningfully investigate or re-

evaluate the relationships with these clients, but rather actively ignored this

information, tried to allay the banks' concerns, and when that did not work, entered into

new ODFI arrangements so that Intercept could continue processing payments for these

clients.

119.     Dresser has received personal financial gain from the illegal practices discussed

herein. As a 50% shareholder in Intercept, Dresser has received millions of dollars in

distributions from the revenue generated by Intercept's payment processing activities.

**Violations of the Consumer Financial Protection Act**

120.     The CFPA prohibits covered persons or service providers from engaging "in any

unfair, deceptive, or abusive act or practice." 12 U.S.C. §§ 5531, 5536(a)(1)(B). An act or

practice is unfair if the act or practice causes or is likely to cause substantial injury to

consumers, which is not reasonably avoidable by consumers, and such substantial injury

is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. § 5531(c).

121.    Section 1054(a) of the CFPA grants the Bureau authority to commence a civil action against any person who violates a federal consumer financial law. 12 U.S.C. § 5554(a). The CFPA is a federal consumer financial law. 12 U.S.C. § 5481(14).

122.    Under the CFPA, a "related person" is deemed to mean a covered person. A related person is:

> (i) any director, officer, or employee charged with managerial responsibility for, or controlling shareholder of, or agent for, such covered person; (ii) any shareholder, consultant, joint venture partner, or other person, as determined by the Bureau (by rule or on a case-by-case basis) who materially participates in the conduct of the affairs of such covered person; and (iii) any independent contractor (including any attorney, appraiser, or accountant) who knowingly or recklessly participates in any . . . violation of any provision of law or regulation . . . or breach of a fiduciary duty. 12 U.S.C. § 5481(25).

123.    The CFPA defines a "service provider" as "any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service." 12 U.S.C. § 5481(26).

124.    The CFPA further makes it unlawful for any person to knowingly or recklessly provide substantial assistance to a covered person or service provider engaged in unfair, deceptive, or abusive acts or practices; the provider of substantial assistance is deemed in violation of the law to the same extent as the person to whom such assistance is provided. 12 U.S.C. § 5536(a)(3).

125.    Defendants are "covered person[s]," "related person[s]," and/or "service provider[s]" within the meaning of the CFPA. 12 U.S.C. § 5481(6), (25), (26).

### Count I – Unfair Acts and Practices in Violation of the CFPA
### (Intercept Corporation, Bryan Smith, and Craig Dresser)

126.    The Bureau incorporates by reference the allegations contained in paragraphs 1 through 125 of this Complaint.

127.    In numerous instances, Defendants ignored warnings from industry, consumers, and law enforcement that their clients were engaged in illegal or fraudulent activities and failed to conduct reasonable due diligence to detect the unlawful conduct.

128.    Defendants' acts and practices in processing transactions to consumers' bank accounts as described above caused, or were likely to cause, substantial injury to consumers that is not reasonably avoidable by consumers and was not outweighed by countervailing benefits to consumers or to competition.

129.    Defendants' acts and practices, therefore, constitute unfair acts or practices in violation of the CFPA, 12 U.S.C. § 5531(a) and (c)(1), and 5536(a)(1)(B).

### Count II – Substantial Assistance in Intercept's Unfair Acts and Practices
### (Bryan Smith and Craig Dresser)

130.    The Bureau incorporates by reference the allegations contained in paragraphs 1 through 125 of this Complaint.

131.    Under the CFPA, it is unlawful for any person to "knowingly or recklessly provide substantial assistance to a covered person or service provider in violation of the provisions of section 1031, or any rule or order issued thereunder." 12 U.S.C. § 5536(a)(3).

132.    Defendant Smith and Defendant Dresser have provided substantial assistance to Defendant Intercept's unlawful conduct by establishing, directing, and managing

Intercept's operations, including managing client and banking relationships, and exercising substantial control over Intercept's operations on a day-to-day basis.

133.    Smith and Dresser knowingly or recklessly have provided this substantial assistance by continuing to maintain relationships with, and process transactions for, clients when they knew about warnings from industry, consumers, and law enforcement that the clients were engaged in fraud or illegal activity, knew about the risk of harm to consumers, or knew facts that made the risk of harm obvious.

134.    Therefore, Defendant Defendants Smith and Dresser knowingly or recklessly provided substantial assistance to Intercept, a covered person and service provider engaged in unfair acts and practices, in violation of the CFPA, 12 U.S.C. § 5536(a)(3).

### Consumer Harm

135.    Defendants have caused consumers substantial monetary loss by debiting money from consumers' bank accounts on behalf of clients engaged in unlawful practices.

136.    In addition to these debits, consumers have also incurred or were likely to incur other costs, such as the costs associated with closing accounts, paying overdraft fees, covering bounced checks, opening new accounts, and ordering new checks.

137.    Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the CFPA. Consumers could not have reasonably avoided this injury.

138.    In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public.

## This Court's Power to Grant Relief

139.    The CFPA empowers this Court to grant any appropriate legal or equitable relief including, without limitation, a permanent or temporary injunction, rescission or reformation of contracts, the refund of moneys paid, restitution, disgorgement or compensation for unjust enrichment, payments of damages or other monetary relief, limits on the activities or functions of Defendants, and civil money penalties. 12 U.S.C. § 5565(a), (c). In addition, the Bureau may recover its costs in connection with the action, if it is the prevailing party. 12 U.S.C. § 5565(b).

## Prayer for Relief

The Bureau requests that the Court:

      a.  Permanently enjoin Defendants from committing future violations of the  CFPA, 12 U.S.C. §§5531 and 5536;

      b.  Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the CFPA, including, but not limited to, refund of moneys paid, restitution, disgorgement or compensation for unjust enrichment, and payment of damages;

      c.  Grant such other injunctive relief as appropriate;

      d.  Impose civil money penalties against the Defendants;

      e.  Order Defendants to pay Plaintiff's costs and fees incurred in connection with prosecuting this action; and

      f.   Award additional relief as the Court may deem just and proper.

Dated: June 6, 2016

                                      Respectfully submitted,

                                      Attorneys for Plaintiff
                                      Consumer Financial Protection Bureau

                                      ANTHONY ALEXIS
                                      Enforcement Director

                                      CARA PETERSEN
                                      Deputy Enforcement Director For
                                      Litigation

                                      JAMES T. SUGARMAN
                                      Assistant Litigation Deputy

                                      Jenelle Dennis
                                      Enforcement Attorney
                                      1700 G Street NW
                                      Washington, DC 20552
                                      202-435-9118
                                      jenelle.dennis@cfpb.gov

                                      */s/ Kirsten Ivey-Colson*
                                      Kirsten Ivey-Colson
                                      Enforcement Attorney
                                      1700 G Street NW
                                      Washington, DC 20552
                                      202-435-7354
                                      kirsten.ivey-colson@cfpb.gov

                                      Richa Shyam Dasgupta
                                      Enforcement Attorney
                                      1700 G Street NW
                                      Washington, DC 20552
                                      202-435-7549
                                      richa.dasgupta@cfpb.gov