**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

**Eastern Division**

| | | |
|---|---|---|
| Consumer Financial Protection Bureau, | : | |
| | : | |
| | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 16-144 |
| | : | |
| Intercept Corporation d/b/a Intercept EFT, | : | |
| Bryan Smith, and Craig Dresser, | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE COMPLAINT**

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION .................................................................................. 1

II.    ALLEGATIONS OF THE COMPLAINT.............................................. 3
    A.    Intercept and its Founders .......................................................... 3
    B.    The Bureau's Claims ................................................................... 4

III.   LEGAL STANDARD ........................................................................... 5

IV.   ARGUMENT ....................................................................................... 6
    A.    The Bureau's Claims Are Time-Barred Under the CFPA's Three-Year
        Statute of Limitations ................................................................. 6

        1.    Defendants' Statute of Limitation Defense Is Properly Asserted at
            this Stage of the Litigation .............................................. 6

        2.    The Bureau Claims Accrued No Later than November 2012 and
            are Accordingly Time-Barred .......................................... 7

            (a)    Possession of the Facts Establishing a Violation of the
                  CFPA Represents "Discovery" of the Violation.......................... 10

            (b)    The Bureau is Charged with the FTC's Knowledge of the
                  Facts Establishing Defendants' Purported CFPA Violations ....... 12

    B.    The Complaint Must be Dismissed Because it Fails to Allege the
        Necessary Elements of an Unfairness Claim under the CFPA ............................ 16

        1.    The Complaint Fails to Articulate the "Illegal and Fraudulent"
            Products and Services of Intercept's Merchants, a Necessary
            Predicate to Meeting its Burden of Alleging "Substantial
            Consumer Injury"............................................................ 17

        2.    The Bureau's Complaint Fails to Allege that the Products and
            Services Extended by Intercept's Merchants were "Offered or
            Provided for Use by Consumers Primarily for Personal, Family, or
            Household Purposes"........................................................ 21

        3.    The Complaint Must be Dismissed Because it Fails to Plausibly
            Allege that Consumers Could Not Reasonably Avoid Injury.................. 23

            (a)    The "Reasonable Avoidance" Requirement Prohibits
                  Bureau Intervention into Transactions Subject to Market
                  Forces ............................................................................ 24

            (b)    The Bureau Fails to Allege that Consumers Could Not
                  Have Reasonably Avoided their Alleged Injuries ....................... 25

**Page**

C.    The Complaint Must be Dismissed Because the Bureau Fails to Allege that Intercept, Smith, and Dresser are "Covered Persons," "Service Providers," or "Related Persons" under the CFPA ............................ 27

    1.    Intercept is neither a Covered Person nor a Service Provider ................ 27

    2.    Smith and Dresser are neither "Covered Persons" nor "Related Persons" ................................................................................ 30

D.    Count Two Must be Dismissed Because the Complaint Fails to Plausibly Allege that Smith and Dresser Substantially Assisted Intercept's Purported Violation of the CFPA. ....................................................................... 32

    1.    The Bureau Has Failed to Plausibly Allege that Smith and Dresser Acted with the Required Mens Rea ........................................... 32

    2.    The Bureau Has Failed to Plausibly Allege that Smith and Dresser Substantially Assisted Intercept in Committing a CFPA Violation.......... 37

E.    The Bureau is Unconstitutionally Composed, and so it Lacks the Authority to Bring this Enforcement Action ......................................................... 38

    1.    Standard of Review ..................................................................... 39

    2.    The Bureau's Unconstitutional Structure ..................................... 39

        (a)    Lack of Multi-Member Commission Moderating Influence ........ 39

        (b)    Lack of Presidential Oversight .................................................. 40

        (c)    Lack of Congressional Oversight ............................................... 42

V.    CONCLUSION .............................................................................. 45

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Aiken Cnty.*, 645 F.3d 428 (D.C. Cir. 2011) .......................................................................41

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................3, 5, 22, 31

*Banks v. John Deere & Co.*, No. 13-2088, 2014 U.S. Dist. LEXIS 42286 (N.D. Iowa Mar. 27, 2014) ..........................................................................................................................7

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................................19, 20

*Bonhomme Inv. Partners, LLC v. Hayes*, No. 13-475, 2015 U.S. Dist. LEXIS 148055 (E.D. Mo. Nov. 2, 2015) ................................................................................................35

*Brookins Hybrid Drive Sys., LLC v. M.A.C., Inc.*, No. 12-101, 2013 U.S. Dist. LEXIS 65419 (D.N.D. May 2, 2013) ................................................................17, 21, 23, 24

*C.H. Robinson Worldwide, Inc. v. Lobrano*, 695 F.3d 758 (8th Cir. 2012) ....................................7

*Camp v. Dema*, 948 F.2d 455 (8th Cir. 1991) ................................................................34, 37, 38

*Cash Advance & Preferred Cash Loans v. Colo. ex rel. Suthers*, 242 P.3d 1099 (Colo. 2010) ...............................................................................................................19, 36

*Catipovic v. Turley*, No. 11-3074, 2012 U.S. Dist. LEXIS 79824 (N.D. Iowa June 8, 2012) ..........................................................................................................................23

*CFPB v. Accrediting Council for Independent Colleges & Schools*, 15-1838, 2016 U.S. Dist. LEXIS 53644 (D.D.C. Apr. 21, 2016) ................................................................29, 43

*CFPB v. ITT Educ. Servs.*, No. 14-292, 2015 U.S. Dist. LEXIS 28254 (S.D. Ind. Mar. 6, 2015) ...............................................................................................5, 15, 23, 24, 26

*CFPB v. Universal Debt & Payment Solutions, LLC*, No. 15-0859 (N.D. Ga. Sept. 1, 2015) ("*Universal Debt* Order") ................................................................28, 32, 33, 34, 37

*City of Arlington v. FCC*, 133 S. Ct. 1863 (2013) ........................................................................38

*Cobb v. JPMorgan Chase Bank, N.A.*, No. 13-1955, 2013 U.S. Dist. LEXIS 169311 (N.D. Cal. Nov. 27, 2013) ................................................................................................8

*Davis v. HSBC Bank*, 691 F.3d 1152 (9th Cir. 2012) ................................................................27

*Erlenbaugh v. United States*, 409 U.S. 239 (1972) ....................................................................33

Page(s)

*Erler v. Graham Packaging*, No. 14-931, 2014 U.S. Dist. LEXIS 160773 (E.D. Mo. Nov. 17, 2014) .................................................................................................................7

*FDIC v. First Interstate Bank, N.A.*, 885 F.2d 423 (8th Cir. 1989)...............................38

*Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010) ..............................................................................................39, 40, 41, 43

*FTC v. Bonnie & Co. Fashions, Inc.*, No. 90-4454, 1992 U.S. Dist. LEXIS 18764 (D.N.J. Sept. 28, 1992) ...........................................................................................14

*FTC v. IFC Credit*, 543 F. Supp. 2d 925 (N.D. Ill. 2008) .............................................27

*FTC v. Wells*, 385 F. App'x 712 (9th Cir. 2010) ..........................................................13

*Gabelli v. SEC*, 133 S. Ct. 1216 (2013) .......................................................................12

*Hamilton v. Palm*, 621 F.3d 816 (8th Cir. 2010) ..........................................................23

*Humphrey's Executor v. United States*, 295 U.S. 602 (1935) .......................................41

*iCARD Stored Value Solutions, L.L.C. v. W. Suburban Bank*, No. 07-1539, 2008 U.S. Dist. LEXIS 16127 (E.D. Mo. Mar. 3, 2008) ...........................................19

*J.R. Simplot Co. v. Campbell*, No. 06-0007, 2007 U.S. Dist. LEXIS 75860 (D.N.D. Oct. 11, 2007) ...............................................................................................26

*K & S Partnership v. Continental Bank, N.A.*, 952 F.2d 971 (8th Cir. 1991)...............37

*Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994)......................................................15

*Levy v. Ohl*, 477 F.3d 988 (8th Cir. 2007) ....................................................................8

*Lustgraaf v. Behrens*, 619 F.3d 867 (8th Cir. 2010) ...............................................5, 17

*Merck & Co. v. Reynolds*, 559 U.S. 633 (2010) ...............................................10, 11, 12

*Metge v. Baehler*, 762 F.2d 621 (8th Cir. 1985) ..........................................................37

*Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928 (8th Cir. 2012)........................5

*Molosky v. Wash. Mut. Inc.*, 664 F.3d 109 (6th Cir. 2011)...........................................15

*Morrison v. Olson*, 487 U.S. 654 (1988) .............................................................39, 41

*Myers v. United States*, 272 U.S. 52 (1926)................................................................40

*Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414 (1990) ....................................42

Page(s)

*Parastino v. Conestoga Tel. & Tel. Co.*, No. 99-679, 1999 U.S. Dist. LEXIS 12818 (E.D. Pa. Aug. 18, 1999) .................................................................................................7

*People v. Miami Nation Enters.*, 166 Cal. Rptr. 3d 800 (Cal. Ct. App. 2014) .......................19, 36

*S&E Contrs. v. United States*, 406 U.S. 1 (1972) .........................................................12

*SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015).....................................34

*SEC v. Cohen*, No. 05-371, 2007 U.S. Dist. LEXIS 28934 (E.D. Mo. Apr. 19, 2007) ...............37

*SEC v. Morriss*, No. 12-80, 2012 U.S. Dist. LEXIS 151885 (E.D. Mo. Sept. 21, 2012).............38

*SEC v. Prince*, 942 F. Supp. 2d 108 (D.D.C. 2013) .......................................................35

*SEC v. Shanahan*, 646 F.3d 536 (8th Cir. 2011)..............................................34, 35, 36

*Smithrud v. City of St. Paul*, 746 F.3d 391 (8th Cir. 2014)...............................................6

*Solid Comfort, Inc. v. Hatchett Hospitality Inc.*, 2013 N.D. 152, 836 N.W.2d 415 ...................31

*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) ............................................................20

*State of Colorado v. Cash Advance*, No. 05-1143 (Denver Dist. Ct. Feb. 18, 2012) ...................19

*In re Strategic Labor, Inc.*, 467 B.R. 11 (Bankr. D. Mass. 2012) ...................................8

*Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843 (8th Cir. 2014) ..............................16, 21

*Tweed v. Schuetzle*, No. 06-32, 2007 U.S. Dist. LEXIS 50661 (D.N.D. July 12, 2007).........17, 20

*United States v. $515,060.42 in United States Currency*, 152 F.3d 491 (6th Cir. 1998)..............13

*United States v. Dean*, 823 F.3d 422 (8th Cir. 2016)....................................................8

*United States v. Twenty-Seven Parcels of Real Prop.*,

236 F.3d 438 (8th Cir. 2001) .........................................................................10, 12

*Varner v. Peterson Farms*, 371 F.3d 1011 (8th Cir. 2004)..............................................6

**STATUTES AND CONSTITUTIONS**

12 U.S.C. § 5481 ..................................................3, 21, 22, 27, 28, 29, 30, 31, 38, 39

12 U.S.C. § 5491 ..................................................................29, 39, 40, 43

12 U.S.C. § 5497 ..................................................................................42

Page(s)

12 U.S.C. § 5514 ...............................................................................................14

12 U.S.C. § 5531 ..................................................1, 13, 18, 21, 23, 25, 27

12 U.S.C. § 5536 .................................................1, 13, 22, 27, 32, 33, 34, 35

12 U.S.C. § 5564 ..................................................2, 6, 9, 11, 12, 14, 38

12 U.S.C. § 5565 ..................................................................................................2

15 U.S.C. § 45 ...........................................................................................13, 25

15 U.S.C. § 57b ...............................................................................................14

15 U.S.C. § 78t ...............................................................................................33

15 U.S.C. § 1692d ...........................................................................................17

15 U.S.C. § 1692e ...........................................................................................17

15 U.S.C. § 1692g ...........................................................................................17

28 U.S.C. § 1658 ...........................................................................................10

28 U.S.C. § 2462 ...........................................................................................14

RULES

Federal Rule of Civil Procedure 8 ................................................................3, 19, 20

Federal Rule of Civil Procedure 12 ...........................................................5, 7, 17

Federal Rule of Evidence 201 ................................................................................8

COURT DOCUMENTS

Amended Complaint, *FTC v. AMG Services, Inc.*, No. 12-536 (D. Nev. Apr. 12, 2013) .........9, 18

Complaint, *CFPB v. Corinthian Colleges, Inc.*, No. 14-7194 (N.D. Ill. Sept. 16, 2014).............15

Complaint, *CFPB v. Universal Debt & Payment Solutions, LLC, et al.*, No. 15-0859
(N.D. Ga. Mar. 26, 2015) ("*Universal Debt* Compl.") ....................................................13, 17

Complaint, *Intercept Corp. v. CFPB*, No. 16-118 (D.N.D. May 19, 2016) ................................11

Complaint, *FTC v. AMG Services, Inc.*, No. 12-536 (D. Nev. Apr. 2, 2012)................................18

Defendants' Motion to Dismiss, *CFPB v. Hanna & Associates*, No. 14-2211 (N.D. Ga.
Oct. 3, 2014) ................................................................................................15

Page(s)

Order, *PHH Corp. v. CFPB*, No. 15-1177 (D.C. Cir. Apr. 4, 2016) ............................................44

Petitioners' Opening Brief, *PHH Corp. v. CFPB*, No. 15-1177 (D.C. Cir. Sept. 28, 2015) .........40

Transcript of Oral Argument, *PHH Corp. v. CFPB*, No. 15-1177 (D.C. Cir. Apr. 12, 2016) .....................................................................................................................40, 44

**ADMINISTRATIVE MATERIALS**

Bureau's Opposition to Respondent's Motion to Dismiss, *In the Matter of Integrity Advance LLC*, CFPB No. 2015-0029 (Jan. 15, 2016) ......................................................11, 12

Decision of the Director, *In re PHH Corporation*, 2014-CFPB-0002 (June 4, 2015) .................40

Order Denying Motion to Dismiss, *In the Matter of Integrity Advance*, CFPB No. 2015-0029 (Apr. 22, 2016). ..........................................................................................................12

**OTHER AUTHORITIES**

*About NACHA*, NACHA.ORG, https://www.nacha.org/about (last visited Aug. 5, 2016)...............4

Consumer Financial Protection Bureau, *CFPB Supervision and Examination Manual* (Oct. 2012) ............................................................................................................................25

Consumer Financial Protection Bureau, *The CFPB Strategic Plan, Budget, and Performance Plan and Report* (Feb. 2016), *available at* http://files.consumerfinance.gov/f/201602_cfpb_report_strategic-plan-budget-and-performance-plan_FY2016.pdf...................................................................................42

Federal Trade Commission, *FTC Policy Statement on Unfairness* (Dec. 17, 1980) .........24, 25, 26

J. Howard Beales III, *The FTC's Use of Unfairness Authority: Its Rise, Fall and Resurrection (2003)*, *available at* https://www.ftc.gov/public-statements/2003/05/ftcs-use-unfairness-authority-its-rise-fall-and-resurrection..............24, 42

Memorandum of Understanding Between The Consumer Financial Protection Bureau and the Federal Trade Commission (Jan. 20, 2012) ...................................................9, 14

NACHA Operating Rules, Article Two, Subsection 2.17.2.2 (2012) ...........................................36

NEW OXFORD DICTIONARY (Oxford Univ. Press 2d ed. 2005)....................................................30

*Our Leadership*, INTERCEPTEFT.COM, https://www.intercepteft.com/leaders.html (last visited Aug. 5, 2016)...............................................................................................................3

## I.      Introduction

Intercept Corporation is a small business that has operated in the Fargo area for nearly twenty-five years.  The company provides payment processing services to a variety of industries, including accounting firms, churches, payroll processors and other businesses, both local and nationwide.  Bryan Smith and Craig Dresser are the founders of the company and serve as its Co-President and Chief Executive Officer, respectively.

As a payment processor, Intercept's responsibility is to facilitate Automated Clearing House ("ACH") transactions—i.e., electronic credit and debit payment requests—between its merchant-customers and the consumers and businesses who contract with these merchants.  It must do so consistent with the Operating Rules published by the National Automated Clearing House Association ("NACHA"), the organization that has overseen the payment processing industry for over forty years.  As befits its ministerial role, Intercept has little visibility into its merchants' business operations and no relationship with its merchants' consumers.

Notwithstanding the foregoing, the Consumer Financial Protection Bureau ("CFPB" or "Bureau") brings the present action against Intercept and its founders claiming, at heart, that Intercept failed to adequately police the activities of certain unspecified merchants, which the Bureau contends defrauded their customers in some unspecified way.  None of these merchants is joined in the Complaint; instead, the Bureau seeks relief from Intercept and its founders alone on the novel theory that Intercept's purported due diligence deficiencies were "unfair" to consumers under the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. §§ 5531, 5536.  The Bureau's position—that it may deploy at whim the crippling remedial

powers of the CFPA[1] to raise *post hoc* challenges to a company's due diligence procedures—is remarkable when one considers that the Bureau did not (because it cannot) allege that NACHA, the regulator actually tasked with policing the ACH system, <u>ever</u> took issue with Intercept's due diligence.

Even more remarkable, however, is that with its Complaint, the Bureau asserts a right to bring an unfairness claim against Intercept nearly four years after the federal government itself declined to challenge Intercept's due diligence procedures under an identical theory, in defiance of the CFPA's three-year statute of limitations. *See* 12 U.S.C. § 5564(g)(1). As the Bureau alleges in its Complaint (or as established in public documents that are attached hereto), in 2012, the Federal Trade Commission ("FTC") brought unfairness and related claims against certain of Intercept's merchants under the FTC Act. At that time, Intercept produced transactional data, due diligence files, internal emails, and other materials relating to its processing for these merchants in support of the government's lawsuit. In short, it produced everything necessary for the FTC to bring an unfairness claim against Intercept for conducting inadequate due diligence should it conclude that such a claim was warranted. The government, however, properly declined to bring such a claim, a result that precludes the Bureau's present effort to revisit that decision long after the CFPA's limitations period has run.

The untimeliness of the Bureau's Complaint is only one of several fatal defects necessitating its dismissal with prejudice. With the sole exception of the merchants implicated in the FTC's lawsuit, the Complaint also fails to identify which of Intercept's more than 68,000 merchants engaged in fraud, and further fails to articulate how these unknown merchants

---

[1] The Bureau's Complaint seeks an array of equitable and legal relief, *see* Compl. at 25, including civil monetary penalties that may amount to $1 million a day per violation. 12 U.S.C. § 5565(c).

defrauded their customers. These seemingly strategic omissions deny Defendants the opportunity to fully mount a legal challenge to the Bureau's theory of liability. They also prevent the Bureau from meeting its Rule 8 obligation to set forth sufficient allegations to make out a plausible unfairness claim, requiring dismissal of the Complaint under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

In addition to these pleading deficiencies, the Complaint fails to assert—in conclusory fashion or otherwise—that Intercept's merchants provided products or services "for use by consumers primarily for personal, family, or household purposes," another required element of an unfairness claim. *See* 12 U.S.C. § 5481(5)(A). The Bureau also improperly seeks to assert jurisdiction over Intercept's activities on the theory that the company is a "covered person" or "service provider," but fails to offer any plausible basis for concluding that Intercept provides products or services directly to consumers, as required of a "covered person," or that its payment processing services represent anything other than "support service of a type provided to businesses generally or a similar ministerial service," which preclude the conclusion that Intercept is a service provider. *See id.* at § 5481(6)(A) & (5) (defining a "covered person") and § 5481(26) (defining a "service provider").

Finally, the Court should dismiss the Complaint on the ground that the Bureau is unconstitutionally structured, in violation of the Constitution's separation of powers mandate, eliminating any authority the Bureau may have to pursue claims under the CFPA.

## II.    Allegations of the Complaint

### A.    Intercept and its Founders

Intercept is a third-party payment processor located in Fargo, North Dakota. Compl. ¶¶ 1, 8. It was founded by Bryan Smith and Craig Dresser in 1993. *Id.* ¶¶ 12, 19; *see also Our Leadership*, INTERCEPTEFT.COM, https://www.intercepteft.com/leaders.html (last

visited Aug. 5, 2016).  The company provides payment processing services to a wide variety of businesses, but also has provided its services to a small number of short-term consumer lenders, auto title lenders, and debt collection companies.  Compl. ¶ 10.  Whatever the identity of its merchant, Intercept's role is very limited.  It accepts from its merchants ACH files that contain payment instructions directing the credit or debit of funds to or from the bank accounts of its merchants' customers.  Intercept then forwards these ACH files to its bank for introduction into the ACH Network.  The payment instructions contained within each ACH file are then forwarded to the banks of the merchants' customers for execution.  *Id.* ¶¶ 26–37.  Intercept has no relationship with its merchants' customers; its sole obligation is to pass along payment requests provided by its merchants and authorized by its merchants' customers.  *Id.*

The ACH network is overseen by NACHA, a not-for-profit organization founded in 1974.  *Id.* at ¶¶ 61–64; *see also About NACHA*, NACHA.ORG, https://www.nacha.org/about (last visited Aug. 5, 2016).  NACHA serves as the regulator of the ACH network and, as such, is responsible for (i) drafting the NACHA Operating Rules that serve as the "legal foundation for the ACH Network" and (ii) enforcing compliance with these Rules.  *Id.*  The Bureau's Complaint suggests that Intercept's alleged due diligence and risk monitoring failures with respect to its merchants and their activities constituted violations of the NACHA Operating Rules, Compl. ¶¶ 38–39; notably, however, the Complaint fails to allege that NACHA itself ever concluded that Intercept violated its Rules.

B.     The Bureau's Claims

The Bureau claims that Intercept and its two founders, Smith and Dresser, engaged in "unfair" acts and practices, in violation of the CFPA by failing to conduct adequate due diligence with respect to an unspecified number of the company's 68,000 merchants, and by failing to sufficiently heed "red flags" suggesting that these merchants may be engaged in

unlawful conduct.  The Bureau further claims that Smith and Dresser "substantially assisted" Intercept's violations of the CFPA.  Compl. ¶¶ 126–134.  Notably, the Bureau does not claim that any of the Defendants engaged in deceptive, abusive or fraudulent conduct in their own right; rather, it contends only that the Defendants failed—in the opinion of the Bureau—to provide the level of due diligence and fraud monitoring required of an ACH processor.  *Id.*

## III.    Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678).  The plausibility of a complaint turns on whether the facts alleged—not legal conclusions, which must be disregarded—allow the Court to draw a "reasonable inference that the defendant[s] are liable for the misconduct alleged."  *Id.*   In deciding Defendants' Motion, the Court may consider the allegations in the Complaint as well as "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned."  *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012) (citations omitted).

Defendants also move for dismissal of the Complaint under Rule 12(b)(1) because the Bureau is an unconstitutional entity that lacks standing to bring this action.  *See infra* Section IV.E; *CFPB v. ITT Educ. Servs.*, No. 14-292, 2015 U.S. Dist. LEXIS 28254, at *14–18 (S.D. Ind. Mar. 6, 2015) (construing defendants' constitutional challenge as one under this rule).

**IV.     Argument**

A.     The Bureau's Claims Are Time-Barred Under the CFPA's Three-Year Statute of Limitations

The CFPA expressly imposes on the Bureau a three-year statute of limitations, which begins to run on the date of the discovery of the violation forming the basis for the Bureau's lawsuit.  *See* 12 U.S.C. § 5564(g)(1) ("Except as otherwise permitted by law or equity, no action may be brought under this title more than 3 years after the date of discovery of the violation to which an action relates.").   As evidenced by the Bureau's own allegations, and documents over which the Court may take judicial notice, it is indisputable that by no later than 2012, the FTC—whose knowledge is imputed to the Bureau—possessed the facts constituting the violations charged in the present Complaint, which was filed on June 6, 2016.  Accordingly, because the Bureau "discovered" Defendants' alleged violations outside the three-year limitations period imposed by the CFPA, its action must be dismissed as time-barred.  *See Smithrud v. City of St. Paul*, 746 F.3d 391, 395–96 (8th Cir. 2014) (affirming dismissal of complaint as time-barred under Fed R. Civ. P. 12(b)(6)).[2]

1.     *Defendants' Statute of Limitation Defense Is Properly Asserted at this Stage of the Litigation*

The statute of limitations defense is properly asserted in a motion to dismiss "when it appears from the face of the complaint itself that the limitation period has run." *Varner v. Peterson Farms*, 371 F.3d 1011, 1016 (8th Cir. 2004).  The Eighth Circuit has interpreted the

---

[2] On April 20, 2016, the Bureau and Intercept entered into an agreement that tolled the limitations period from April 15, 2016 to June 15, 2016 as to Intercept alone ("Tolling Agreement," a true and correct copy of which is attached as Exhibit A).  Smith and Dresser were not parties to the Tolling Agreement, consistent with the Bureau's representations to that point that only Intercept was the subject of its inquiry.  The Tolling Agreement ultimately has no effect on the timeliness of the Bureau's claims against Intercept, as those claims expired at least five months earlier, in November 2015, three years after the government possessed the information supporting its claims in the present suit.  *See infra* Section IV.A.2.

phrase "face of the complaint" as including "public records and materials embraced by the complaint, and material[s] attached to the complaint." *C.H. Robinson Worldwide, Inc. v. Lobrano*, 695 F.3d 758, 764 (8th Cir. 2012) (citations and internal quotation marks omitted) (considering these materials when evaluating the affirmative defense of *res judicata*); *Banks v. John Deere & Co.*, No. 13-2088, 2014 U.S. Dist. LEXIS 42286, at *5–8 (N.D. Iowa Mar. 27, 2014) (applying *C.H. Robinson* to the statute of limitations affirmative defense); *Erler v. Graham Packaging*, No. 14-931, 2014 U.S. Dist. LEXIS 160773, at *7 (E.D. Mo. Nov. 17, 2014) (same).  Significantly, "[b]ecause . . . subpoenas are matters of public record, they may be considered in deciding whether to dismiss under Rule 12(b)(6)." *Parastino v. Conestoga Tel. & Tel. Co.*, No. 99-679, 1999 U.S. Dist. LEXIS 12818, at *4 n.4 (E.D. Pa. Aug. 18, 1999).

       2.    *The Bureau Claims Accrued No Later than November 2012 and are Accordingly Time-Barred*

The Bureau's lawsuit alleges that Defendants committed unfair acts or practices, in violation of the CFPA, by conducting inadequate due diligence and ignoring "red flags" while processing payments for certain of Intercept's merchants, which the Bureau contends were engaged in unlawful activity.  Compl. ¶¶ 2–3.  As factual support for this theory of liability, the Bureau alleges at length that the Defendants were on notice at least as far back as the spring of 2012 that the government (through the FTC) was pursuing a civil enforcement action against a number of Intercept's online consumer lenders—AMG Services, Inc., Red Cedar Services, Inc., MNE Services, Inc. (collectively "the AMG lenders")—yet, notwithstanding this knowledge, "continued to process for AMG." *Id.* ¶¶ 84–89.

The Bureau is correct that Intercept was aware in the summer of 2012 that the FTC was pursuing an action against the AMG lenders.[3]  What is problematic for the timeliness of the Bureau's complaint, however, is that these allegations (and related public documents) also reveal that the *government* was aware by 2012 (if not earlier) that Intercept was processing on behalf of these lenders.   Even more problematically, these materials demonstrate that the government possessed by no later than November 20, 2012 documents concerning: (1) the "due diligence" that Intercept conducted with respect to the AMG lenders; (2) whether Intercept had any knowledge about what the Bureau now classifies as "red flags," including high return rates, customer complaints, and bank and regulator concerns as to its processing for the AMG lenders; and (3) how Intercept responded to those "red flags."   Intercept produced these materials to the FTC in response to a detailed subpoena[4] issued by the agency on September 11, 2012, which sought, in essence, the entirety of Intercept's internal files pertaining to the AMG lenders.  (*See* Ex. B, FTC Subpoena Requests 4, 9.)

Tellingly, while Intercept's internal files were used by the FTC to prosecute a number of unfair or deceptive act and practice ("UDAP") claims under the FTC Act against the

---

[3] The Bureau's other allegations, however, grossly misrepresent the facts, including in particular that Intercept failed to take "meaningful steps to look into [the AMG lenders'] business practices after the FTC filed suit."  Compl. ¶ 87.  Nevertheless, Intercept acknowledges that any dispute with the Bureau's representation of the facts is premature.

[4] Pursuant to Federal Rule of Evidence 201(c)(2), Defendants respectfully request that the Court take judicial notice of the September 11, 2012 subpoena issued to Intercept in connection with the FTC litigation ("FTC Subpoena") and Intercept's certification that it responded to the FTC Subpoena on November 20, 2012, copies of which are attached as Exhibits B and C.  The FTC Subpoena is an indisputably authentic public record and thus not subject to reasonable dispute.  *See Levy v. Ohl*, 477 F.3d 988, 991 (8th Cir. 2007) (court may take judicial notice of court records); *Cobb v. JPMorgan Chase Bank, N.A.*, No. 13-1955, 2013 U.S. Dist. LEXIS 169311, at *16 (N.D. Cal. Nov. 27, 2013) (granting defendants' request to take "to take judicial notice of court documents, including docket reports, complaints, subpoenas, and orders" from prior litigation).  Similarly, the certification, which was provided to the FTC by Intercept at the agency's request, is not subject to reasonable dispute because it is signed under penalty of perjury.  *United States v. Dean*, 823 F.3d 422 (8th Cir. 2016) (affirming district court's ruling taking judicial notice of testimony provided under penalty of perjury); *cf. In re Strategic Labor, Inc.*, 467 B.R. 11, 16 n.7 (Bankr. D. Mass. 2012) (taking judicial notice over documents "which are signed by the debtor under the pains and penalties of perjury and filed with the United States trustee").

AMG lenders (and other service providers to those lenders), the agency declined at that time to raise an unfairness claim against Intercept itself, despite having the transactional data, underwriting files, internal emails, and other documentation sufficient to do so.[5]  *See* Amended Compl., *FTC v. AMG Services, Inc.*, No. 12-536 (D. Nev. Apr. 12, 2013).   Nor did the government seek injunctive relief prohibiting Intercept from processing for AMG or other online lenders.   Instead, it chose to do precisely nothing until June 6, 2016, when this Complaint was filed by the FTC's successor, alleging unfairness claims predicated on alleged misconduct that had been known to the government for the intervening four years.   As § 5564(g) affords the government only *three* years to bring an action following "discovery" of a violation, this Complaint is untimely.   12 U.S.C. § 5564(g).

Because it is indisputable that, by no later than November 20, 2012, the FTC possessed the facts underlying the unfairness claim alleged in the instant Complaint, the only outstanding questions are (i) whether the possession of those facts constituted "discovery of the violation [the Bureau now alleges in the instant Complaint]" such that the Bureau's claims against Intercept accrued at that time and (ii) whether the FTC's knowledge in 2012 is imputed to the Bureau.[6]   As explained below, the law is clear that "discovery" occurs upon actual or constructive possession of the facts underlying a cause of action, and, in these circumstances, the FTC's knowledge is imputed to the Bureau.

---

[5] It may turn out that the limitations period commenced even before Intercept made its November 2012 production, as the detailed nature of the FTC Subpoena suggests that the government had a thorough understanding of Intercept's operations by the summer of 2012, if not earlier.  For purposes of this Motion to Dismiss, however, the Defendants rely only on the allegations of the Complaint and matters of public record.

[6] Because the FTC and Bureau share regulatory responsibilities and priorities, as reflected in their January 2012 Memorandum of Understanding (*see infra* Section IV.A.2.b), it is entirely possible that the FTC disclosed the information it obtained in the AMG lawsuit to the Bureau, which would obviate the need to impute the FTC's knowledge to the Bureau.  For the reasons stated below, however, the FTC's knowledge of the critical facts is sufficient to commence the statute of limitations and bar the Bureau's claims.

(a)      Possession of the Facts Establishing a Violation of the CFPA
Represents "Discovery" of the Violation

As to the first question, the plain language of the CFPA's statute of limitations

provision dictates application of the "discovery rule"—i.e., that a claim accrues when a plaintiff

"first knows or *with due diligence should know* facts that will form the basis for an action" under

the CFPA. *Merck & Co. v. Reynolds*, 559 U.S. 633, 646 (2010) (citations omitted) (emphasis

supplied by the Court). In *Merck*, the Supreme Court addressed when a claim accrues under a

statute that, much like the CFPA, is constrained by a statute of limitations provision triggered by

"the discovery of the facts constituting the violation." 559 U.S. at 638 (quoting 28 U.S.C.

§ 1658(b)). The Court explained that although "one might read the statutory words 'after the

discovery of the facts constituting the violation' as referring to the time a plaintiff actually

discovered the relevant facts, . . . in the statute of limitations context, the word 'discovery' is

often used as a term of art in connection with the 'discovery rule.'" *Id.* at 644. Under this rule, a

claim accrues when the plaintiff "first knows or *with due diligence should know*" a violation has

occurred, *id.* at 646 (emphasis in original), imposing on the government a duty to act with

"reasonable diligence" in discovering violations of that statute. *Id.*; *see also United States v.*

*Twenty-Seven Parcels of Real Prop.*, 236 F.3d 438, 440 (8th Cir. 2001) (citations omitted)

(construing the forfeiture statute of limitations, which starts "when the alleged offense was

discovered," as "requiring the government to exercise reasonable care and diligence in seeking to

learn the facts disclosing the alleged wrong").

The lesson of *Merck* is clear: claims brought under statutes containing a

limitations provision triggered by the "discovery" of a violation accrue when the putative

plaintiff possesses actual or constructive knowledge of the facts sufficient to bring a cause of

action.[7]  Notwithstanding this authority, the Bureau has taken contrary, and shifting positions, as to when it "discovers" a violation for the purposes of § 5564(g)(1).   In discussions with Intercept's counsel regarding the effect of the statute of limitations on the Bureau's claims in the present lawsuit, the Bureau contended that a violation of the CFPA is "discovered" when Bureau Director Richard Cordray personally concludes as much, apparently only after Bureau enforcement staff has formally closed its inquiry and submitted a recommendation to the Director.  Complaint ¶ 38, *Intercept Corp. v. CFPB*, No. 16-118 (D.N.D. May 19, 2016).  This is a dangerous contention that is not only inconsistent with Supreme Court precedent, but would also permit the Director to toll the statute of limitations indefinitely simply by withholding a final determination of liability, a result hardly in line with Congress' intention to impose a limitations period.

In a different enforcement proceeding, the Bureau has suggested that "discovery" of a violation may be deferred until one of the following: (i) the Bureau receives the last production of documents from an entity under investigation for a violation of the CFPA, (ii) the entity under investigation "certifies" that its production is complete; or (iii) the entity provides a response to the Bureau's Notice and Opportunity to Respond and Advise ("NORA") process (i.e., the procedure by which the Bureau affords the subject of an investigation an opportunity to challenge its findings of a violation of the consumer laws).   Bureau's Opposition to

---

[7] The Court in *Merck* also held that under the discovery rule—but on facts entirely different than those in this matter—the plaintiffs could not have discovered the violation more than two years before the complaint was filed.  559 U.S. at 653–54.  The defendant argued that an FDA letter and pleadings in product liability cases showed provided plaintiffs with "the facts constituting the violation"—i.e., that the defendant knowingly misrepresented the connection between the use of pain-killer, Vioxx, and risks of heart attack.  The Court disagreed, holding that neither the letter nor the pleadings triggered the accrual of plaintiffs' claims because none of the materials addressed Merck's mental state, an element of plaintiffs' claim.  *Id.*  In this case, however, the Complaint's allegations and the FTC's subpoena demonstrate that the government knew no later than November 20, 2012 that Intercept processed for the AMG lenders, the extent of the due diligence Intercept performed in connection with these lenders, whether Intercept's processing activity for the lenders resulted in any "red flags," and how Intercept responded to those "red flags."  Ex. B, FTC Subpoena Requests 4, 9.

Respondent's Motion to Dismiss at 12 n.10, *In the Matter of Integrity Advance LLC*, CFPB No. 2015-0029 (Jan. 15, 2016).[8]  Much like the position that the Bureau has taken with Intercept—that the statute does not start to run until Director Cordray says so—these free-wheeling interpretations would allow the Bureau to toll the statute of limitations indefinitely and at its sole discretion by sending gratuitous CIDs until the Bureau is prepared to file its complaint, or by delaying the NORA process.[9]  Even worse, these interpretations fail to account for situations like the present one, where the government already possesses sufficient facts upon which it could bring a complaint.  *See Merck*, 559 U.S. at 646.

> (b)  The Bureau is Charged with the FTC's Knowledge of the Facts Establishing Defendants' Purported CFPA Violations

The CFPA's statute of limitations is silent as to whose discovery within the government starts the limitations clock.  *See* 12 U.S.C. § 5564(g)(1).  Given the basic principle that the government is treated "as a unit rather than as an amalgam of separate entities," however, the collective knowledge of the government as a whole must be imputed to the Bureau. *S&E Contrs. v. United States*, 406 U.S. 1, 10 (1972); *see also Gabelli v. SEC*, 133 S. Ct. 1216, 1223 (2013) (in the context of the discovery rule, suggesting that "the knowledge of one [agency could be] attributed to all").  The Eighth Circuit has recognized this principle when faced with statutory language similar to the CFPA—i.e., a discovery-based accrual statute that is silent as to which governmental agency must make the discovery.  *Twenty-Seven Parcels*, 236 F.3d 438

---

[8]  The administrative law judge in *Integrity Advance* ultimately held that the limitations period of § 5564(g)(1) does not apply when the Bureau proceeds administratively, as opposed to in federal court, and so did not address the Bureau's accrual contentions.  Order Denying Motion to Dismiss at 19–29, *In the Matter of Integrity Advance LLC*, CFPB No. 2015-0029 (Apr. 22, 2016).

[9]  Incidentally, companies under inquiry are not required to respond as part of the NORA process, and the Bureau apparently reserves the right not to initiate the NORA process.  For example, in Intercept's case, no such process was afforded to Smith or Dresser.

(citing 19 U.S.C. § 1621).  In that case, the Court of Appeals did not distinguish between the Drug Enforcement Agency—whose investigation led to the "discovery" of the alleged offense— and the Department of Justice—which ultimately brought the forfeiture action.  *Id.* at 440–41, 442–444 (Bye, J., concurring in part and dissenting in part).  Rather, the DEA's discovery was deemed to have been made by the "government" as a whole.  The Sixth Circuit held similarly in *United States v. $515,060.42 in United States Currency*, when the court concluded that a forfeiture claim was untimely because the collective information gathered by two separate agencies—the Federal Bureau of Investigation and Internal Revenue Service—demonstrated that the government's "discovery" took place more than five years before the action was filed.  152 F.3d 491, 502 (6th Cir. 1998).

Information known to the FTC must be imputed to the Bureau in particular because of the considerable regulatory overlap between the two agencies.  The Bureau succeeded the FTC as the principal enforcer of the consumer finance laws upon its creation in 2010, and the two agencies share common regulatory priorities.  Each agency possesses the ability to prosecute the type of "unfair act and practices" violations that the Bureau now alleges against Intercept, Smith, and Dresser.  *Compare* 15 U.S.C. § 45(n) (FTC unfair act and practice standard), *with* 12 U.S.C. §§ 5531(c), 5536(a)(1)(B) (nearly identical CFPA standard).  Both agencies also routinely bring enforcement actions against payment processors.  *See, e.g.*, *FTC v. Wells*, 385 F. App'x 712, 713 (9th Cir. 2010) (unfairness claim brought under the FTC Act against payment processor); Complaint, *CFPB v. Universal Debt & Payment Solutions, LLC*, No. 15-859 (Mar. 26, 2015) (charging unfair act and practice claims against, *inter alia*, payment processors).

In recognition of this regulatory overlap, the agencies are obligated by contract and federal statute to coordinate their enforcement activities.  In January 2012, several months

before the FTC sued the AMG lenders and subpoenaed Intercept, the FTC and the Bureau entered into a Memorandum of Understanding ("MOU") in accordance with the CFPA.[10] MOU, a true and correct copy of which is attached as Exhibit D.   The MOU describes a substantial coordination between the agencies, including quarterly meetings to discuss "future law enforcement activities and how they can coordinate and cooperate effectively in those activities," as well as a mutual commitment to provide advance notice to the other agency before initiating an investigation or enforcement action.  *Id.* § IV.A.4; IV.B.1–2; IV.C.1, 3.

Moreover, the regulatory overlap of the two agencies raises a practical consideration that necessitates imputing the FTC's knowledge to the Bureau.  As noted, each agency has the authority to bring unfairness claims.  And both agencies are subject to statute of limitations provisions.  *Compare* 15 U.S.C. § 57b(d) (three-year statute of limitations period for violations of any rule relating to unfair or deceptive acts or practices) *and FTC v. Bonnie & Co. Fashions, Inc.*, No. 90-4454, 1992 U.S. Dist. LEXIS 18764, at *19 n.8 (D.N.J. Sept. 28, 1992) (applying the five-year limitations period prescribed by 28 U.S.C. § 2462 to civil monetary penalties), *with* 12 U.S.C. § 5564(g)(1).  If the FTC's knowledge is not imputed to the Bureau, then the two agencies will in effect be empowered to "stack" their respective statute of limitations periods—i.e., if the FTC possessed the facts necessary to bring an enforcement action under the FTC Act, but failed to do so within its relevant limitations period, it could simply pass along its file to the Bureau, which would enjoy a refreshed statute of limitations.  The FTC would accordingly have little need to bring actions amenable to suit under either the FTC Act or

---

[10] The CFPA required the Bureau and FTC to "negotiate an agreement for coordinating with respect to enforcement actions by each agency," so as not to subject regulated entities to duplicitous enforcement actions.  12 U.S.C. § 5514(c)(3).   As reflected in the MOU, the agreement was required by statute to include, *inter alia*, "procedures for notice to the other agency, where feasible, prior to initiating a civil action to enforce any Federal law regarding the offering or provision of consumer financial products or services."  *Id.*

the CFPA within its statutorily mandated limitations periods, and defendants would face the prospect of defending suits predicated on conduct that occurred as many as eight years earlier. Imputation of the FTC's knowledge to the Bureau is therefore necessary to prevent such an end run around the limitations periods applicable to each agency.

In sum, the Bureau's claims accrued, at the latest, on November 20, 2012, when the government came into possession of the transactional data, due diligence files, customer complaints, and other documents sought by the FTC in connection with the AMG lawsuit, which now form the basis of the instant Complaint. These materials were obtained by the FTC in support of the UDAP claims it brought against the AMG lenders in 2012. At that time, the FTC declined to bring an equivalent unfairness claim against Intercept despite having knowledge that Intercept was processing payments for clients engaged in allegedly unlawful conduct—and that it was doing so notwithstanding allegedly high return rates and other purported red flags. The Bureau may disagree with the FTC's original conclusion, but it has no right to attempt to overrule it long after the statute of limitations has expired. Accordingly, the Court should dismiss the entire Complaint as time-barred.[11]

---

[11] Should the Court decline to do so, it should nonetheless bar the Bureau from imposing liability on or requesting relief from Defendants based on conduct that occurred before July 21, 2011—the date on which the Bureau assumed its enforcement powers under the CFPA. As the Bureau has acknowledged in other enforcement actions, it may not enforce the CFPA retroactively to conduct occurring before that date. *See* Bureau's Response to Defendants' Motion to Dismiss at 38 n.102, *CFPB v. Hanna & Associates*, No. 14-2211 (N.D. Ga. Oct. 3, 2014) (stating that the Bureau "does not seek to enforce the CFPA as to conduct that occurred before [July 21, 2011]"); Complaint ¶¶ 154, 160, *CFPB v. Corinthian Colleges, Inc.*, No. 14-7194 (N.D. Ill. Sept. 16, 2014) (limiting relief sought under CFPA to conduct that occurred after "July 21, 2011"); Complaint ¶¶ 165, 173, 182, *CFPB v. ITT Educ. Servs. Inc.*, No. 14-292 (S.D. Ind. Feb. 24, 2014) (same); *see also Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994) (absent an expression of contrary congressional intent, a statute presumptively does not apply retroactively if it would "increase a party's liability for past conduct"); *Molosky v. Wash. Mut. Inc.*, 664 F.3d 109, 113 n. 1 (6th Cir. 2011) (the Dodd-Frank Act, which established the CFPA, does not apply retroactively).

B.     The Complaint Must be Dismissed Because it Fails to Allege the Necessary Elements of an Unfairness Claim under the CFPA

"The essential function of a complaint under the Federal Rules of Civil Procedure is to give the opposing party 'fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved.'" *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014) (citations omitted).  The Bureau appears to have settled on a general legal theory: that it is an unfair act or practice under the CFPA to process payments on behalf of a merchant in the face of certain red flags suggesting that the merchant was engaged in fraudulent or illegal practices.  Compl. ¶¶ 2, 39.  But the Bureau has failed to plead sufficient facts to place the Defendants on notice as to how they allegedly violated that theory, or to afford them the opportunity to rebut the Bureau's theory.  *See Topchian*, 760 F.3d 848 ("The well-pleaded facts alleged in the complaint, not the legal theories of recovery or legal conclusions identified therein, must be viewed to determine whether the pleading party provided the necessary notice and thereby stated a claim in the manner contemplated by the federal rules.").

Remarkably, and in stark contrast to other complaints filed by the Bureau, the instant Complaint fails to provide even the most basic information regarding its theory, such that upon reading the Complaint, one is left to wonder the following:

- Who are each of the merchants on whose behalf Intercept allegedly processed payments without conducting adequate due diligence?[12]

- Were the merchants' products and services offered to consumers for "personal, family, or household purposes"?

---

[12] The Bureau identifies only the merchants named in the 2012 FTC lawsuit—i.e., the AMG lenders. Compl. ¶¶ 84–89.  No other merchant is identified, nor does the Bureau explain how the remaining merchants' customers were defrauded.  The Bureau's allegations as to the AMG lenders are insufficient to support its theory because they are time-barred, *see supra* Section IV.A, and, in any event, fail to specify a theory as to why the loans were unlawful.  *See* Compl. ¶¶ 84–85 (describing the FTC's allegations but failing to state which of the FTC's theories of liability the Bureau intended to adopt).

- How were the merchants' products and services "illegal and fraudulent" such that they injured consumers?[13]

In the absence of these critical facts, Defendants have been deprived of their right to present a complete and comprehensive defense to the Bureau's claims at the Rule 12 stage. *See Tweed v. Schuetzle*, No. 06-32, 2007 U.S. Dist. LEXIS 50661, at *4 (D.N.D. July 12, 2007) (citations omitted) ("[T]he rules of notice pleading . . . prescribe that a complaint 'must contain allegations sufficient to alert the defendants to the nature of the claim and allow them to defend against it.'"). Moreover, the Bureau has failed to allege facts that would allow the Court to draw a "reasonable inference" that Intercept, Smith, and Dresser are "liable for the misconduct alleged." *Lustgraaf*, 619 F.3d at 873 (citations omitted); *see also Brookins Hybrid Drive Sys., LLC v. M.A.C., Inc.*, No. 12-101, 2013 U.S. Dist. LEXIS 65419, at *9–10 (D.N.D. May 2, 2013) (Erickson, J.) (dismissing patent infringement case because in plaintiffs' complaint, "questions of patent law are obscurely referenced, ambiguously dodged, or altogether unaddressed").

These deficiencies necessitate dismissal of the entire Complaint.

1.    *The Complaint Fails to Articulate the "Illegal and Fraudulent" Products and Services of Intercept's Merchants, a Necessary Predicate to Meeting its Burden of Alleging "Substantial Consumer Injury"*

The *sine qua non* of the Bureau's theory is that the payments that Intercept processed on behalf of certain unspecified merchants were made in support of "illegal or fraudulent" products and services offered by these merchants to their consumers. Compl. ¶ 2.

---

[13] By contrast, the Bureau filed a 344-paragraph complaint in *CFPB v. Universal Debt & Payment Solutions, LLC, et al.*, No. 15-0859 (N.D. Ga. Mar. 26, 2015) (hereinafter "*Universal Debt* Compl.") against a number of payment processors that, like Intercept, Smith, and Dresser, were accused of committing unfair acts and practices for failing to conduct reasonable due diligence to detect the alleged unlawful conduct of their merchants. In that complaint, the Bureau identified by <u>name and address</u> the thirteen merchants alleged to have been engaged in fraud over the course of sixty-five detailed allegations. *Universal Debt* Compl. ¶¶ 11–75, 333. The complaint also explicitly described the alleged misconduct, complete with statutory citations. *Id.* ¶¶ 292–303, 311 (alleging that the processors' merchant-clients engaged in harassment, oppressive and abusive debt collection practices in violation of 15 U.S.C. § 1692d, made false, deceptive and misleading representations, in violation of 15 U.S.C. § 1692e, and failed to validate debt, in violation of 15 U.S.C. § 1692g).

But with one exception—the AMG lenders[14]—the Complaint fails to identify which of Intercept's 68,000 merchants allegedly defrauded consumers, and further fails to identify the fraud that was allegedly perpetrated. *See, e.g.*, Compl. at ¶ 39 (referencing "many clients" "engaged in fraudulent or illegal transactions" without identifying either the clients or the fraud); ¶ 41 (alleging that unspecified "ODFIs[15] expressed concerns" regarding "certain of Intercept's clients"); ¶ 43 (same); ¶ 65 (making reference to the return rates of "many of Intercept's clients[]"); ¶ 77 (alleging that "many of Intercept's clients" generated high overall return rates); ¶ 81 (same).[16]

These allegations are critical because, in their absence, the Bureau fails to establish that any of the consumers of Intercept's merchants suffered injury, much less "substantial" injury, a necessary element of an unfairness claim.  12 U.S.C. § 5531(c)(1)(A). And by failing to allege "substantial injury," the Bureau fails to state a valid unfairness claim under the CFPA.

The AMG lenders provide a ready illustration as to why this information is essential.  The Bureau alleges that Intercept processed loan payments for the AMG lenders. Compl. ¶¶ 84, 89.  According to the Bureau, the AMG lenders fraudulently claimed to be owned

---

[14] Even as to the AMG lenders, the Bureau misrepresents the alleged fraud.  The Bureau alleges that "[t]he FTC's lawsuit also alleged that AMG operated under a sham ownership structure, purporting to be owned and controlled by Native American tribes, in an effort to evade state and federal law."  Compl. ¶ 84.  In fact, neither the original nor the Amended Complaint filed against the AMG lenders by the FTC contains such allegations.  *See* Complaint, *FTC v. AMG Services, Inc.*, No. 12-536 (D. Nev. Apr. 2, 2012); Amended Compl., *FTC v. AMG Services, Inc.*, No. 12-536 (D. Nev. Apr. 12, 2013).

[15] ODFI is an initialism of Original Depository Financial Institution.  Intercept's "ODFI" is the bank through which Intercept processes payments.  *See* Compl. ¶ 32.

[16] On three occasions, the Bureau makes vague allusion to possible violations of Georgia, Arkansas, and Maine state law by certain of Intercept's merchants.  Compl. ¶¶ 53–54, 95. The Bureau's allegations, however, fail to identify the lender(s) in question or which aspects of state law the lender(s) allegedly violated.  The Bureau also fails to state whether its theory of liability is limited to these three states or is intended to be more far-reaching.

and operated by Native American tribes in an effort to preempt state lending laws that would otherwise prohibit their loans.  *Id.* ¶¶ 84, 88–89.  If, contrary to the Bureau's theory, the AMG lenders were properly owned and controlled by Native American tribes (as two courts have held[17]), and their loans were, in fact, legal, then the AMG lenders' customers cannot be said to have suffered any loss, as the loan transactions would have been properly performed in accordance with a legal contract between the lenders and their consumers.

That consumer injury is contingent on a showing of underlying unlawful behavior is not a controversial point; indeed, the Bureau has acknowledged as much.  *See* Compl. ¶ 135 (emphasis added) ("Defendants have caused consumers substantial monetary loss by debiting money from consumers' bank accounts *on behalf of clients engaged in unlawful practices.*").  And, as noted, in other lawsuits involving payment processors, the Bureau readily alleges the identity of the alleged wrongdoer and the nature of the alleged wrongdoing.  *See supra* note 13.  Thus, the Bureau knows it must allege these facts and regularly does so in other cases, it possesses the ability to do so in this case, but nevertheless resorts to broad statements about unspecified "clients" engaged in undefined "fraudulent or illegal transactions."  *See, e.g.*, Compl. ¶ 39.  Whatever advantage the Bureau seeks to gain from its charging strategy, it is clear that it fails to meet the requirements of Rule 8.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 565 n.10 (2007) (pleadings that "mentioned no specific time, place, or person involved in the alleged [wrongdoing]" and "furnishe[d] no clue" as to the details of an alleged fraud failed to state a claim for relief); *iCARD Stored Value Solutions, L.L.C. v. W. Suburban Bank*, No. 07-1539, 2008

---

[17] *Cash Advance & Preferred Cash Loans v. Colo. ex rel. Suthers*, 242 P.3d 1099, 1106 (Colo. 2010) (*en banc*); Amended Order, *State of Colorado v. Cash Advance*, No. 05-1143 (Denver Dist. Ct. Feb. 18, 2012); *People v. Miami Nation Enters.*, 166 Cal. Rptr. 3d 800 (Cal. Ct. App. 2014), *depublished following grant of review by* 324 P.3d 834 (Cal. 2014).

U.S. Dist. LEXIS 16127, at *5 (E.D. Mo. Mar. 3, 2008) ("[V]ague references to 'certain services' and 'certain information' are not sufficient factual allegations to meet the *Twombly* standard.").

Making matters worse, by failing to plead how the conduct of Intercept's merchants was "fraudulent or illegal," the Bureau deprives Defendants of their right to defend against those allegations by, *inter alia*, testing their legal sufficiency in a motion to dismiss.  *See Tweed*, 2007 U.S. Dist. LEXIS 50661, at *4; *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("[A]llegations in a complaint . . . but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively.").  In other words, Rule 8 does not permit the Bureau to state by *diktat* that the merchants' conduct was "fraudulent or illegal."  Rather, the Bureau must plead facts in support of those allegations so that Intercept, Smith, and Dresser can mount a defense, including by challenging as a matter of law the Bureau's legal position as to the legitimacy the merchants' conduct.  *Twombly*, 550 U.S. at 565 n.10 (criticizing, and ultimately remanding for the dismissal of, a complaint that "furnishes no clue" as to which of four defendants entered into an allegedly illicit agreement, or "when and where the illicit agreement took place," such that "a defendant seeking to respond to plaintiffs' conclusory allegations . . . would have little idea where to begin.").  Defendants, however, have been denied that opportunity by the Bureau's refusal to articulate any coherent legal position on that essential issue.

In sum, the Bureau's Complaint is replete with sweeping charges—for example, that Intercept "systematically enabled its clients to withdraw millions of dollars' worth of unauthorized or otherwise illegal charges from consumers' bank accounts."  Compl. ¶ 1.  These generalizations may read well in a Bureau press release, but they fall far short of providing

Intercept, Smith, and Dresser "fair notice of the nature and basis or grounds for [the Bureau's] claim[s]." *Topchian*, 760 F.3d at 848. And more importantly, the dearth of specific and critical factual allegations deprive Defendants of the opportunity to challenge the Bureau's case at this ever-important stage of the litigation, including, in particular, the requirement that the Bureau allege that a consumer suffered "substantial injury." Allegations to the effect that unnamed consumers of one or more of Intercept's unspecified merchants were victimized by an unspecified fraud fall far short, requiring dismissal of the Complaint. *Brookins Hybrid Drive Sys., LLC*, 2013 U.S. Dist. LEXIS 65419, at \*9–10.

> 2. *The Bureau's Complaint Fails to Allege that the Products and Services Extended by Intercept's Merchants were "Offered or Provided for Use by Consumers Primarily for Personal, Family, or Household Purposes"*

Setting aside the Bureau's failure to provide fair notice of its theory of liability or properly allege substantial injury, the Complaint is defective and must be dismissed for the independent reason that it fails to plausibly allege that the products and services offered by Intercept's merchants were "consumer financial product(s) or service(s)"; that is, that they were provided "for use by consumers primarily for personal, family, or household purposes." *See* 12 U.S.C. § 5481(5)(A) (defining a "consumer financial product or service"). The funds from a short-term loan, for example, can be deployed in support of an individual's business, to make payment on an investment property, and for myriad other non-personal, family, or household purposes.

The Bureau's jurisdiction to enforce the Consumer Financial Protection Act is limited to cases involving products and services used by consumers for personal reasons. This jurisdictional limitation is implemented in the CFPA by requiring the Bureau to allege a consumer financial product or service whenever it asserts an unfairness claim. *See* 12 U.S.C. § 5531(c)(1) ("The Bureau shall have no authority under this section to declare an act or practice in

-21-

connection with a transaction with a *consumer for a consumer financial product or service*, or *the offering of a consumer financial product or service*, to be unlawful on the grounds that such act or practice is unfair [unless certain conditions are met]") (emphasis added).[18]

The Complaint makes no allegation—conclusory or otherwise—that the products or services offered by Intercept's merchants were used primarily for "personal, family, or household purposes."  Even the most charitable reading of the Complaint yields only a single relevant reference to a consumer financial product or service, *see* Compl. ¶ 10 ("Intercept is also a service provider to covered persons, such as payday lenders, debt collectors, and auto title lenders, because it processes transactions relating to consumer financial products or services. 12 U.S.C. §§ 5481(26)(A)(ii)."), but even that sole allegation is a mere recitation of the legal standard, barren of any factual support, and accordingly must be disregarded.  *Iqbal*, 556 U.S. at 678 (citations omitted) ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do'").  Moreover, even were the allegation to be credited, it provides only that Intercept is in the business of processing transactions "relating" to consumer financial products or services, without bothering to state (even conclusorily) that the consumer financial products and services for which Intercept provides processing services are the same products and services underpinning the Bureau's unfairness cause of action.

---

[18] This limitation is also incorporated into the definitions of "covered person" and "service provider."  *See* 12 U.S.C. § 5481(6)(A) ("The term 'covered person' means any person that engages in offering or providing a *consumer financial product or service*"); § 5481(26)(A) ("The term 'service provider' means any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a *consumer financial product or service*") (emphasis added).  The Bureau's ability to bring claims against persons who "substantially assist" a violation of the CFPA is similarly limited, in that the Bureau must establish that the assistance be provided to "covered persons" or "service providers," the definitions of which, as noted, incorporate a requirement of a consumer financial product or service.  *See id.*; 12 U.S.C. § 5536(a)(3).

These failings are no doubt a byproduct of the Complaint's principal failure to provide any detail regarding which of Intercept's merchants engaged in misconduct, the nature of the misconduct, and which consumers were purportedly harmed by the merchant's misconduct, but that is no excuse for failing to allege the required elements of an unfairness cause of action. As such, the Complaint must be dismissed for the additional reason that it is devoid of allegations establishing that the allegedly fraudulent products and services offered by Intercept's merchants were intended for use by consumers primarily for personal, family or household purposes. *See Brookins Hybrid Drive Sys., LLC*, 2013 U.S. Dist. LEXIS 65419, at *9–14 (dismissing claims where necessary allegations are "altogether unaddressed").

3.    *The Complaint Must be Dismissed Because it Fails to Plausibly Allege that Consumers Could Not Reasonably Avoid Injury*

In drafting the CFPA, Congress expressly prohibited the Bureau from declaring an act or practice "unfair" when the "injury" caused by that act or practice is "reasonably avoidable" by the consumer.  12 U.S.C. § 5531(c)(1)(A).  "An injury is reasonably avoidable if consumers have reason to anticipate the impending harm and the means to avoid it, or if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact." *ITT Educ. Servs.*, 2015 U.S. Dist. LEXIS 28254, at *85. Because the inability of a consumer to reasonably avoid his or her injury is a necessary element of an unfairness claim, the Bureau bears the burden of making plausible allegations to that effect in its Complaint.  *See Hamilton v. Palm*, 621 F.3d 816, 818 (8th Cir. 2010) (requiring plaintiff to meet the Rule 12 pleading burden as to a claim element); *Catipovic v. Turley*, No. 11-3074, 2012 U.S. Dist. LEXIS 79824, at *64 (N.D. Iowa June 8, 2012) (a plaintiff must plead "allegations sufficient to raise a plausible inference as to each element of a claim or cause of action").

Apart from formulaic recitations of the statutory language, the Complaint fails to allege that consumers could not have reasonably avoided their purported injuries. *See* Compl. ¶¶ 120, 128, 137. Rather, the Bureau appears to allege instead that consumers were not privy to Intercept's supposed due diligence shortcomings. *See*, *e.g.*, *id.* ¶ 82 ("Unlike Defendants, consumers lacked knowledge of Intercept's clients' unusually high return rates and Defendants' efforts to shield their problem clients from scrutiny"). This is a mischaracterization of the applicable legal standard, which as noted (and as noted in the Bureau's own Complaint), requires consumers to be unable to reasonably avoid *injury*, not be unaware of a defendant's alleged violations of the CFPA. The Bureau's failure to make the required allegations, and its inappropriate efforts to artfully plead around the governing standard, require dismissal of the Complaint in its entirety. *Brookins Hybrid Drive Sys., LLC*, 2013 U.S. Dist. LEXIS 65419, at *9 (dismissing complaint where plaintiff attempted to "ambiguously dodge" its Rule 8 obligations).

(a) The "Reasonable Avoidance" Requirement Prohibits Bureau Intervention into Transactions Subject to Market Forces

The "reasonable avoidance" requirement historically has served as a curb on the Government's ability to declare acts and practices "unfair."[19] It was first introduced by the FTC in its 1980 Unfairness Policy Statement to quell widespread criticism of the agency's overreach, and to head off an effort by Congress to eliminate the agency's ability to bring unfairness claims. *See supra* note 19; *see also ITT Educ. Servs. Inc.*, 2015 U.S. Dist. LEXIS 28254, at *51 n.21. In its Policy Statement, the FTC declared that the market normally should be governed by the exercise of consumer choice, unimpeded by "regulatory intervention," under the expectation that

---

[19] *See generally* J. Howard Beales III, *The FTC's Use of Unfairness Authority: Its Rise, Fall and Resurrection (2003)*, *available at* https://www.ftc.gov/public-statements/2003/05/ftcs-use-unfairness-authority-its-rise-fall-and-resurrection.

-24-

consumers will disregard "inadequate or unsatisfactory" options and thereby cause marketplace "self-correction."   Federal Trade Commission, *FTC Policy Statement on Unfairness* (Dec. 17, 1980).  The agency committed to bringing unfairness claims only when certain seller practices— such as withholding "critical price . . . data," "engag[ing] in overt coercion," or exercising undue influence over "highly susceptible classes of purchasers as by promoting fraudulent 'cures' to seriously ill cancer patients"—prevented consumers from using their own judgment.  *Id.*   In short, the "reasonable avoidance" element was intended to prevent government regulators from bringing suit as part of an effort to second-guess choices that consumers had made freely.

This limitation on unfairness claims, at first self-imposed by the FTC, was subsequently codified into the FTC Act by Congress in 1994, *see* 15 U.S.C. § 45(n), and thereafter imported in its entirety into the CFPA with the adoption of Dodd-Frank.  12 U.S.C. § 5531(c)(1)(A).  Consistent with the obligation imposed by its organic statute, the Bureau has formally committed to be bound by the same principles articulated by the FTC in the 1980 Policy Statement.  *See* Consumer Financial Protection Bureau, *CFPB Supervision and Examination Manual*, UDAAP at 2 (Oct. 2012) ("Normally the marketplace is self-correcting; it is governed by consumer choice and the ability of individual consumers to make their own private decisions without regulatory intervention.").  As shown below, however, the Bureau has failed to keep that commitment in this case.

(b)     The Bureau Fails to Allege that Consumers Could Not Have Reasonably Avoided their Alleged Injuries

The Bureau alleges that consumers sustained "substantial injury" in the form of "substantial monetary loss" and the payment of costs and fees, resulting from payment processing conducted by Intercept on behalf of merchants engaged in unspecified "unlawful practices."  Compl. ¶¶ 135–36.  To the extent that the Bureau intends to argue that the customers

of Intercept's online lenders were among the consumers to have suffered these injuries,[20] it fails to allege that Intercept or its lenders engaged in any of the traditional practices that undermine the ability of consumers to "self-regulate" the market—i.e., withholding critical information from the consumers, coercing them into participating in any loan transaction, or exercising undue influence over them akin to one who promotes fraudulent cures to seriously ill cancer patients. *See* FTC, *FTC Policy Statement on Unfairness* (Dec. 17, 1980).

Indeed, the Complaint conspicuously contains no allegation that any loan contracts misrepresented the applicable interest rate, that consumers were not free to decline any loan agreement offered to them, or that the lenders "guided [the consumers] into a precarious position and exploited that vulnerability to channel them into unwise and damaging debt obligations." *Contrast ITT Educ. Servs.*, 2015 U.S. Dist. LEXIS 28254, at *88–90 (Bureau adequately alleged that ITT students could not reasonably avoid their injury in light of allegations that the college "boxed [students] into a corner" by threatening to withhold transcripts, deny the transfer of credits, or expel students who did not accept costly loans).

These are meaningful omissions because, again, the Bureau bears the burden of establishing its right to intervene in marketplace transactions that can effectively be regulated by consumers through their selection (or rejection) of particular products and services. *See J.R. Simplot Co. v. Campbell*, No. 06-0007, 2007 U.S. Dist. LEXIS 75860, at *14 (D.N.D. Oct. 11, 2007) (Erickson, J.) ("Freedom of contract necessarily entails the freedom not to contract."). If consumers actively sought out their loans, were apprised of the terms of loans, and voluntarily accepted those terms—and the Bureau's Complaint provides no reason to believe otherwise—

---

[20] As laid out *supra* in Section IV.B.1, the Bureau avoids naming any merchants at issue except the AMG lenders, or articulating how their products were illegal, which limits Defendants' ability to fully address the deficiencies in the Bureau's unfairness claims.

there is simply no role for regulatory intervention. *FTC v. IFC Credit*, 543 F. Supp. 2d 925, 951 (N.D. Ill. 2008) (injury "could have been reasonably avoided merely by not signing on with NorVergence and either maintaining the extant service or finding another provider"); *Davis v. HSBC Bank*, 691 F.3d 1152, 1169 (9th Cir. 2012) (plaintiff failed to state a UCC claim predicated on an FTC Act violation where his alleged injury was "certainly avoidable" because advertisement disclaimers provided "'the means to avoid' the alleged harm").

  C.  <u>The Complaint Must be Dismissed Because the Bureau Fails to Allege that Intercept, Smith, and Dresser are "Covered Persons," "Service Providers," or "Related Persons" under the CFPA</u>

    An unfair act and practice claim can be brought against only a "covered person," "service provider," or "related person," as those terms are defined by the CFPA.  12 U.S.C. §§ 5531(c), 5536(a)(1)(B).  Because the Bureau has not pled that Intercept, Smith, and Dresser fall into these statutory definitions—and in fact has pled facts demonstrating just the opposite— the Complaint must be dismissed in its entirety.

    1.  *Intercept is neither a Covered Person nor a Service Provider*

    The Bureau alleges that Intercept is a "covered person" and "service provider." Compl. ¶¶ 9–10.  Intercept is neither.

    The CFPA defines a "covered person" as "any person that engages in offering or providing a consumer financial product or service."  12 U.S.C. § 5481(6)(A).  A "consumer financial product or service" is defined, in pertinent part,[21] as "any financial product or service that is described in one or more categories under [12 U.S.C. § 5481(15)] and *is offered or*

---

[21] A "consumer financial product or service" also includes any financial product or service that is enumerated within clauses (i), (iii), (ix) and (x) of subsection 5481(15)(A) and "delivered, offered, or provided" in connection with a consumer financial product or service referred to in subsection 5(A).  12 U.S.C. § 5481(5)(B). This alternate provision, however, is concededly inapplicable as the Complaint acknowledges that the "financial product or service" that Intercept provides—payment processing—is referenced within clause (vii) of subsection 5481(15), not clauses (i), (iii), (ix) or (x).  Compl. ¶ 9.

provided for use by consumers primarily for personal, family, or household purposes . . . ." 12 U.S.C. § 5481(5)(A) (emphasis added).  To meet the statutory requirement that Intercept offers a "financial product or service" described within § 5481(15), the Bureau alleges that Intercept "provides payments or other financial data processing products or services *to consumers* by technological means, including through a payments systems or network used for processing payments data."  Compl. ¶ 9 (citing 12 U.S.C. § 5481(15)(A)(vii)) (emphasis added).  As the italicized text in §§ 5481(5)(A) and (15)(vii) makes patently clear, a payment processor such as Intercept must offer its payment processing services *directly to consumers* to be considered a "covered person," and those services must be used "primarily for personal, family, or household purposes."  This is hardly a surprising result, as one would expect that persons "covered" by the *Consumer* Financial Protection Act would have a direct relationship with consumers.

Intercept, however, does not contract with individual consumers, and its customers do not use its services for "personal, family or household purposes." Rather, it provides payment processing services to *business* customers in need of bulk ACH processing services, a point the Bureau appears to acknowledge, as its Complaint readily lists business customers among Intercept's clientele, *see* Compl. ¶ 26 (identifying among Intercept's clients lenders, finance companies and debt collectors), while failing to allege that Intercept contracted with individual consumers intending to use Intercept's services for personal reasons.  *See* Compl. ¶¶ 26–37; *see also supra* Section IV.B.2.  The language of the CFPA dictates the limits of the Bureau's jurisdiction, and plainly excludes business-to-business companies such as Intercept from its reach.  *See* Order at 46, *CFPB v. Universal Debt & Payment Solutions, LLC*, No. 15-0859 (N.D. Ga. Sept. 1, 2015) (hereinafter "*Universal Debt* Order") (emphasizing the statutory requirement that "processing products or services" must be provided directly "to a consumer,"

but declining to rule on the issue).  The Court should resist the Bureau's efforts to enlarge its already expansive jurisdiction over "the offering and provision of consumer financial products or services."  12 U.S.C. § 5491(a); *see CFPB v. Accrediting Council for Independent Colleges & Schools*, 15-1838, 2016 U.S. Dist. LEXIS 53644, at *9, *12 (D.D.C. Apr. 21, 2016) (describing the Bureau's efforts to arrogate for itself the ability to regulate the accreditation of for-profit schools as a "bridge too far" and advising the agency to act prudently before "choosing to plow head long into fields not clearly ceded to [it] by Congress").

The Bureau's allegations also demonstrate that Intercept is not a "service provider."  Although that term applies to entities that "process[] transactions relating to the consumer financial product or service," the CFPA expressly provides an exception for entities, like Intercept, that provide (i) "support service of a type provided to businesses generally" or (ii) "a similar ministerial service."  12 U.S.C. § 5481(26)(A)(ii), (B)(i).  Intercept meets both statutory exceptions.

Intercept processes payments through the ACH network for a wide variety of merchants.  Compl. ¶ 26 (emphasis added) (alleging that Intercept's merchants include "payday lenders, auto title lenders, sales finance companies, and debt collectors, *among others*").  As is apparent from the Complaint, Intercept performs a commodity service in the same fashion for each of its merchants, irrespective of its industry.  *See id.* ¶¶ 26–37 (describing how Intercept processes payments without distinguishing among types of merchants).  Accordingly, Intercept's processing activities are not provided solely to merchants that offer "consumer financial products or services," but instead are provided to "businesses generally."  12 U.S.C. § 5481(26)(B)(i).

For similar reasons, it is apparent that Intercept provides its merchants with "ministerial services" and is thus not subject to suit under the CFPA as a "service

provider." *Id.* A ministerial service is one performed "in obedience to a legal order without exercise of personal judgment or discretion." THE NEW OXFORD DICTIONARY (Oxford Univ. Press 2d ed. 2005). The Complaint describes how Intercept—without exercising any judgment or discretion—simply accepts the payment instructions provided by its merchants. Compl. ¶¶ 31–37. For example, after a merchant sends a credit or debit instruction, Intercept "conveys that request to its own bank," which in turn contacts the consumer's bank. *Id.* ¶¶ 31–32. In other words, Intercept's merchants direct the entire transaction:

> In a typical transaction that Intercept undertakes on behalf of a lender or debt collector, *the client instructs Intercept* to withdraw loan payments from a borrower's bank account, *directing Intercept on which bank to contact, the payment schedule to use, and the amount to withdraw.*

*Id.* ¶ 37 (emphasis added). Once Intercept executes a merchant's instructions, it remits to the merchant the debited funds. *Id.* As the Bureau's own description makes clear, Intercept is simply an intermediary that performs the "ministerial" task of processing—without any "judgment or discretion"—payment transactions on behalf of its merchants.

In light of the foregoing, Intercept is neither a covered person nor a service provider, necessitating dismissal of Count One as to the company. Moreover, because the viability of Count Two is contingent on a showing that Intercept is a covered person or service provider that acted in violation of the CFPA, *see infra* Section IV.D, Count Two also must be dismissed.

### 2. *Smith and Dresser are neither "Covered Persons" nor "Related Persons"*

Count One similarly must be dismissed as to Smith and Dresser because the Bureau's allegations, *see* Compl. ¶¶ 16–17, 23–24, fail to make out a plausible claim that they are either "covered persons" or "related persons," as those terms are defined in the CFPA. 12 U.S.C. §§ 5481(6)(A), 5481(25). Like Intercept, Smith and Dresser are not "covered persons"

because they do not provide "payments or other financial data processing products or services *to a consumer*," nor are there allegations—plausible or otherwise—that any services they allegedly provide[22] are offered for use by such consumers "*primarily for personal, family, or household purposes*." 12 U.S.C. §§ 5481(5)(A), (15)(A)(vii) (emphases added).[23]

The Bureau also fails as a matter of law to establish that Smith and Dresser are "related persons." The term "related person" applies "only with respect to a covered person," 12 U.S.C. § 5481(25)(A), and is defined in relevant part as:

> (i) any director, officer, or employee charged with managerial responsibility for, or controlling shareholder of, or agent for*, such covered person*;

> (ii) any shareholder, consultant, joint venture partner, or other person, as determined by the Bureau (by rule or on a case-by-case basis) who materially participates in the conduct of the affairs of *such covered person* . . . .

12 U.S.C. § 5481(25)(C) (emphasis added). Accordingly, in the absence of a "covered person," there can be no "related person." Because Intercept is not a "covered person"—since it does not provide any services to consumers, who in turn use such services for personal, family or

---

[22] The Complaint appears to allege—wholly without support—that Smith and Dresser *personally* provide payment processing products or services. Compl. ¶¶ 17, 24. Intercept is an independent S-corporation, as the Bureau acknowledges. *See id.* ¶ 8. As a separate legal entity, the company may provide financial products or services; its owners, however, do not. *See, e.g.*, *Solid Comfort, Inc. v. Hatchett Hospitality Inc.*, 2013 N.D. 152, ¶ 18, 836 N.W.2d 415, 422 (under North Dakota law, a corporation and its owners are separate and distinct except in rare circumstances). The Bureau's unsupported allegation suggesting otherwise can and should be ignored, *see Iqbal*, 556 U.S. at 678, but as laid out above, there are ample alternative grounds upon which to reject the Bureau's position that Smith and Dresser are "covered persons."

[23] The Bureau separately alleges that Smith and Dresser are "covered persons" pursuant to § 5481(26)(A). Compl. ¶¶ 17, 24. Section 5481(26)(A) is the statutory provision defining "service providers." It makes absolutely no reference to "covered persons" and, as such, does not do the work the Bureau appears to suggest it does—i.e., support the contention that Smith and Dresser meet the definition of covered persons. Making matters worse, the Complaint contains no allegations—let alone any plausible ones—that Smith or Dresser are "service providers." *See id.* (alleging only how Smith and Dresser are covered persons under § 5481(15)(A)(vii). These two flawed allegations are representative of larger problem attending this Complaint, discussed at greater length in Section IV.B—viz., the Complaint fails to articulate a comprehensible theory of liability and leaves Defendants guessing at the Bureau's intentions. For the reasons stated above, the Bureau's lapses are a fatal error, requiring dismissal of Count One as to the individual defendants.

household purposes—Smith and Dresser cannot be "related persons," whether or not they are Intercept shareholders and officers.

      D.     <u>Count Two Must be Dismissed Because the Complaint Fails to Plausibly Allege that Smith and Dresser Substantially Assisted Intercept's Purported Violation of the CFPA.</u>

Although Smith and Dresser cannot be held principally liable under the CFPA as "covered" or "related" persons, the Bureau has alternatively proceeded against them by contending that they "substantially assisted" Intercept's allegedly unlawful conduct.  Compl. ¶¶ 130–34; 12 U.S.C. § 5536(a)(3).   Under this provision, a defendant who "knowingly or recklessly provides substantial assistance to a covered person or service provider" is liable "to the same extent" as the covered person or service provider.  *Id.*  This count must be dismissed because the Bureau has failed to state an unfairness claim under § 5531 against Intercept.  12 U.S.C. § 5536(a)(3) (requiring a person to substantially assist a "violation of the provisions" of § 5531).  But even if the Bureau could establish such a violation, Count Two should nevertheless be dismissed because the Bureau has not plausibly alleged that Smith and Dresser "knowingly or recklessly" provided "substantial assistance" to Intercept.  *Id.*

      1.     *The Bureau Has Failed to Plausibly Allege that Smith and Dresser Acted with the Required Mens Rea*

To properly plead liability for substantially assisting an unfairness claim under the CFPA, the Bureau must plausibly allege that a putative defendant acted with a culpable *mens rea*—i.e., "knowingly or recklessly" provided substantial assistance to a covered person or service provider.   12 U.S.C. § 5536(a)(3).   The one court to have evaluated this standard concluded, at a minimum, that it requires a showing by the Bureau of "not merely simple or even inexcusable negligence, but *an extreme departure* from the standards of ordinary care." *Universal Debt* Order at 17–22 (emphasis added).

The *Universal Debt* court arrived at its conclusion by analogizing to § 20(e) of the Securities Exchange Act, which, like the "substantial assistance" provision under the CFPA, establishes "aiding and abetting" liability.   *Compare* 15 U.S.C. § 78t ("any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided"), *with* 12 U.S.C. § 5536(a)(3) ("any person to knowingly or recklessly provide substantial assistance to a covered person or service provider in violation of the provisions of section 5531 of this title, or any rule or order issued thereunder . . . shall be deemed to be in violation of that section to the same extent as the person to whom such assistance is provided"). Both standards were introduced in 2010 in the same statute: the Dodd-Frank Act, and the court accordingly applied the canon of statutory construction *in pari materia* in concluding that Congress intended them to be read as imposing an equivalent *mens rea* requirement—i.e., that a defendant's conduct represents "an extreme departure from the standards of ordinary care." *Universal Debt* Order at 21 (quoting *Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972)) (application of *in pari materia* "certainly makes the most sense when the statutes were enacted by the same legislative body at the same time").

The *Universal Debt* court's reasoning is lengthy and scholarly, *see id.* at 16-22, but may be summarized as follows:  Aiding and abetting liability under § 20(e) historically required a putative defendant to "knowingly" provide substantial assistance.  *Id*. at 18.  Over the years, federal courts interpreted this standard as requiring a showing of actual knowledge *or* an "extreme departure from the ordinary standards of care."  *Id*. at 20-21.  In 2010, with Dodd-Frank, Congress codified this body of decisional law by amending § 20(e) to impose aiding and

abetting liability for "knowing[] or reckless[]" substantial assistance.  This amendment, however, was intended only to *clarify* the law, not substantively change it.  *Id.* at 19–20 (citing *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 800 (11th Cir. 2015)).  That is, Congress intended to correct the holding of those courts that had concluded that "knowingly" encompasses only actual knowledge.  *Big Apple Consulting*, 783 F.3d at 800 (citing H.R. Rep. No. 111-687(I), at 80 (2010)).[24]  Because the Dodd-Frank Act applied the same "knowingly or recklessly" standard to the substantial assistance provision of the CFPA, the *Universal Debt* court held that the *mens rea* elements of § 20(e) and § 5536 should be interpreted similarly.  *Universal Debt* Order at 21.

Some courts, like the Eighth and Eleventh Circuits, characterize the "extreme departure" standard as "severe recklessness," not "recklessness."  *See id.* at 17–20 & 19 n.4 (collecting Eleventh Circuit cases but noting that the Second Circuit defines "reckless conduct" as "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care"); *Camp v. Dema*, 948 F.2d 455, 461 (8th Cir. 1991).  This difference in nomenclature is "insignificant," however.  *Universal Debt* Order at 21.  In *Universal Debt*, the Bureau took the position that Dodd-Frank's addition of the term "recklessly"—without a "severe" modifier—meant that Congress intended for § 5536(a)(3) to impose a form of "recklessness" that was lower than the Eleventh Circuit's "severe recklessness" standard.  *Id.* at 18–19 & n.3.  The court rejected this argument, holding that Congress' omission of the "severe" modifier was "insignificant" because "the severe recklessness formulation the Eleventh Circuit uses is substantively the same as those in other circuits [like the Second Circuit], which simply call it recklessness."  *Id.* at 21; *see also id.* at 19 n.4.  In sum, §§ 20(e) and

---

[24] The Eighth Circuit has not interpreted the meaning of the word "recklessly" as it is used in either § 20(e) or § 5536(a)(3).  *SEC v. Shanahan*, 646 F.3d 536, 547 n.7 (8th Cir. 2011).

5536(a)(3) each require a showing that a putative "aider and abettor" engage in conduct that represents "an extreme departure from the standards of ordinary care," regardless of whether that standard is labelled one of "severe recklessness" or "recklessness." *Id.* at 22.

The actions of Smith and Dresser, as alleged in the Complaint, clearly fail to meet this standard. For one, the Bureau's allegations demonstrate that Smith and Dresser routinely worked with banking professionals to determine the appropriate level of due diligence and even whether to work with certain merchants. *See* Compl. ¶¶ 43, 46, 103, 106–07. This transparency with third parties belies a finding that their actions represented "an extreme departure from the standards of ordinary care." *See Bonhomme Inv. Partners, LLC v. Hayes*, No. 13-475, 2015 U.S. Dist. LEXIS 148055, at *11 (E.D. Mo. Nov. 2, 2015) (holding in a non-§ 20(e) case that plaintiffs failed to prove "severe recklessness" where the defendant's "reliance on other professionals to ensure the validity and enforceability of . . . loans without further personal examination was reasonable"); *Shanahan*, 646 F.3d at 544 (same, where "[d]epending on others to ensure the accuracy of disclosures to purchasers and sellers of securities—even if inexcusably negligent—is not severely reckless conduct that is the functional equivalent of intentional securities fraud"); *cf. SEC v. Prince*, 942 F. Supp. 2d 108, 143 (D.D.C. 2013) (reliance on counsel negates "extreme recklessness").

Second, the Bureau erroneously alleges that prior to September 2015, NACHA "prohibited merchants from using the ACH system if they generated returns categorized as 'unauthorized' in excess of 1%." Compl. ¶ 64. This allegation is demonstrably false. During the operative timeframe, the applicable NACHA rules required ACH network participants to take steps to reduce an out-of-compliance merchant's unauthorized return rate below the 1% threshold over a period of months upon receipt of a notice from NACHA for information

pertaining to the potential violation—they did not prohibit continued processing for such a merchant (indeed, they presume continued processing in order to reduce the rate).  *See* NACHA Operating Rules, Article Two, Subsection 2.17.2.2 (2012) ("The ODFI must reduce the [merchant's] return rate for unauthorized Entries to a rate below one percent within sixty days after receipt of [NACHA's] written request for information and maintain that return rate below one percent for an additional one hundred eighty days"), a true and correct copy of which is attached as Exhibit E.  There is no allegation that Smith and Dresser violated this requirement, let alone "departed"—in an "extreme" fashion—from the applicable NACHA standard.

Finally, the Bureau's vague allegation that Smith and Dresser continued to process for AMG despite "notice of AMG's efforts to evade the law through the pretense of tribal ownership as early as 2011" is inadequate to show "an extreme departure from the standards of ordinary care."[25]  Compl. ¶¶ 88–89.  As the Eighth Circuit has held, the impropriety of a defendant's conduct "must be proved based on contemporaneous standards."  *Shanahan*, 646 F.3d at 545.  Between 2010 and 2014, the overwhelming conclusion of the state courts—including the courts evaluating the structures of the very same AMG entities the Bureau relies upon—was that tribal lenders were not required to comport with state law.  *See e.g.*, *Cash Advance*, 242 P.3d at 1106 (the "trial court erred in denying the [AMG-related] tribal entities' motion to dismiss on the basis that tribal sovereign immunity does not preclude enforcement of the state's investigatory powers with respect to alleged violations of state law"); *Miami Nation Enters.*, 166 Cal. Rptr. 3d 800 (concluding that the doctrine of tribal sovereign immunity protected two tribal lenders affiliated with AMG from California's enforcement action), *depublished following grant of review by* 324 P.3d 834 (Cal. 2014).

---

[25] It is also implausible since Smith and Dresser did not personally process transactions.  *See supra* note 22.

The Bureau's failure to plausibly allege that the actions of Smith and Dresser constituted an "extreme departure from the ordinary standards of care" requires dismissal of Count Two.

2.    *The Bureau Has Failed to Plausibly Allege that Smith and Dresser Substantially Assisted Intercept in Committing a CFPA Violation*

In addition to pleading that Smith and Dresser acted with the requisite *mens rea*, the Bureau must allege plausibly that Smith and Dresser "substantially assisted" Intercept's alleged unfair act or practice.  This too is a rigorous standard, requiring a showing that the defendant engaged in "culpable conduct" that "proximately caused" the principal CFPA violation.  *Metge v. Baehler*, 762 F.2d 621, 624 (8th Cir. 1985).

Like the *mens rea* element, the CFPA's "substantial assistance" requirement has been defined by reference to the securities laws governing aiding and abetting.  *Universal Debt* Order at 36–39.  The Eighth Circuit has interpreted "culpable conduct" in the securities context as requiring the defendant to "have some degree of knowledge that his actions are aiding the primary violator."  *Camp*, 948 F.2d at 460.  Without that knowledge, "engag[ing] in acts which, as it turned out, did give assistance" is not sufficient to meet "substantial assistance" standard because the defendant would lack the requisite "element of blameworthiness."  *Id.*; *see also SEC v. Cohen*, No. 05-371, 2007 U.S. Dist. LEXIS 28934, at *58 (E.D. Mo. Apr. 19, 2007).

Moreover, the Eighth Circuit "requires the plaintiff to show that the secondary party proximately caused the violation, or, in other words, that the encouragement or assistance was a substantial factor in causing the tort."  *K & S Partnership v. Continental Bank, N.A.*, 952 F.2d 971, 979 (8th Cir. 1991); *see also Metge*, 762 F.2d at 624 ("[T]he district court properly held that the appellants had the burden of showing that the secondary party proximately caused the violation."); *Camp*, 948 F.2d at 460 (citations and internal quotation marks omitted)

("[T]here must be a substantial causal connection between the culpable conduct of the alleged aider and abettor and the harm to the plaintiff.").  The same holds in civil actions brought by federal agencies.  *See FDIC v. First Interstate Bank, N.A.*, 885 F.2d 423, 429 n.6 (8th Cir. 1989) (affirming district court jury instruction requiring the jury to find proximate cause); *SEC v. Morriss*, No. 12-80, 2012 U.S. Dist. LEXIS 151885, at *36 (E.D. Mo. Sept. 21, 2012) (citations omitted) ("The aider and abettor's substantial assistance must be a proximate cause of the primary violation.").[26]

There are no such allegations here.  Accordingly, for the same reasons that the Bureau has failed to plead that Smith and Dresser acted with the required *mens rea*, the Bureau has not plausibly alleged that they engaged in "culpable conduct" that "proximately caused" Intercept's alleged unfair act or practice violation.

E.    <u>The Bureau is Unconstitutionally Composed, and so it Lacks the Authority to Bring this Enforcement Action</u>

The entire Complaint must be dismissed because the Bureau is an unconstitutional entity and thus lacks authority to bring this enforcement action.  Fed. R. Civ. P. 12(b)(1).  The Dodd-Frank Act, which created the Bureau in 2010, vests in a single individual—the Bureau Director—the power to enforce the CFPA as well as eighteen other federal statutes.  12 U.S.C. §§ 5481(12), (14), 5564, 5581.  Given the "danger posed by the growing power of the administrative state," one would expect the Director to be significantly constrained by other branches of government.  *City of Arlington v. FCC*, 133 S. Ct. 1863, 1879 (2013) (Roberts, C.J., dissenting).  Yet the Director does not answer to the President (as he can be terminated only "for

---

[26] The *Universal Debt* court adopted the Second Circuit's contrary position that proximate cause "is relevant but not required" to establish substantial assistance in governmental enforcement actions (as distinct from private lawsuits).  *Id.* at 38 (citing *SEC v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012)).  As noted, however, the Eighth Circuit requires a showing of proximate causation even in actions brought by the government.  *First Interstate Bank*, 885 F.2d at 429 n.6.

-38-

cause"), Congress (as he alone sets the Bureau's budget), or other agency leaders (as the Bureau lacks a multi-member commission). These structural deficiencies combine to allow the Director to wield unconstitutional power, in violation of the separation of powers mandate.

1.      *Standard of Review*

The Supreme Court employs a holistic approach to evaluating the constitutionality of an agency's structure. *See Morrison v. Olson*, 487 U.S. 654, 696 (1988) (considering whether the Ethics in Government Act "as a whole" violated the separation of powers). The Court recently applied this approach in *Free Enterprise v. Public Company Accounting Oversight Board*, which involved a constitutional challenge to the provisions governing removal of members of the PCAOB. 561 U.S. 477 (2010). The PCAOB's organic statute, the Sarbanes-Oxley Act, provided that PCAOB members could be removed "for good cause shown" by commissioners of the Securities and Exchange Commission, who in turn are removable by the President under a similar standard. *Id.* at 486–87. The Court held that even though these restrictions on the President's ability to remove the PCAOB members were permissible in isolation, the combined effect of the restrictions "is contrary to Article II's vesting of the executive power in the President" and thus violated the separation of powers. *Id.* at 483–84.

2.      *The Bureau's Unconstitutional Structure*

(a)      Lack of Multi-Member Commission Moderating Influence

Unlike countless federal agencies, the powers of the Bureau are vested in a single individual: the Director. 12 U.S.C. § 5491(b). The Director's powers are not limited to those set forth in the CFPA. Rather, he has the authority to enforce no fewer than eighteen other federal statutes. *Id.* § 5481(12), (14). This coalescence of such power in a single individual—as opposed to a multi-member commission—raises significant separation of powers concerns. As Judge Kavanaugh of the D.C. Circuit recently observed during oral argument in a case

-39-

challenging the constitutionality of the Bureau's structure, "it's very dangerous in our system to put such huge power in a single person."   Transcript of Oral Argument at 17, *PHH Corp. v. CFPB*, No. 15-1177 (D.C. Cir. Apr. 12, 2016) (Kavanaugh, J.).[27]   By contrast, multi-member commissions ensure that an agency will be "non-partisan or bipartisan," a feature which "you can't have . . . with a single person."   *Id.*

> (b)   Lack of Presidential Oversight

Notwithstanding the sweeping amount of power the Director possesses, he is not answerable to the President.  It is well-settled that the "President cannot 'take Care that the Laws be faithfully executed' if he cannot oversee the faithfulness of the officers who execute them." *Free Enter. Fund*, 561 U.S. at 484 (quoting U.S. Const. art. II, § 1, cl. 1).  This constitutional mandate requires the President to possess "the power to remove [executive officers] without delay." *Myers v. United States*, 272 U.S. 52, 134 (1926).  Under the Dodd-Frank Act, however, the Director is removable in limited circumstances only "for cause"—*i.e.*, "inefficiency, neglect of duty, or malfeasance in office."  12 U.S.C. § 5491(c).  Accordingly, as the Bureau recently conceded during oral arguments in *PHH*, the Director can "serve out his or her term regardless of what the next President wants in terms of . . . consumer financial protection," unless terminated for cause.  Transcript of Oral Argument at 17, *PHH Corp. v. CFPB*, No. 15-1177 (D.C. Cir. Apr. 12, 2016).

---

[27] In that case, the Bureau filed an administrative enforcement action against mortgage insurer PHH Corporation for violations of the Real Estate Settlement Procedures Act.  The administrative law judge found the company liable and ordered disgorgement in the amount of $6,442,399.  PHH appealed to the Director, who construed the Bureau's regulations as giving him "*de novo* . . . review as to both facts and law."  Decision of the Director at 9, *In re PHH Corporation*, 2014-CFPB-0002 (June 4, 2015) (citing 12 C.F.R. § 1081.405(a)). Exercising that *de novo* power, Director Cordray upheld the ALJ's liability finding (albeit on different grounds) and, remarkably, increased the disgorgement amount to $109,188,618.  In its appeal to the D.C. Circuit, PHH argued that the Bureau's structure—which gives the Director "sweeping legislative, executive, and judicial power," evidenced by his nearly seventeen-fold increase of the disgorgement penalty—violates the separation of powers mandate. Opening Brief for Petitioners at 45, *PHH Corp. v. CFPB*, No. 15-1177 (D.C. Cir. Sept. 28, 2015).  This matter was argued in April 2016 and is now pending before the D.C. Circuit.

A "for cause" termination provision violates the separation of powers if it "interfere[s] with the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II." *Morrison*, 487 U.S. at 690. The Supreme Court has upheld such provisions, but only where the officer in question was "an inferior officer . . . with limited jurisdiction and tenure and lacking policymaking or significant administrative authority" (*Morrison*) or was part of a multi-member commission (*Humphrey's Executor*). *Morrison*, 487 U.S. at 691 (independent counsel properly removable for cause); *Humphrey's Executor v. United States*, 295 U.S. 602, 626 (1935) (same, for FTC commissioner).[28] Neither case applies here, however, because the Bureau's unprecedented structure grants the Director overwhelming "policymaking and administrative authority" that is unchecked by the moderating influence of a multi-member commission.

As one United States congressman has observed, Dodd-Frank has enabled the Bureau to operate "with such secrecy, unaccountability, and bureaucratic tyranny it would make a Soviet Commissar blush" and to act "as judge, jury, and executioner, all without accountability and all without due process." Jeb Hensarling, U.S. Representative & Chairman of the House of Representatives Financial Services Committee, Speech at the National Center for Policy Analysis (May 12, 2016) (hereinafter, *Hensarling Speech*). In these circumstances, by requiring only "for cause" removal of the Director, Dodd-Frank prevents the President from fulfilling his duty to ensure that the CFPA, and the other eighteen federal statutes that the Director enforces, are "faithfully executed."

---

[28] *Humphrey's Executor* has been called into question, and Defendants here preserve the argument that it should be overruled. *See In re Aiken Cnty.*, 645 F.3d 428, 444, 446 (D.C. Cir. 2011) (Kavanaugh, J., concurring) ("The [*Free Enterprise*] Court's rhetoric and reasoning are notably in tension with *Humphrey's Executor*.").

(c)     Lack of Congressional Oversight

Congress also lacks the ability to rein in the Director, because he alone has the power to fund the Bureau. Under the CFPA, the Director is empowered to requisition up to 12% of the Federal Reserve's operating expenses—$631.7 million for the fiscal year 2016 and $646.2 for the fiscal year 2017. 12 U.S.C. § 5497(a)(1); Consumer Financial Protection Bureau, *The CFPB Strategic Plan, Budget, and Performance Plan and Report* 9 (Feb. 2016), *available at* http://files.consumerfinance.gov/f/201602_cfpb_report_strategic-plan-budget-and-performance-plan_FY2016.pdf. Critically, Congress has *no authority* to review the Director's budget demand. *See* 12 U.S.C. § 5497(a)(2)(c) ("[T]he funds derived from the Federal Reserve System . . . shall not be subject to review by the Committees on Appropriations of the House of Representatives and the Senate.").

Without any control over the Bureau's funding, the Dodd-Frank Act deprives Congress of a significant check on the power of the Bureau and its Director. Congress routinely wields its "power of the purse" to curb regulatory overreach by federal agencies. *See Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990) (this power has the "fundamental and comprehensive purpose" of "assur[ing] that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents"). In fact, this power has been used to substantial effect in the context of "unfairness" claims in particular. As recounted by a former FTC commissioner, in the late 1970s, "[t]he breadth, overreaching, and lack of focus in the FTC's ambitious rulemaking agenda outraged many in business, Congress, and the media." *The FTC's Use of Unfairness Authority: Its Rise, Fall, and Resurrection* at II.B. To combat what it perceived as regulatory abuse of its unfairness authority, Congress refused to fund the agency, thus "shut[ing]

-42-

down the FTC for several days." *Id.* This funding restriction contributed to the FTC "abandon[ing] most of its rulemaking initiatives." *Id.*

Many in Congress are similarly "outraged" by the "Orwellian-named Consumer Financial Protection Bureau," calling the Bureau "a case study in the overreach and pathologies of the unaccountable, administrative state run amok" and an entity that "[a]t almost every opportunity, . . . abuses and exceeds its statutory authority, which is already immense." *Hensarling Speech.*[29] But because the Director independently controls the Bureau's funding, Congress lacks an essential tool for reining in these unconstitutional excesses.

* * *

Taken together, these structural deficiencies violate the Constitution's separation of powers mandate. Congress has never before granted so much power to a single individual who is unanswerable to the President, Congress, or other agency leaders. Unfortunately for the Bureau, uniqueness is no saving grace. The Supreme Court in *Free Enterprise* emphasized that the lack of historical precedent for a federal agency is "[p]erhaps the most telling indication of [a] severe constitutional problem." *Free Enter. Fund*, 561 U.S. at 505–506. Consistent with this pronouncement, in *PHH*, the D.C. Circuit *sua sponte* issued an order asking the parties to be prepared to address at oral argument "what independent agencies"—i.e., "an agency whose head is not removable at will but is removable only for cause"—"now or historically have been

---

[29] Similar sentiments have been raised by federal judges. *See, e.g., Accrediting Council for Independent Colleges & Schools*, 2016 U.S. Dist. LEXIS 53644. In the *ACICS* case, the Bureau, apparently not content with its dominion over "the offering and provision of consumer financial products or services," 12 U.S.C. § 5491(a), issued a civil investigative demand to determine whether ACICS committed an unfair act and practice in connection with its accreditation of for-profit colleges. *Id.* at *5–7. In a sharply worded opinion, Judge Leon rejected all the Bureau's "*post hoc* justification[s]" for investigating conduct that had nothing to do with consumer financial products or services, and warned that "[a]lthough it is understandable that new agencies like the CFPB will struggle to establish the exact parameters of their authority, they must be especially prudent before choosing to plow head long into fields not clearly ceded to them by Congress." *Id.* at *7–9.

headed by a single person?"  Order, *PHH Corp. v. CFPB*, No. 15-1177 (D.C. Cir. Apr. 4, 2016). When pressed at oral argument, the Bureau identified only three agencies—the Social Security Administration, Office of Special Counsel, and Federal Housing Finance Agency.  Transcript of Oral Argument at 16–21, *PHH Corp. v. CFPB*, No. 15-1177 (D.C. Cir. Apr. 12, 2016). Although each is headed by a single individual removable for cause, only one (FHFA) is funded outside the appropriations process, and none possesses even a fraction of the powers wielded by the Director.

In light of its unconstitutional structure, the Bureau's enforcement action must be dismissed with prejudice.

V.      **Conclusion**

For the foregoing reasons, the Court should dismiss the Complaint against Intercept, Smith, and Dresser with prejudice.

Dated: August 8, 2016                              Respectfully submitted,

                                                   */s/ Michael T. Andrews*
                                                   Michael T. Andrews (ND #05516)
                                                   David J. Hauff (ND #04145)
                                                   Anderson, Bottrell, Sanden & Thompson
                                                   4132 30th Ave SW, Suite 100
                                                   PO Box 10247
                                                   Fargo, ND 58106-0247
                                                   (701) 235-3300
                                                   mandrews@andersonbottrell.com
                                                   dhauff@andersonbottrell.com

                                                   and

                                                   Jay A. Dubow
                                                   Richard J. Zack (admitted *Pro Hac Vice*)
                                                   Matthew Homberger (admitted *Pro Hac Vice*)
                                                   Pepper Hamilton LLP
                                                   3000 Two Logan Square
                                                   Eighteenth and Arch Streets
                                                   Philadelphia, PA 19103-2799
                                                   (215) 981-4000
                                                   zackj@pepperlaw.com
                                                   dubowj@pepperlaw.com
                                                   hombergerm@pepperlaw.com

                                                   *Attorneys for Defendants*