**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

**EASTERN DIVISION**

| | |
|---|---|
| **CONSUMER FINANCIAL PROTECTION BUREAU,** | |
| *Plaintiff*, | Civil Action No. 3:16-cv-00144 |
| v. | |
| **INTERCEPT CORPORATION**, *et al.*, | |
| *Defendants*. | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**


I. Preliminary Statement ..... 1

II. Argument and Authorities ..... 5

A. Standard of Review ..... 5

B. Defendants engaged in and substantially assisted unfair acts or practices by electronically debiting millions of dollars from consumers' accounts despite numerous warnings that the payment requests were illegal or fraudulent ..... 6

1. Defendants are subject to the Consumer Financial Protection Act's prohibitions on engaging in and substantially assisting unfair practices ..... 6

a. Intercept is both a covered person and a service provider ..... 6

b. Smith and Dresser are covered persons as well as related persons ..... 15

2. Intercept, Smith, and Dresser engaged in unfair acts or practices ..... 17

a. Defendants' conduct caused or was likely to cause substantial injury ..... 18

b. The injury to consumers was not reasonably avoidable ..... 23

3. Smith and Dresser substantially assisted the unfair acts or practices ..... 26

C. The Bureau's claims are not time barred ..... 29

D. The Bureau's structure is constitutional ..... 35

III. Conclusion ..... 39

# TABLE OF AUTHORITIES

**CASES**

*AINS, Inc. v. United States*, 56 Fed. Cl. 522 (Fed. Cl. 2003)........................................................38

*Am. Fed'n of Gov't Emps.*, *AFL-CIO v. FLRA*, 388 F.3d 405 (3d Cir. 2004)........................37, 38

*Arista Records LLC v. Gruebel*, 453 F. Supp. 2d 961 (N.D. Tex. 2006)................................22, 23

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)........................................................................................5, 20

*Aten v. Scottsdale Ins. Co.*, 511 F.3d 818 (8th Cir. 2008) ..............................................................9

*Badaracco v. Comm'r*, 464 U.S. 386 (1984) ...............................................................................29, 30

*BedRoc Ltd. LLC v. United States*, 541 U.S. 176 (2004)...............................................................27

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .......................................................5, 20, 23

*Bell v. Pfizer, Inc.*, 716 F.3d 1087 (8th Cir. 2013)..............................................................................8

*Bonhomme Inv. Partners, LLC v. Hayes*, No. 4:13-cv-475, 2015 WL 6702257 (E.D. Mo. Nov. 2, 2015) ..........................................................................................................................................28

*BP America Prod. Co. v. Burton*, 549 U.S. 84 (2006)......................................................................29

*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009) ....................................................28

*Cuellar-Aguilar v. Deggeller Attractions, Inc.*, 812 F.3d 614 (8th Cir. 2015)................................8

*CFPB v. All American Check Cashing, Inc.*, No. 3:16-cv-00356 (S.D. Miss. July 15, 2016) ......22

*CFPB v. ITT Educ. Servs*. Inc., No. 1:14-cv-00292, 2015 WL 1013508 (S.D. Ind. Mar. 6, 2015) ...............................................................................................................................17, 36, 38

*CFPB v. Morgan Drexen, Inc.*, 60 F. Supp. 3d 1082 (C.D. Cal. 2014)...........................36, 37, 38

*CFPB v. Universal Debt & Payment Solutions, LLC*, No. 1:15-cv-00859 (N.D. Ga. Sept. 1, 2015) ........................................................................................................................................ passim

*Davis v. HSBC Bank Nevada, NA*, 691 F.3d 1152 (9th Cir. 2012)................................................25

*Dep't of Homeland Security v. MacLean*, 135 S. Ct. 913 (2015).................................................11

*Eckert v. Titan Tire Corp.*, 514 F.3d 801 (8th Cir. 2008)..............................................................5

*Emerson v. Cleveland*, No. 3:09-cv-36, 2011 WL 1103243 (D.N.D. Mar. 22, 2011)....................5

*Farmer v. Brennan*, 511 U.S. 825 (1994)..............................................................26, 27

*FDIC v. Wabick*, 214 F. Supp. 2d 864 (N.D. Ill. 2002)..............................................33

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010)......................36, 39

*FTC v. AMG Servs., Inc.*, 29 F. Supp. 3d 1338 (D. Nev. 2014)......................................31

*FTC v. Capital Choice Consumer Credit, Inc.*, No. 02-21050 CIV, 2004 WL 5149998 (S.D. Fla. Feb. 20, 2004)....................................................................................3, 24

*FTC v. Global Mktg. Grp., Inc.*, 594 F. Supp. 2d 1281 (M.D. Fla. 2008)..........................3, 24

*FTC v. Ideal Fin. Solutions, Inc.*, No. 2:13-cv-00143, 2015 WL 4032103 (D. Nev. June 30, 2015)...........................................................................................19

*FTC v. IFC Credit Corp.*, 543 F. Supp. 2d 925 (N.D. Ill. 2008)......................................25

*FTC v. Instant Response Sys., LLC*, No. 13 Civ. 00976, 2014 WL 558688 (E.D.N.Y. Feb. 11, 2014)...........................................................................................34, 35

*FTC v. InterBill, Ltd.*, No. CV–S–06–01644, 2009 WL 10267504 (D. Nev. Apr. 30, 2009)...........................................................................................3, 23, 24

*FTC v. Loewen*, No. C12-1207, 2013 WL 5816420 (W.D. Wash. Oct. 29, 2013)...........................3

*FTC v. Neovi*, 598 F. Supp. 2d 1104 (S.D. Cal. 2008)..............................................19, 24

*FTC v. Neovi*, 604 F.3d 1150 (9th Cir. 2010)................................................4, 19, 23, 24

*FTC v. Real Wealth, Inc.*, No. 10-0060-CV-W, 2011 WL 3206887 (W.D. Mo. Jul. 8, 2011)......35

*FTC v. Wells*, 385 Fed. App'x 712 (9th Cir. 2010)....................................................3, 24

*FTC v. Windward Mktg. Grp., Inc.*, No. 1:96-cv-615F, 1997 WL 33642380 (N.D. Ga. Sept. 30, 1997)...........................................................................................22, 24

*FTC v. Wyndham Worldwide Corp.*, 10 F. Supp. 3d 602 (D.N.J. 2014).................................19

*FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015)...................................18, 19

*Gabelli v. SEC*, 133 S. Ct. 1216 (2013)...............................................................33

*Gomez v. Toledo*, 446 U.S. 635 (1980) ....................30

*Humphrey's Executor v. United States*, 295 U.S. 602 (1935) ....................36, 37

*Jessie v. Potter*, 516 F.3d 709 (8th Cir. 2008) ....................30

*John R. Sand & Gravel Co. v. United States*, 552 U.S. 130 (2008) ....................30

*Knieriem v. Grp. Health Plan, Inc.*, 434 F.3d 1058 (8th Cir. 2006) ....................5

*Kushner v. Beverly Enters., Inc.*, 317 F.3d 820 (8th Cir. 2003) ....................32

*In re LabMD, Inc.*, No. 9357, 2016 WL 4128215 (F.T.C. July 28, 2016) ....................18

*Lansdowne on the Potomac Homeowners Ass'n v. OpenBand at Lansdowne, LLC*, 713 F.3d 187 (4th Cir. 2013) ....................10

*Leisman v. Archway Med., Inc.*, 53 F. Supp. 3d 1144 (E.D. Mo. 2014) ....................23

*Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110 (11th Cir. 2014) ....................10

*McAuley v. Federal Ins. Co.*, 500 F.3d 784 (8th Cir. 2007) ....................5

*Mistretta v. United States*, 488 U.S. 361 (1989) ....................39

*Morrison v. Olson*, 487 U.S. 654 (1998) ....................36

*New Jersey v. New York*, 523 U.S. 767 (1998) ....................18

*Oriental Trading Co. v. Firetti*, 236 F.3d 938 (8th Cir. 2001) ....................16

*Orkin Exterminating Co. Inc. v. FTC*, 849 F.2d 1354 (11th Cir. 1988) ....................23

*Reis v. Walker*, 491 F.3d 868 (8th Cir. 2007) ....................9

*Reyes v. Netdeposit, LLC*, 802 F.3d 469 (3d Cir. 2015) ....................3

*Rodriguez v. United States*, 480 U.S. 522 (1987) ....................11

*Schaaf v. Residential Funding Corp.*, 517 F.3d 544 (8th Cir. 2008) ....................5

*S & E Contractors, Inc. v. United States*, 406 U.S. 1 (1972) ....................33, 34

*SEC v. Prince*, 942 F. Supp. 2d 108 (D.D.C. 2013) ....................28

*SEC v. Shanahan*, 646 F.3d 536 (8th Cir. 2011) ....................28

*Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997 (2012)........................................................27

*United States v. $515,060.42 in U.S. Currency*, 152 F.3d 491 (6th Cir. 1998) ............................34

*United States v. Bruguier*, 735 F.3d 754 (8th Cir. 2013) .............................................................11

*United States v. Findett Corp.*, 220 F.3d 842 (8th Cir. 2000) ......................................................29

*United States v. Manamela*, 612 Fed. App'x 151 (3d Cir. 2015) .................................................10

*United States v. Rodriguez*, 389 F. Supp. 2d 1135 (D.N.D. 2005) ...............................................27

*United States v. Twenty-Seven Parcels of Real Property*, 236 F.3d 438 (8th Cir. 2001) ........33, 34

*United States ex rel. Zissler v. Regents of the Univ. of Minn.*, 992 F. Supp. 1097 (D. Minn. 1998) ........................................................................................................................................33

*Varner v. Peterson Farms*, 371 F.3d 1011 (8th Cir. 2004) ....................................................30, 31

*Wyler v. Korean Air Lines Co.*, 928 F.2d 1167 (D.C. Cir. 1991) .................................................33

**CONSENT ORDERS**

*CFPB v. Cellco P'ship*, No. 15-3268 (D.N.J. June 9, 2015) .........................................................4

*CFPB v. Global Client Solutions LLC*, No. 2:14-cv-06643 (C.D. Cal. Aug. 27, 2014).................4

*CFPB v. Meracord LLC*, No. 3:13-cv-05871 (W.D. Wash. Oct. 4, 2013) ....................................4

*CFPB v. Sprint Corp.*, No. 14-cv-009931 (S.D.N.Y. June 30, 2015)............................................4

*FTC v. Capital Payments, LLC*, No. 16-CV-526 (E.D.N.Y. Feb. 3, 2016)....................................4

*FTC v. First American Payment Processing, Inc.*, No. CV 04-0074 (D. Ariz. Nov. 29, 2004)......4

*FTC v. Electronic Fin. Grp., Inc.*, No. W-03-CA-211 (W.D. Tex. Mar. 23, 2004) .......................4

*FTC v. Landmark Clearing, Inc.*, No. 4:11cv826 (E.D. Tex. Dec. 29, 2011) ................................4

*FTC v. Process America, Inc.*, No. CV14-0386 (C.D. Cal. Jan. 23, 2014) ...................................3

*FTC v. Your Money Access, LLC*, No. 07-5147 (E.D. Penn. Aug. 12, 2010) ................................3

*FTC v. Universal Processing, Inc.*, No. CV05-6054 (C.D. Cal. Aug. 22, 2005) .......................3, 4

**STATUTES**

12 U.S.C. § 16 ....................37

12 U.S.C. § 243 ....................37

12 U.S.C. § 1462a ....................38

12 U.S.C. § 1755 ....................37, 38

12 U.S.C. § 1817 ....................37

12 U.S.C. § 4516 ....................37

12 U.S.C. § 5481 .................... passim

12 U.S.C. § 5491 ....................1, 36

12 U.S.C. § 5497 ....................37

12 U.S.C. § 5511 ....................1, 12

12 U.S.C. § 5514 ....................8

12 U.S.C. § 5517 ....................10

12 U.S.C. § 5531 ....................1, 6, 17, 26

12 U.S.C. § 5536 ....................1, 6, 17, 26

12 U.S.C. § 5561 ....................35

12 U.S.C. § 5564 ....................1, 30

12 U.S.C. § 5565 ....................1

15 U.S.C. § 45 ....................19

15 U.S.C. § 53 ....................34

**RULES**

Fed. R. Civ. P. 8(a)(2) ....................5

Fed. R. Civ. P. 8(c) ....................30

Fed. R. Civ. P. 12(b)(6)........................................................................................5, 23, 30

**LEGISLATIVE MATERIALS**

S. Rep. No. 111-176 (2010)........................................................................................8, 12

**OTHER AUTHORITIES**

Black's Law Dictionary (10th ed. 2014)........................................................................14

*FTC v. AMG Servs. Inc.*, No. 2:12-cv-00536 (D. Nev. Feb. 13, 2013) (Pl.'s Mot. for Partial Summ. Judgment)........................................................................................21, 22

Conference of State Bank Supervisors, Third Party Payment Processors Job Aid (Feb. 2014; revised Aug. 2014), available at www.csbs.org/regulatory/resources/Documents/Third_Party_Payment_ Processor_Job_Aid%20revised%20Aug14.pdf........................................................................3

FDIC, Payment Processor Relationships: Revised Guidance (FIL-3-2012) (Jan. 31, 2012; revised July 2014), available at www.fdic.gov/news/news/financial/2012/fil12003.html ......................2, 3

FTC, Policy Statement on Unfairness, available at www.ftc.gov/public-statements/1980/12/ftc-policy-statement-unfairness (Dec. 17, 1980)........................................................................19, 25

NACHA, 2012 Operating Rules and Guidelines, Article II (2012)..............................................2

NACHA, *About NACHA*, www.nacha.org/about........................................................................18

The Pew Charitable Trusts, Auto Title Loans: Market Practices and Borrowers' Experiences (Mar. 2015), available at www.pewtrusts.org/~/media/assets/2015/03/autotitleloansreport.pdf....9

Restatement (Third) of Agency § 7:01 (2006)........................................................................16

Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 2 (2016)................26

U.S. Department of Justice, *Org. Chart*, www.justice.gov/agencies/chart..................................34

16AA Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3975 (4th ed. 2016)........................................................................................9

**I. Preliminary Statement**

The Consumer Financial Protection Bureau ("Bureau") brings this action in response to violations of federal law that resulted in millions of dollars of harm to people across the country. Those violations, and the consumer injury they caused, are no less severe for the fact that they took place out of sight on an electronic payments network, were talked about in an esoteric jargon of "Originating Depository Financial Institutions" and the like, and were carried out by businesspeople who rarely dealt directly with the consumers they harmed. The Bureau's complaint alleges that defendants Intercept Corporation, its president and shareholder Bryan Smith, and its CEO and shareholder Craig Dresser violated the Consumer Financial Protection Act by debiting millions of dollars from consumers' bank accounts on behalf of their clients despite numerous red flags that the payment requests they were submitting were fraudulent or illegal. Defendants have moved to dismiss the complaint for lack of subject-matter jurisdiction and failure to state a claim. The Court should deny that motion in its entirety.

Congress established the Bureau in the wake of the recent financial crisis to ensure that consumers have access to markets for financial products and services that are fair, transparent, and competitive. 12 U.S.C. § 5511. The Bureau is an independent agency charged by Congress with the responsibility to enforce the Consumer Financial Protection Act and other federal consumer financial laws. §§ 5491, 5564. It has authority to bring civil actions against persons violating such laws to "impose a civil penalty or to seek all appropriate legal and equitable relief including a permanent or temporary injunction as permitted by law." §§ 5564; 5565. The violations alleged in this complaint arise under the Consumer Financial Protection Act's prohibitions on unfair acts or practices, §§ 5531, 5536(a)(1), and on substantially assisting such violations, § 5536(a)(3).

More specifically, those violations involve Defendants' conduct processing fraudulent and illegal requests for payment from consumers' bank accounts using a nationwide electronic payments network, the Automated Clearing House (ACH) system. The ACH system allows businesses and individuals to move money quickly and conveniently between bank accounts—roughly $40 trillion each year. To use the system, many businesses rely on third-party payment processors such as Intercept that have preexisting relationships with one or more banks.

As gatekeepers to a system in which so much money changes hands, third-party payment processors as well as the banks they work with have responsibilities to monitor their transactions for suspicious activity and not enable fraud on the ACH network. See, e.g., NACHA, 2012 Operating Rules and Guidance (2012), Art. II (trade-association guidelines describing duties of bank and third-party senders, including ensuring that the system is not used for transmitting illegal payments), portions attached as Amicus's Ex. A, ECF No. 20-2. Processors and banks that shirk these responsibilities or look the other way by giving fraudsters and criminals access to the ACH system can, in doing so, amplify the resulting harm to consumers by orders of magnitude above what their clients would be capable of with cash or paper checks alone.

Industry has been on notice for years of this enormous potential for consumer fraud and abuse, and it has become clearly established that the failure to watch for such activity can result in liability for banks and payment processors. For example, the FDIC warned in 2012 that, "Financial institutions that fail to adequately manage these relationships may be viewed as facilitating a payment processor's or merchant client's fraudulent or unlawful activity and, thus, may be liable for such acts or practices." Payment Processor Relationships: Revised Guidance (FIL-3-2012), at 2 (Jan. 31, 2012; revised July 2014), available at

www.fdic.gov/news/news/financial/2012/fil12003.pdf. More recently, the Conference of State Bank Supervisors stated with respect to third-party payment processors that:

> Financial institutions that … [work with third-party processors] may find that these relationships expose them to a greater level of compliance, credit, and legal risk. The heightened risk exposure often results from the riskiness of a processor's underlying clients. Processors may deliver services to clients that engage in deceptive, abusive, or illegal practices … . Insufficiently managing such risks could result in enforcement and legal actions.

Third Party Payment Processors Job Aid, at 2 (Feb. 2014; revised Aug. 2014), available at www.csbs.org/regulatory/resources/Documents/Third_Party_Payment_Processor_Job_Aid%20revised%20Aug14.pdf. As well, a large and growing body of case law stands for the proposition that payment processors cause serious consumer injury—and violate the law—when they ignore warning signs of illegal activity and continue to facilitate their clients' use of electronic payments systems.[1] More generally, "[c]ourts have long held that consumers are injured for

---

[1] *CFPB v. Universal Debt & Payments Solution, LLC*, No. 1:15-cv-00859 (N.D. Ga. Sept. 1, 2015) (Bureau stated unfairness claim against payment processors for processing transactions in the face of red flags indicating fraud); *FTC v. InterBill, Ltd.*, No. CV-S-06-01644, 2009 WL 10267504, at *1 (D. Nev. Apr. 30, 2009) ("[D]efendants' acts and practices in processing debit transactions to consumers' bank accounts, while knowing or consciously avoiding knowing that those debit transactions were unauthorized by consumers," was unfair.), *aff'd under the name, FTC v. Wells*, 385 Fed. App'x 712 (9th Cir. 2010); *FTC v. Global Mktg. Grp., Inc.*, 594 F. Supp. 2d 1281, 1288–89 (M.D. Fla. 2008) (unfair for payment processor to process transactions on behalf of fraudulent telemarketing schemes). See also *Reyes v. Netdeposit, LLC*, 802 F.3d 469 (3d Cir. 2015) (reversing denial of class certification on RICO claim against bank and payment processors alleging a fraudulent scheme to process unauthorized debits from consumer accounts); *FTC v. Loewen*, No. C12-1207, 2013 WL 5816420, at *6–7 (W.D. Wash. Oct. 29, 2013) (defendants' credit card processing was deceptive and violated Telemarketing Sales Rules); *FTC v. Capital Choice Consumer Credit, Inc.*, No. 02-21050 CIV, 2004 WL 5149998, at *37 (S.D. Fla. 2004) (unfair to debit consumer accounts on behalf of deceptive telemarketing scheme).

The FTC has brought and settled numerous similar claims against payment processors in recent years. E.g., *FTC v. Process America, Inc.*, No. CV14-0386 (C.D. Cal. Jan. 23, 2014) (settling allegations that payment processor unfairly debited unauthorized charges despite red flags); *FTC v. Your Money Access, LLC*, Civ. No. 07-5147 (E.D. Pa. Aug. 12, 2010) (settling allegations that payment processor unfairly debited or attempted to debit millions of dollars on behalf of fraudulent telemarketers); *FTC v. Universal Processing Inc.*, CV-05-6054 (C.D. Cal.

purposes of [identifying unfair acts or practices] not solely through the machinations of those with ill intentions, but also through the actions of those whose practices facilitate, or contribute to, ill intentioned schemes if the injury was a predictable consequence of those actions." *FTC v. Neovi*, 604 F.3d 1150, 1156 (9th Cir. 2010) (citing cases going back decades).

Nonetheless, Defendants argue that the Bureau's complaint in this case should be dismissed. They advance three basic arguments in support of their motion. First, they argue that the Bureau has, in various respects, failed to adequately plead that Defendants engaged in unfair acts and practices. The Court should reject this argument because in bringing this action, the Bureau has fully met the standard for alleging claims of unfairness and substantial assistance against Intercept, Smith, and Dresser. Second, Defendants suggest that the Bureau's action is time-barred based on unspecified information supposedly known by a separate agency—the FTC—before the Bureau even began its investigation of Intercept. Not only does Defendants' argument rely on alleged facts far beyond the ambit of the complaint, it is also completely unsupported by the law. Finally, Defendants argue that the Bureau itself is unconstitutional.

---

Aug. 22, 2005) (settling allegations that payment processor unfairly debited or attempted to debit $1.2 million despite clear signs that debits were unauthorized); *FTC v. First American Payment Processing, Inc.*, No. CV-04-0074 (D. Ariz. Nov. 29, 2004) (settling allegations that payment processor unfairly processed unauthorized or otherwise illegal payment requests); *FTC v. Electronic Fin. Group*, No. W-03-CA-211 (W.D. Tex. Mar. 23, 2004) (settling allegations that payment processor unfairly processed ACH transactions on behalf of outbound telemarketers). See also *FTC v. Capital Payments, LLC*, No. 16-CV-526 (E.D.N.Y. Feb. 3, 2016) (settling allegations that marketer of payment-processing services assisted deceptive telemarketing scheme by facilitating payment requests it knew or should have known were illegal); *FTC v Landmark Clearing, Inc.*, No. 4:11cv826 (E.D. Tex. Dec. 29, 2011) (settling allegations that processor used payment method known as remotely created payment orders to unfairly facilitate unauthorized charges). See also *CFPB v. Sprint Corp.*, No. 14-cv-9931 (S.D.N.Y. June 30, 2015) (settling allegations that telecom provider acted unfairly when serving as payment processor by disregarding red flags that clients were submitting authorized charges); *CFPB v. Cellco P'ship*, No. 15-3268 (D.N.J. June 9, 2015) (same); *CFPB v. Global Client Solutions, LLC*, No. 2:14-cv-06643 (C.D. Cal. Aug. 27, 2014) (settling allegations that payment processor violated Telemarketing Sales Rule by processing illegal fees on behalf of debt-settlement companies); *CFPB v. Meracord LLC*, No. 3:13-cv-05871 (W.D. Wash. Oct. 4, 2013) (same).

Defendants' arguments founder once again, as they cannot find any support in the Constitution's text or judicial precedent. For these reasons, explained more fully below, Defendants' motion to dismiss should be denied on all counts.

## II. Argument and Authorities

### A. Standard of Review

A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This statement must provide the defendant with fair notice of the plaintiff's claim and the grounds upon which it rests. *Eckert v. Titan Tire Corp.*, 514 F.3d 801, 806 (8th Cir. 2008). When determining whether a complaint states a claim, the court should construe the complaint liberally, in the light most favorable to the plaintiff. *Id.*; *Emerson v. Cleveland*, No. 09-cv-36, 2011 WL 1103243, at *2 (D.N.D. Mar. 22, 2011). A court must accept all factual allegations in the complaint as true and grant every reasonable inference in favor of the plaintiff. *McAuley v. Fed. Ins. Co.*, 500 F.3d 784, 787 (8th Cir. 2007); *Knieriem v. Group Health Plan, Inc.*, 434 F.3d 1058, 1060 (8th Cir. 2006).

To survive a Rule 12(b)(6) motion to dismiss, a complaint need not contain detailed factual allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). However, assuming the factual allegations in the complaint are true, those factual allegations "must be enough to raise a right to relief above the speculative level." *Id.*; see also *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 549 (8th Cir. 2008). A complaint must contain enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**B. Defendants engaged in and substantially assisted unfair acts or practices by electronically debiting millions of dollars from consumers' accounts despite numerous warnings that the payment requests were illegal or fraudulent.**

**1. Defendants are subject to the Consumer Financial Protection Act's prohibitions on engaging in and substantially assisting unfair practices.**

The Bureau's complaint alleges two violations of the Consumer Financial Protection Act: that Intercept, Smith, and Dresser engaged in unfair acts or practices in violation of 12 U.S.C. §§ 5531, 5536(a)(1), and that Smith and Dresser provided substantial assistance to Intercept in violation of 12 U.S.C. § 5536(a)(3). The Act sets out several categories of persons to which these provisions apply: "covered persons," § 5481(6); "service providers,"§ 5481(26); "related persons," § 5481(25); and "any person" who knowingly or recklessly assists a covered person or service provider's unfair conduct, § 5536(a)(3). The factual allegations in the Bureau's complaint, accepted as true and construed in the light most favorable to the plaintiff, establish that Defendants fit these categories and thus are subject to the prohibitions on unfair acts or practices and substantial assistance.

**a. Intercept is both a covered person and a service provider.**

The Bureau's complaint plausibly alleges that Intercept meets the definitions of both "covered person" and "service provider," and is therefore subject to the prohibition on unfair acts or practices. See § 5536(a)(1) (deeming it unlawful for "any covered person or servicer provider" to engage in any unfair act or practice).

*Covered Person*: Under the Consumer Financial Protection Act, a "covered person" includes "any person that engages in offering or providing a consumer financial product or service." § 5481(6). A "consumer financial product or service" is in turn defined to include "any financial product or service that is described in one or more categories under [section 5481(15)] and is offered or provided for use by consumers primarily for personal, family, or household

purposes." § 5481(5). The categories of financial products or services described under section 5481(15) include, as relevant here, "providing payments or other financial data processing products or services to a consumer by any technological means, including processing or storing financial or banking data for any payment instrument, or through any payments systems or network used for processing payments data, including payments made through an online banking system." § 5481(15)(A)(vii).

Applying these nesting statutory provisions to the complaint, the facts alleged establish that Intercept is a covered person. First, the complaint alleges that Intercept's services squarely fit the definition of a "financial product or service" in section 5481(15)(A)(vii) because they consisted of providing payment processing services to consumers by transmitting payment requests through the ACH system, an electronic payments network. Compl. ¶¶ 9, 26–37. Next, the complaint alleges that this financial product or service was a *consumer* financial product or service because it was offered for use by consumers primarily for personal, family, or household purposes. The complaint states that Intercept processed payments for "consumer lenders such as payday lenders, auto title lenders, sales finance companies, and debt collectors." ¶ 26. It describes such entities as covered persons, ¶ 10, which necessarily means that they offered their services for use by consumers "primarily for personal, family, or household purposes." See 12 U.S.C. § 5481(5). There can be no dispute that when a consumer makes an electronic payment on a product such as a consumer loan that was taken out for personal, family, or household purposes, that electronic payment service is also being used for a personal, family, or household purpose. Intercept's payment processing was thus a consumer financial product or service. Lastly, the complaint alleges that Intercept "engages in offering or providing" this consumer financial product or service, e.g., ¶¶ 26–37, and is therefore a covered person.

Defendants nonetheless contend that the complaint should be dismissed in its entirety because it does not state explicitly (1) that Intercept's clients offered their products for one of the three consumer purposes ("personal, family, or household"), or (2) that Intercept's payment-processing service was also used for these purposes. Defs' Mem. at 21, 28. In doing so, they turn the appropriate legal standard on its head by attempting to read all factual allegations in the complaint in the light *least* favorable to the nonmoving party and draw all reasonable inferences *against* the plaintiff. Cf., e.g., *Cuellar-Aguilar v. Deggeller Attractions, Inc.*, 812 F.3d 614, 618 (8th Cir. 2015) (On a 12(b)(6) motion, "courts must draw all reasonable inferences in favor of the plaintiff."); *Bell v. Pfizer, Inc.*, 716 F.3d 1087, 1091 (8th Cir. 2013) ("[W]e assume all factual allegations in the pleadings are true and interpret them in the light most favorable to the nonmoving party.") (internal quotation marks removed).

Applying the correct standard for a motion to dismiss and drawing all reasonable inferences in the Bureau's favor, it is clear that the facts in the complaint establish that Intercept's clients provided consumer financial products or services for use by consumers for personal, family, or household purposes. For example, the complaint alleges that Intercept's "covered person" clients included "consumer lenders such as payday lenders, auto title lenders, sales finance companies, and debt collectors." These allegations necessarily mean that the clients' products were used for consumer purposes, both because that is a clear statutory predicate to the clients being "covered persons" and because the clients' offerings are archetypical consumer financial products. See, e.g., 12 U.S.C. § 5514(a)(1) (including payday loans as one of only three specifically enumerated industries over which the Bureau has supervisory authority); S. Rep. No. 111-176, at 19–21 (2010) (describing continuing consumer-protection concerns in the fields of payday lending and debt collection that the Bureau would be

empowered to address); The Pew Charitable Trusts, Auto Title Loans: Market Practices and Borrowers' Experiences, at 6 (Mar. 2015) ("Nearly all [auto title loan] borrowers—94 percent—report using the loans exclusively for personal or family expenses, not business expenses."), available at www.pewtrusts.org/~/media/assets/2015/03/autotitleloansreport.pdf.[2] And because the complaint describes in detail how Intercept processed consumer payments on these consumer products taken out for consumer purposes, the complaint also sufficiently alleges that Intercept's services were used by consumers for consumer purposes. Defendants' argument that such reasonable inferences must instead be made *against* the Bureau is wrong as a matter of law.[3]

Defendants, as well as amicus Third Party Payment Processors Association,[4] get no further with their argument that Intercept cannot be a covered person because it does not contract directly with the consumers whose payments it processed. That is not the relevant question. Instead, the statutory language asks whether Intercept "provid[ed]" its services "to a consumer"—as required for payment processing to be a "financial product or service" under section 5481(15)—and "for use by consumers" for a personal, family, or household purpose—as required for processing to be a "*consumer* financial product or service" under section 5481(5). While these provisions obviously contemplate a consumer to whom the services are directed, nothing in the statutory text even implies that a covered person must contract directly with the

---

[2] Intercept seeks to manufacture a factual dispute by noting that funds from these loans could be put to non-consumer—e.g., business—purposes. Defs' Mem. at 21. But the fact that a service *can* be used for more than one purpose does not render the Bureau's allegations implausible. See *Aten v. Scottsdale Ins. Co.*, 511 F.3d 818, 821 (8th Cir. 2008) (operative question at this stage is whether "relief may be appropriate under a 'set of facts that could be proved consistent with the allegations'"), quoting *Reis v. Walker*, 491 F.3d 868, 870 (8th Cir. 2007).

[3] Should this Court disagree, the Bureau asks for leave to amend its complaint.

[4] Although TPPPA does not mention the fact in its amicus brief, it is worth noting that Intercept was, until at least March 2016, involved in leading the association and held a seat on its board of directors. Cf. 16AA Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3975 (4th ed. 2016) ("[A]n amicus ought to add something distinctive to the presentation of the issues, rather than serving as a mere conduit for the views of one of the parties.").

consumer.[5] When payment processors transmit legitimate credit and debit requests that were authorized by consumers, those processors provide the service of convenient and fast electronic payment processing both "to" and "for use by" consumers regardless of whether they do so directly or via third-party arrangements.

Intercept seeks to avoid this conclusion by rewriting the statutory text to say that payment processors are covered persons only if they provide services "directly" to consumers pursuant to contractual agreements between the processors and consumers. But that is not what Congress said. Nearby sections of the statute make clear that Congress was well aware that financial services can be delivered to consumers both directly and indirectly, and was capable of drafting provisions to reach only the former when it chose to do so. See 12 U.S.C. § 5517(a)(2)(A)(i) (referring to persons that "extend[] credit directly to a consumer"); § 5517(a)(2)(D)(i) ("credit extended … directly by a merchant or retailer to a consumer"); § 5517(d)(2)(C) ("extending credit directly to a consumer"). Similar language even appears in the very provision at issue here, which includes a limited exception for merchants dealing in a "nonfinancial good or service sold directly by such person to the consumer." § 5481(15)(A)(vii)(I). The fact that, in contrast, Congress chose to use different language earlier in that same provision compels the conclusion that it intended to sweep more broadly when referring to processors of consumer payments. "The Supreme Court has recognized a general rule of statutory construction that '[w]here Congress

[5] Courts interpreting analogous language in other statutes have similarly recognized that services may be "provided" both directly and indirectly. See, e.g., *United States v. Manamela*, 612 Fed. App'x 151, 156 (3d Cir. 2015) (interpreting definitional provision of the Health Insurance Portability and Accountability Act; court describes broad dictionary definitions of the word "provide" and concludes that "'[p]rovide' does not mean 'provide *directly*'") (emphasis in original); *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1123 (11th Cir. 2014) (rejecting argument that "provide" means "provide directly" under the Telephone Consumer Protection Act); *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 202–03 (4th Cir. 2013) (both a cable service provider and the direct seller of that cable service to consumers "provided" the service to consumers).

includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely.'" *United States v. Bruguier*, 735 F.3d 754, 759–60 (8th Cir. 2013), quoting *Rodriguez v. United States*, 480 U.S. 522, 525 (1987). This presumption is at its very strongest where, as here, the different phrasings are used repeatedly and in close proximity to one another. *Dep't of Homeland Sec. v. MacLean*, 135 S. Ct. 913, 919 (2015).

The structure of section 5481(15)(A)(vii) provides further confirmation that it reaches processors of consumer payments irrespective of whether they contract directly with consumers. As explained above, section 5481(15)(A)(vii) says it is a financial product or service to provide payments or other financial data processing services to a consumer. The provision then goes on to specifically exempt from its reach any company that "provides access to a host server to a person for purposes of enabling that person to establish and maintain a website." 12 U.S.C. § 5481(15)(A)(vii)(II). The fact that Congress considered it necessary to create this exemption for web-hosting companies—the entities that provide server space and other services needed to create and run websites—indicates that those companies would otherwise be covered under subparagraph (vii) notwithstanding the fact that their commercial interactions (and contractual relationships) are with the business entities setting up websites rather than with the consumer clients of such entities. Under Defendants' interpretation, this exception would serve little purpose because web-hosting companies would already be outside the provision's reach.

The Bureau's plain-language reading finds further support in the report that accompanied the Senate's passage of the Consumer Financial Protection Act. The report clarifies that, "The legislation does not intend to capture as 'covered persons' companies that engage in financial data processing activities … where the company acts as a mere conduit for such data, provides

services to a person that enables that person to establish and maintain a web site simply as a conduit, or merchants that provide for electronic payments for the sale of their nonfinancial goods or services." S. Rep. No. 111-176, at 160 (2010).[6] The strong negative inference from this detailed list of carefully circumscribed exceptions is that the legislation *did* intend to capture as covered persons other companies that engage in financial data processing activities—even if those companies do not contract directly with consumers.[7]

Defendants cite only one case in support of their proposed rewriting of the statute, but the case actually supports the Bureau's position. As Defendants acknowledge, the court in *CFPB v. Universal Debt & Payments Solution, LLC*, No. 1:15-cv-00859 (N.D. Ga. Sept. 1, 2015), found it unnecessary to reach the issue of whether third-party processors of consumer payments provided services to consumers such that they were covered persons.[8] Slip op. at 46. What Defendants fail to mention, however, is that the same opinion went on to analyze whether those payment processors met the statutory definition of "service providers." As relevant here, the question before the court was whether the processors "provide[d] a material service to a covered person," 12 U.S.C. § 5481(26), notwithstanding the fact that they did not directly contract with the

---

[6] The report's reference to conduits concerns a separate statutory exception, not relevant to this litigation, for "electronic conduit services." See 12 U.S.C. §§ 5481(11); (15)(C)(ii). The reference to merchants selling nonfinancial goods or services concerns yet another exception that is also not relevant here. See § 5481(15)(A)(vii)(I). Neither exception applies to Intercept, and Intercept does not argue otherwise.

[7] It is noteworthy that Intercept fails to offer any reason to think Congress would regulate payment processors differently based on whether they transact directly with consumers or instead provide the same service indirectly through a lender or debt collector. That kind of differential regulation would seem to fly in the face of the Bureau's statutory purpose and objective to "enforce Federal consumer financial law consistently" in order to ensure fair competition and transparent markets. 12 U.S.C. § 5511(a), (b)(4). And it could lead to consumers facing arbitrarily differing levels of risk based solely on whether companies decide to process payments themselves or to contract out that function to third-parties.

[8] For this reason, amicus TPPPA is simply wrong to state that the court in *Universal Debt* "reject[ed]" the Bureau's argument that third-party processors of consumer payments can be covered persons. Amicus Br. at 17.

covered persons, a group of debt collectors. The court held that, despite the absence of direct contractual privity, the processors did in fact provide their services "to" the debt collectors—and were therefore service providers. *Universal Debt*, slip op. at 50 ("Although Frontline [one of the companies involved in processing payments] may have contracted with [a different, non-Debt-Collector entity], the Court finds that the CFPB plausibly alleges Frontline *provided services to* the Debt Collectors by processing their applications and assisting them in obtaining payment processing accounts.") (emphasis added). The same general reasoning supports the Bureau's plain-language interpretation here, which would say that an entity can provide services "to" and "for use by" consumers even in the absence of a direct contractual relationship.

*Service Provider*: The Bureau's complaint also establishes that Intercept is a "service provider" to the lenders, debt collectors, and other covered persons among its clients.[9] The Act defines a service provider, in relevant part, as "any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service, including a person that … processes transactions relating to the consumer financial product or service." 12 U.S.C. § 5481(26). The complaint is replete with allegations establishing that Intercept provided a material service to covered persons, such as those of its clients that offered consumer loans, by providing them with access to the ACH network and processing consumer payments over that network. E.g., Compl. ¶¶ 10, 26–37.

Intercept correctly concedes this general point, Mem. at 29, but argues that it nonetheless falls within an exception in the definition of service provider for persons engaged solely in "providing to a covered person a support service of a type provided to businesses generally or a similar ministerial service." 12 U.S.C. § 5481(26)(B)(i). (The definition includes other, separate

[9] The statute specifically contemplates that a defendant can be both a "covered person" and a "service provider." 12 U.S.C. § 5481(26)(C).

exceptions, but they are inapplicable to Intercept and Intercept does not argue otherwise.) As an initial matter, Intercept appears to misread section 5481(26)(B)(i) as providing for two distinct exceptions. Mem. at 29. The Bureau agrees with the only court to have interpreted section 5481(26)(B)(i) that it plainly describes one exception and not two. See *Universal Debt*, slip op. at 48. The phrase "or a similar ministerial service" is most naturally read as clarifying and limiting the first half of the provision—not as stating a second, standalone exception.

Although this Court should not adopt Intercept's flawed reading, it makes no difference in this case because Intercept would not qualify for the exception even under its own interpretation. Focusing solely on the first half of the provision, Intercept claims that payment processing is "a support service of a type provided to businesses generally" because its clients include non-covered persons. That reading would produce the absurd result that an entity could not be a service provider if it provided support services to even a single non-covered-person client—regardless of the entity's conduct with respect to covered persons. Intercept provides no justification for such an arbitrary result, and indeed there is none. Its argument also crashes on the launch pad for the simple reason that the definition of service provider specifically includes companies that process payments for consumer financial products. § 5481(26)(A)(ii). It defies reason that Congress would specifically identify such payment processing as a "material service" it intended to reach, only to exclude it in the very next sentence.

The same reasoning applies to Intercept's argument that payment processing is merely "ministerial" and thus not covered. That argument fails for the additional reason that the complaint contains numerous allegations showing that Intercept's services cannot be described as ministerial, a term reserved for actions "that involve[] obedience to instructions or laws instead of discretion, judgment, or skill." *Black's Law Dictionary* (10th ed. 2014). The complaint

alleged that Intercept's services necessarily required more than mere robotic obedience to instructions and instead involved judgment and discretion about issues such as return rates and other signs of fraud, ¶ 38, and investigating potential clients, ¶¶ 39, 111–113. The complaint also describes how Intercept created and offered additional services such as its Xcelerated Returns program, which concealed its clients' high return rates. ¶¶ 65–68. In this respect, Intercept's conduct mirrors that of the payment processors in *CFPB v. Universal Debt*, in which the court held that those companies were service providers and that their services were not ministerial. Slip op. at 48–49. Although Intercept cites *Universal Debt* elsewhere in its brief, it fails to note this aspect of the decision's holding in its discussion here.

**b. Smith and Dresser are covered persons as well as related persons.**

*Covered Persons*: The allegations in the Bureau's complaint also establish that Smith and Dresser are covered persons because they themselves "engage[d] in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6)(A). The complaint describes how Smith and Dresser, in their respective roles as president and CEO of a small and closely held company, engaged in providing the consumer financial service of processing consumer payments on products such as consumer loans. E.g., Compl. ¶¶ 12–18 (describing Smith's role as founder, president, and 50% shareholder of Intercept); 19–25 (describing Dresser's role as CEO and 50% shareholder of Intercept); 114–19 (describing both men's involvement in the unfair conduct). Smith and Dresser were involved in the company's day-to-day business operations and personally managed its relationships with clients and banks. ¶¶ 115, 118. For example, when the banks that worked with Intercept voiced concerns about Intercept's clients, Smith and Dresser acted to assuage the bank's concerns and, when that did not work, found new banks to work with. ¶¶ 44–46. Far from being uninvolved company figureheads or passive shareholders, Smith

and Dresser were personally and actively "engage[d] in offering or providing a consumer financial product or service."

Nevertheless, Smith and Dresser attempt to escape designation as covered persons by raising the same arguments as does Intercept: namely, that processing consumers' payments on products and services like auto title and payday loans is not itself a consumer financial product or service. These arguments fail for the reasons already discussed.

In addition, Smith and Dresser contend in a footnote that they cannot have engaged in providing payment processing services because those services were provided by Intercept, and corporations have a distinct legal personhood from their owners. Mem. at 31 n.22. This argument is both wrong as a matter of basic logic and irrelevant to the question at hand. It is wrong because the fact that Intercept provided payment-processing services does not mean that Smith and Dresser could not also have "engage[d] in" providing those services. It is irrelevant because the complaint acknowledges the separate legal status of the company and its principals by charging each defendant solely for that party's own personal violations of law, rather than asserting any theory of vicarious liability. Cf. generally *Oriental Trading Co. v. Firetti*, 236 F.3d 938, 945 (8th Cir. 2001) (corporate officers were individually liable for their own tortious conduct notwithstanding their role in the corporation), cited in Restatement (Third) of Agency § 7.01 (2006) ("Unless an applicable statute provides otherwise, an actor remains subject to liability [for his or her own conduct] although the actor acts as an agent or an employee").

*Related Persons*: In addition, the complaint provides a second and independent basis for establishing that Smith and Dresser are covered persons on the grounds that they are "related persons." Under the Consumer Financial Protection Act, a related person includes "any director, officer, or employee charged with managerial responsibility for, or controlling shareholder of, or

agent for" a covered person that is not a bank, credit union, or depository institution. § 5481(25)(C)(i). As a consequence of being a related person, such individual is also deemed a covered person (and so is subject to the prohibition on unfair acts or practices). § 5481(25)(B). Smith and Dresser do not dispute that this definition squarely describes their positions at Intercept—nor could they. Instead, they argue from the flawed premise that Intercept is not a covered person, and therefore they cannot be related persons. But because Intercept is a covered person—for the reasons set out above—Smith and Dresser's sole grounds for disputing their status as related persons must fail. As a consequence, they are also deemed covered persons.

**2. Intercept, Smith, and Dresser engaged in unfair acts or practices.**

Having established that Defendants are subject to the prohibition on unfair acts or practices, the complaint properly alleges that all three defendants engaged in such acts or practices in violation of 12 U.S.C. § 5536(a)(1)(B). An unfairness claim has three basic elements: (1) the act or practice causes or is likely to cause substantial injury to consumers, (2) which is not reasonably avoidable by consumers; and (3) such substantial injury is not outweighed by countervailing benefits to consumers or competition. § 5531(c); see also *CFPB v. ITT Educ. Servs. Inc.*, No. 14-cv-00292, 2015 WL 1013508, at *25 (S.D. Ind. Mar. 6, 2015); *Universal Debt*, slip op. at 50. Defendants' challenge is limited to the sufficiency of the Bureau's pleading with respect to the first two elements. See Mem. at 17, 23. Defendants do not address the third element and thus have conceded the sufficiency of the complaint in that respect.[10]

[10] Amicus TPPPA attacks the Bureau's unfairness claim on the grounds that it "lacks a predicate allegation, namely [that] Intercept violated NACHA rules." Amicus Br. at 13–16. This argument grievously misapprehends the statutory elements of unfairness, which do not include a requirement that a covered person act in violation of industry best practices or other private guidance. TPPPA's "everyone else is doing it" defense would have the perverse effect of immunizing exactly that harmful conduct that is most widespread. The association fails to cite a

**a. Defendants' conduct caused or was likely to cause substantial injury.**

The Bureau has clearly alleged that Defendants' acts and practices caused or were likely to cause substantial injury to consumers. This element can be met by establishing either that Defendants' conduct did in fact "cause[]" consumer injury or that it created a significant risk of such injury and thus was "likely to cause" harm. See *In re LabMD, Inc.*, No. 9357, 2016 WL 4128215, at *16–20 (F.T.C. July 28, 2016) (act or practice may be found "likely to cause" substantial injury even where there is no direct evidence that it has yet done so). The Bureau's complaint does both. For example, the complaint alleges actual injury occurred when Intercept "systematically enabled its clients to withdraw millions of dollars' worth of unauthorized or illegal charges from consumers' bank accounts." Compl. ¶ 1. It describes how consumers were harmed or likely to be harmed when Defendants "provide[d] these clients with access to the banking system and the means to extract money from consumers' bank accounts." ¶ 2. And it alleges both that "[d]efendants have caused consumers substantial monetary loss by debiting money from consumers' bank accounts on behalf of clients engaged in unlawful practices" and

---

single case in support of this radical view or even to identify which statutory element of unfairness its argument relates to.

What's more, TPPPA (and Defendants) mischaracterize the role NACHA plays, depicting it as a quasi-sovereign entity with sole jurisdiction over the ACH network. See Amicus Br. at 14 ("The NACHA Rules were the *only* rules available to Defendants"). See also Defs' Mem. at 2 (describing NACHA as "the regulator actually tasked with policing the ACH system"). In truth, NACHA is a trade group that exists to "administer[] … private-sector operating rules for ACH payments" and "advocate for the industry," among other purposes. See *About NACHA*, www.nacha.org/about. Its existence in no way absolves ACH participants of their existing obligations under federal law.

To the extent TPPPA is attempting to raise a fair notice defense on defendants' behalf, that issue is not properly before the Court because defendants have not raised it themselves, see *New Jersey v. New York*, 523 U.S. 767, 781 n.3 (1998) ("[W]e must pass over the arguments of the named *amici* for the reason that New York, the party to the case, has in effect renounced them, or at least any benefit they might provide."), and it is also wrong on the merits, see *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 249–59 (3d Cir. 2015) (rejecting similar fair notice challenge to FTC unfairness action).

that "consumers have also incurred or were likely to incur other costs, such as the costs associated with closing accounts, paying overdraft fees, covering bounced checks, opening new accounts, and ordering new checks." ¶¶ 135–36. In addition, the complaint alleges that Defendants' conduct was "likely to cause" these same consumer harms. ¶¶ 128, 136.

There is no question that these allegations, taken as true as they must be at this stage, adequately set forth the first element of an unfairness claim. Direct monetary losses such as the unauthorized or illegal debiting of cash from consumer accounts have long been recognized as "substantial injury" under the FTC's unfairness provision, the meaning of which informs the Bureau's similar prohibition. E.g., FTC Policy Statement on Unfairness ("In most cases a substantial injury involves monetary harm"), available at www.ftc.gov/ftc-policy-statement-on-unfairness and codified at 15 U.S.C. § 45(n); *FTC v. Ideal Fin. Solutions, Inc.*, No. 2:13-cv-00143, 2015 WL 4032103, at *8 (D. Nev. June 30, 2015) ("The unauthorized charges against unwitting consumers' bank accounts and credit cards were plainly substantial"). Similarly, courts and the FTC have stated that substantial injury can include costs that consumers indirectly incur as a result of the unfair practice. E.g., *FTC v. Wyndham Worldwide Corp.*, 10 F. Supp. 3d 602, 622 (D.N.J. 2014) (denying motion to dismiss unfairness claim where alleged injuries included the "time and money [consumers spent] resolving fraudulent charges and mitigating subsequent harm"), *aff'd*, 799 F.3d 236 (3d Cir. 2015); *FTC v. Neovi*, 598 F. Supp. 2d 1104, 1115 (S.D. Cal. 2008) (practice caused substantial injury in the form of the "substantial losses for consumers that had unauthorized checks drawn on their bank accounts" as well as the time and resources they spent "contesting the checks at their banks, protecting their accounts, and attempting to get their money back"), *aff'd*, 604 F.3d 1150 (9th Cir. 2010).

Tellingly, Defendants nowhere suggest that the consumer injury caused or likely to be caused by their conduct was insubstantial. Rather than confronting these allegations head-on, Defendants claim not to understand them, asserting that the complaint is too vague or ambiguous for Defendants even to present a defense on this element of unfairness. Mem. at 17. Yet despite Defendants' protestations to the contrary, their own brief shows their grasp of the Bureau's complaint and its claims: "The Bureau appears to have settled on a general legal theory: that it is an unfair act or practice under the CFPA to process payments on behalf of a merchant in the face of certain red flags suggesting the merchant was engaged in fraudulent or illegal practices." Mem. at 16; See also *id.* at 8–9 (asserting that the FTC possessed the evidence needed to bring the same unfairness claim against Intercept in 2012); *id.* at 20 (noting that the Bureau's complaint alleges that Intercept "systematically enabled its clients to withdraw millions of dollars' worth of unauthorized or otherwise illegal charges from consumers' bank accounts"). As described in more detail below, the complaint provides numerous examples of both the specific red flags that were raised by Intercept's clients as well as Defendants' disregard of those red flags while continuing to debit consumer accounts. What, then, is the fatal ambiguity?

Defendants suggest that the complaint is ambiguous or otherwise deficient because it does not identify each of Intercept's clients and specify each one's illegal conduct. As a threshold matter, however, that level of comprehensive specificity simply is not required to state a claim under Rule 8. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678, quoting *Twombly*, 550 U.S. at 570. The Bureau's complaint meets this test. In addition, as Defendants themselves recount in their brief, the claim alleges that Intercept continued to process for clients in the face of glaring indications that those clients were

submitting illegal and fraudulent payment requests. Thus, even if the Bureau's allegations left Defendants in the dark as to which clients engaged in this activity—which it does not—Defendants can still respond to the allegations by, for example, denying that they received any such red flags or denying that the warnings indicated unlawful acts.

Contrary to Defendants' assertion, the complaint contains ample information that would allow Defendants to identify clients relevant to the Bureau's allegations. For example, the complaint quotes from communications between Intercept and a bank about one of Intercept's clients, an auto title lender. Compl. ¶ 42. Intercept presumably still has these communications and has the means to identify the lender. The complaint also quotes statements from Dresser attempting to assuage the concerns of a bank about specific Intercept clients and stating that Intercept was willing to work with clients that were not considered "clean business." ¶ 46. The references to specific clients in these communications, as well as Dresser's own admission, further undermine Defendants' claims of ignorance. Along the same lines, the repeated references to specific and alarmingly high return rates, see, e.g., ¶¶ 66–71, would allow Intercept to identify relevant companies, as would the allegations that certain of its clients were subject to cease-and-desist orders in Georgia and Maine, ¶¶ 91, 95.

Defendants next allege that the complaint does not "plead how the conduct of Intercept's merchants was 'fraudulent or illegal.'" Mem. at 20. This is simply inaccurate. As Defendants recognize elsewhere in their brief, *id.* at 18, the Bureau alleges with specificity the fraudulent and illegal practices that the AMG lenders engaged in. Compl. ¶¶ 84–89.[11] The Bureau provides

[11] Defendants are incorrect to assert that the Bureau misrepresented the FTC's lawsuit against AMG. See Mem. at 18 n.14. In fact, the FTC argued in its motion for summary judgment in that case that "the facts developed to date conclusively preclude any attempt by Defendants to characterize their online payday lending and collections enterprise as a tribal operation exempt from the FTC Act and all federal regulation." Pl.'s Motion for Partial Summ. Judgment at 26–28,

numerous other examples of the nature of the illegal conduct. The Bureau alleges that another client was illegally debiting consumers' accounts multiple times without authorization. ¶ 42. The Bureau further alleges that other merchant clients were subject to cease and desist orders issued by Georgia and Maine that rendered their continued operations in those states illegal. ¶¶ 91–93, 95. The Bureau also alleges that Intercept was aware that certain of its clients were attempting to process transactions that would have yielded unauthorized return rates well in excess of 1%, and with respect to at least one client as high as 4.3%. ¶¶ 65–71. It is well understood in the payment processing industry that unauthorized return rates are indicative of illegal conduct, such as debiting consumers accounts without proper authorization. See *FTC v. Windward Marketing, Ltd.*, No. 1:96-CV-615, 1997 WL 33642380, at *12 (N.D. Ga. Sept. 30, 1997) (unusual return rate that included unauthorized returns, returns for insufficient funds, and stop-payments was suggestive of unauthorized transactions; defendants had also received complaints from their bank about unauthorized bank drafts and were aware of ongoing investigations by authorities in Georgia and West Virginia). Thus, Intercept has been adequately informed regarding the manner in which its clients' conduct was fraudulent or illegal.

To the extent Defendants want to engage in factual disputes regarding the legitimacy of their clients' conduct—such as by arguing that the AMG lenders used Intercept's services to operate legal and legitimate businesses, Mem. at 19—this demonstrates that a claim has been alleged with sufficient specificity. Defendants will have ample opportunity to defend against that claim at the summary judgment stage and with the benefit of discovery. See, e.g., *CFPB v. All American Check Cashing, Inc.*, No. 16-cv-356, slip. op. at 7 (S.D. Miss. July 15, 2016), ECF No. 24, quoting, indirectly, *Arista Records LLC v. Gruebel*, 453 F. Supp. 2d 961, 972 (N.D. Tex.

---

*FTC v. AMG Servs., Inc.*, No. 2:12-cv-00536 (D. Nev. Feb. 13, 2013), ECF No. 327. Thus, the FTC did contend that AMG operated under a sham ownership structure.

2006) ("The factual shortcomings of which Defendant[s] complain [] are 'matters that can be clarified and developed during discovery, not matters that impede [their] ability to form a responsive pleading.'"). At this stage, Rule 12(b)(6) requires simply that the Bureau plead "enough facts to raise a reasonable expectation that discovery will reveal evidence of the claim." *Leisman v. Archway Med., Inc.*, 53 F. Supp. 3d 1144, 1146 (E.D. Mo. 2014), citing *Twombly*, 550 U.S. at 556. The Bureau has clearly done so.

**b. The injury to consumers was not reasonably avoidable.**

The complaint also contains sufficient factual allegations to allege that consumers could not reasonably avoid the injuries caused or likely to be caused by Defendants' unfair acts or practices. "In determining whether consumers' injuries were reasonably avoidable, courts look to whether the consumers had a free and informed choice." *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1158 (9th Cir. 2010). The applicable test is frequently stated in terms of whether consumers "have reason to anticipate the impending harm and the means to avoid it, or they may seek to mitigate the damage afterward if they are aware of potential avenues toward that end." *Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d 1354, 1365 (11th Cir. 1988). Applying this standard to the Bureau's complaint, the Bureau has clearly alleged that consumers could not avoid the injuries associated with Defendants' processing of illegal and fraudulent payments.

First, it is well established as a matter of both case law and common sense that consumers cannot reasonably avoid the injuries that result when entities seek to withdraw funds from their accounts without authorization. See *FTC v. InterBill, Ltd.*, No. CV-S-06-01644, 2009 WL 10267504, at *1 (D. Nev. Apr. 30, 2009) ("processing debit transactions to consumers' bank accounts, while knowing or consciously avoiding knowing that those debit transactions were unauthorized by consumers, caused substantial injury to consumers which was not reasonably

avoidable"), *aff'd under the name, FTC v. Wells*, 385 Fed. App'x 712 (9th Cir. 2010); *FTC v. Neovi, Inc.*, 598 F. Supp. 2d 1104, 1115 (S.D. Cal. 2008) ("[C]onsumers who had their bank accounts accessed without authorization had no chance whatsoever to avoid the injury before it occurred. Indeed, many consumer victims learned about the unauthorized access of their bank account only after receiving a bank statement showing that their account had been looted."), *aff'd*, 604 F.3d 1150 (9th Cir. 2010); *FTC v. Global Mktg. Group, Inc.*, 594 F. Supp. 2d 1281, 1288–89 (M.D. Fla. 2008) (consumers could not avoid injuries caused by companies processing payments on behalf of fraudulent telemarketing schemes); *FTC v. Capital Choice Consumer Credit, Inc.*, 2004 WL 5149998, at *37 (S.D. Fla. 2004) (debiting consumer accounts without authorization in connection with telemarketing scheme); *Windward Mktg.*, 1997 WL 33642380, at *11–13 (unfair to issue bank drafts on consumers' accounts without authorization).

The Bureau's complaint contains copious factual allegations describing how Defendants engaged in processing unauthorized payments despite clear indications that those payments were unauthorized. The banks that Intercept worked with voiced concerns to all three defendants about Intercept's clients, based, in part, on signs that the clients were submitting payment requests that differed in amount and date from what consumers had actually authorized or were missing the required telephone scripts for ACH transactions authorized by phone. Compl. ¶ 41. One bank complained to Defendants that a particular client-merchant of Intercept's, an auto title lender, was making repeated unauthorized attempts to withdraw money from consumer' accounts, warning Defendants that it was "not ok [for the] merchant to us[e] the ACH to 'sneak' attack a consumer's account, [as] it will only draw regulatory attention." ¶ 42. The complaint includes specific factual allegations that Defendants received complaints from consumers concerning thousands of transactions, asserting that the payment requests were unauthorized. See, e.g.,

¶¶ 43, 50–51, 53. It describes the abnormally high rates of "unauthorized returns" experienced by some of Intercept's clients. ¶¶ 65–70, 75. And the complaint alleges that consumers were unaware of Intercept's conduct in continuing to process payment requests in the face of such glaring trouble signs. ¶ 82.

Second, consumers had no reason to anticipate the harms resulting from charges Intercept put through *that were illegal*, because: the lender-clients were unlicensed in the states they operated in, as alleged in ¶ 95; existed under sham ownership structures in an attempt to skirt federal and state law, ¶ 84; solicited payments through illegal threats, *id.*; or were in violation of outstanding cease-and-desist orders, ¶ 91. Consumers could not reasonably be expected to know that the businesses they were transacting with were unlicensed in their state or flouting a cease-and-desist order. And with respect to consumer payments that were elicited by illegal threats, the FTC long ago noted that "overt coercion" is among the most obvious ways that unfair conduct can interfere with free consumer choice. See FTC Policy Statement on Unfairness n.22 (citing cases). Taking these facts as true, there can be no serious dispute that the Bureau sufficiently alleged this element of unfairness.

Because consumers could not reasonably foresee or avoid these injuries, Defendants are incorrect to assert that the Bureau failed to allege a hindrance to the kind of free and informed consumer decisionmaking that typically leads to market self-correction. The only two decisions they cite in which a court found consumer injury to be avoidable are completely inapposite. Mem. at 27. In both cases, *FTC v. IFC Credit Corp.*, 543 F. Supp. 2d 925, 949–52 (N.D. Ill. 2008), and *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168–69 (9th Cir. 2012), the courts concluded that the relevant injury (the expense of complying with a clearly disclosed forum-selection clause in *IFC* and a credit card fee in *Davis*) was avoidable because it was

disclosed and obvious to consumers at the time the parties contracted. In contrast, the Bureau's complaint has plausibly alleged that consumers had no reason to foresee or reasonable means to avoid the substantial injuries they suffered as a result of Defendants' conduct.

**3. Smith and Dresser substantially assisted the unfair acts or practices.**

Finally, the complaint establishes that Smith and Dresser substantially assisted Intercept's unfair acts or practices, in violation of 12 U.S.C. § 5536(a)(3). That provision bars "any person" from "knowingly or recklessly provid[ing] substantial assistance to a covered person or service provider in violation of the provisions of section 5531 of this title [prohibiting unfair practices]."

As recounted above, the complaint describes facts establishing the two men's active involvement in the day-to-day operations of Intercept, in particular their efforts to manage the objections of the banks they worked with and then to replace those banks when the relationships inevitably soured. E.g., Compl. ¶¶ 14, 21, 43–49. The complaint also describes the pair's personal knowledge of the many red flags indicating that Intercept was processing fraudulent or illegal payment requests. E.g., ¶¶ 43, 46, 88, 115, 118. Smith and Dresser were thus, at minimum, "reckless" with respect to their company's violation. Cf. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994) ("The civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known."); Restatement (Third) of Torts: Phys. & Emot. Harm § 2 (2016) (a person acts recklessly if, in the face of known or obvious risks, the person demonstrates his or her indifference to that risk by failing to take even those precautions that are slight in comparison to the magnitude of the risk). And there can be no serious dispute that they "provide[d] substantial assistance" in their roles as managers and corporate officers.

Seeking to avoid the main issue, Smith and Dresser spend several pages of their brief attempting to convince this Court that the word "recklessly" in the statute actually means "with severe recklessness." The better approach is to apply the standard set out by the plain language of the statutory provision. See *Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning."); *United States v. Rodriguez*, 389 F. Supp. 2d 1135, 1141 (D.N.D. 2005) ("When interpreting a statute, a court must 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'"), quoting *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004). Under that approach, the Bureau's allegations need only meet the ordinary, well-established meaning of "recklessness." See *Farmer*, 511 U.S. at 836. This approach is further recommended by the fact that neither Defendants nor the district court in *Universal Debt*, which Defendants cite in support of their proposed reading, is able to articulate how the "reckless" and "severely reckless" standards actually differ, and Defendants cannot explain why any such distinction would make a difference for the sufficiency of the pleadings in this case.

Turning to the facts alleged in the complaint, Smith and Dresser make a number of arguments as to why the Bureau has failed to plead that they acted "recklessly" under the statute. They claim that because they worked closely with banks in a manner that revealed the details of Intercept's business, their actions could not constitute a reckless departure from the ordinary standard of care. Mem. at 35. But that conclusion does not follow, and its premise—that Smith and Dresser worked diligently with banks to conduct due diligence on their clients—contradicts the factual allegations in the complaint, which describe how numerous banks warned Smith and Dresser about apparent fraud and illegality and how the two men responded, not by acting on

those concerns, but by seeking to minimize and work around them. E.g., Compl. ¶¶ 43–49. Smith and Dresser cannot now hope to hide behind the very warnings they previously chose to ignore.

Nor do the cases cited in support of this proposition provide Smith and Dresser with any cover whatsoever. See Mem. at 35. *Bonhomme* turned on the facts that the defendant was not involved in the relevant transactions and that none of the professionals on whom he relied "ever brought to [his] attention a concern about the legality of" the transactions. *Bonhomme Inv. Partners, LLC v. Hayes*, No. 4:13cv475, 2015 WL 6702257, at *5 (E.D. Mo. Nov. 2, 2015). In direct contrast, the Bureau alleges that Smith and Dresser were both involved in the running of Intercept's operation and that they were aware of concerns about illegality. The *Shanahan* and *Prince* cases are inapposite for essentially the same reason. *SEC v. Shanahan*, 646 F.3d 536, 544 (8th Cir. 2011) ("It is undisputed that none of these professionals ever raised to Shanahan Jr. any concern regarding option dating and pricing and the OPS disclosures."); *SEC v. Prince*, 942 F. Supp. 2d 108, 143 (D.D.C. 2013) ("The record shows that Integral requested and received nothing but 'green flags' from [its counsel] Venable," was unaware of any potential illegality in its conduct, and acted in good faith to solicit and follow counsel's advice).

The individual defendants also quibble with two specific paragraphs in the Bureau's complaint. Mem. at 35–36. They are wrong with respect to both. More importantly, they do not come close to explaining why these discrete issues would compel a conclusion that the Bureau has failed to state a claim for substantial assistance. See generally *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) ("The complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible."). Smith and Dresser first focus on paragraph 64 of the complaint, which alleges that NACHA, the trade association for the ACH network, set a threshold on unauthorized returns at 1% for companies

that use the network. Smith and Dresser dispute this assertion on the factual grounds that NACHA gave companies that exceeded this return rate a probationary period in which to come back into compliance—that is, NACHA did not immediately kick the companies off the network. Defendants seem not to realize that the existence of the probationary period during which companies had to return to compliance with the 1% threshold demonstrates rather than disproves the threshold's existence. They then turn to paragraph 88, which states that they were aware of AMG's attempts "to evade the law through the pretense of tribal ownership." Smith and Dresser dispute this statement on the grounds that, according to them, the case law on the legality of these arrangements was unclear at the time. What the two men fail to mention is that the very same paragraph quotes language from their communications with Intercept's vice president of risk management revealing that Defendants themselves saw tribal affiliation as a legal dodge.

There is no call for the Court to delve into these factual disputes at this point, however, as even when these two paragraphs of the complaint are not considered, the Bureau would have pleaded more than enough facts to establish that Smith and Dresser acted with at least reckless disregard for—if not knowledge of—Intercept's unfair conduct.

**C. The Bureau's claims are not time-barred.**

Defendants contend that the Bureau's complaint should be dismissed on the additional grounds that the claims are barred by the statute of limitations. Defendants have an increased burden when asserting limitation arguments against the government. *BP America Prod. Co. v. Burton*, 549 U.S. 84, 95–96 (2006) ("[S]tatutes of limitations are construed narrowly against the government."); *United States v. Findett Corp.*, 220 F.3d 842, 848 (8th Cir. 2000) ("Statutes of limitation sought to be applied to bar rights of the Government, must receive a strict construction in favor of the Government."), quoting *Badaracco v. Comm'r*, 464 U.S. 386, 391 (1984). As

explained below, Defendants' argument is not based on a strict construction of the applicable statute of limitations. Instead, Defendants devise a new legal theory. Defendants' theory is that, when determining the date a federal agency "discovers a violation," a court should look to whether a different agency could have discovered the same violation and then, whether that agency could have shared its discovery with the first agency. If both of these possibilities exist, then, according to Defendants, the court can impute the other agency's ability to discover a violation to the first agency and start the limitations period at that point. This new theory has no support in the cases Defendants rely on, or in the law of limitations generally. More fundamentally, Defendants have fallen well short of meeting their burden of showing from the facts in the complaint that the limitations period has run—under theirs or any other theory.

"Bar by a statute of limitation is typically an affirmative defense, which the defendant must plead and prove." *Jessie v. Potter*, 516 F.3d 709, 713 n.2 (8th Cir. 2008), citing *John R. Sand & Gravel Co. v. United States,* 552 U.S. 130 (2008) and Fed. R. Civ. P. 8(c). "A defendant does not render a complaint defective by pleading an affirmative defense, *Gomez v. Toledo,* 446 U.S. 635, 640 (1980), and therefore the possible existence of a statute of limitations defense is not ordinarily a ground for Rule 12(b)(6) dismissal unless the complaint itself establishes the defense." *Potter*, 516 F.3d at 713 n.2. Dismissal of a complaint as time-barred is thus only appropriate "when it appears from the face of the complaint itself that the limitation period has run." *Varner v. Peterson Farms,* 371 F.3d 1011, 1016 (8th Cir. 2004) (internal quotation marks removed).

As Defendants note, this action is governed by the statute of limitations provision in 12 U.S.C. § 5564(g)(1):

> Except as otherwise permitted by law or equity, no action may be brought under this title more than 3 years after the date of discovery of the violation to which an action relates.

The Bureau filed its complaint on June 6, 2016. Therefore, to prevail on a statute of limitations defense, Defendants must establish that the Bureau discovered their violations prior to June 6, 2013 with respect to the individual defendants and—due to the operation of a tolling agreement—prior to April 15, 2013 with respect to Intercept.[12] Again, on a motion to dismiss, Defendants must establish these dates of discovery based on the allegations in the complaint itself. See *Varner*, 371 F.3d at 1016.

Defendants ignore the allegations in the complaint. Instead, they rely on a subpoena the FTC sent to Intercept as well as Intercept's certification to the FTC that whatever documents it produced in response to the subpoena were authentic business records. Defs' Exs. B and C, ECF Nos. 19-2, 19-3. The subpoena is a third-party subpoena stemming from an FTC investigation of one of Defendants' clients. See *FTC v. AMG Servs., Inc.*, 29 F. Supp. 3d 1338 (D. Nev. 2014) (finding AMG's lending practices were deceptive and violated Truth in Lending Act). Defendants cite no allegations from the complaint and produce no evidence about what violation information Intercept actually provided to the FTC or what the FTC knew. Neither the subpoena nor the certification—especially when read with all reasonable inferences drawn in the Bureau's rather than Defendants' favor—reveal what documents Intercept may have provided or the contents of any such documents. The certification merely states that any such documents were business records. Thus, although Defendants apparently concede that their conduct warranted action by the FTC, see Mem. at 9, they have nevertheless failed to establish what it was they produced that would have invited such an action. Even if they had, any specific discovery

[12] The tolling agreement is attached as Exhibit A to Defendants' memorandum. ECF No. 19-1.

materials they handed over would still be inappropriate for consideration on a motion to dismiss. See *Kushner v. Beverly Enters., Inc*., 317 F.3d 820, 829–30 (8th Cir. 2003) (documents containing facts subject to reasonable dispute "should not be the subject of judicial notice on a motion to dismiss").

Defendants face the additional threshold problem that, even if they somehow were able to establish at this stage what the FTC knew about Intercept's work with AMG, such facts could not constitute "discovery" of the violations the Bureau alleges. Even under Intercept's novel theory of imputed knowledge, any information provided to the FTC would at most have alerted the Bureau to Intercept's unfair conduct in processing transactions *with AMG*. The Bureau's allegations are broader than that. Defendants offer no explanation for why information specific to AMG, even if the Bureau had been aware of it, would put the Bureau on notice as to Intercept's conduct with other clients. Nor does Defendants' brief even gesture toward explaining why any information handed over to the FTC would have implicated Smith and Dresser personally, such that either the FTC or the Bureau would have known of their active involvement in the violations. For these reasons as well, Defendants cannot hope to establish that the Bureau's complaint is time-barred on its face.

Although it is not necessary to consider Defendants' new "imputation" theory because there are no facts alleged or even information identified to support it, if the Court does decide to consider it, it should reject Defendants' reasoning as a matter of law. Defendants' theory rests on the incorrect view that if the FTC knew about Intercept's legal violations, such knowledge should be imputed to the Bureau. The Bureau is unaware of—and, as discussed below, Defendants have not identified—any decision imputing the knowledge of one agency to a separate agency in connection with a statute of limitations. To the contrary, the general rule is

that the knowledge of one government agency is *not* imputed to a separate agency. See *United States ex rel. Zissler v. Regents of the Univ. of Minn.*, 992 F. Supp. 1097, 1107 (D. Minn. 1998) (rejecting argument that statute of limitations could be tolled by knowledge of official at separate agency because to do so would improperly "impute[] the knowledge of the FDA to the NIH, and vice versa"); *FDIC v. Wabick*, 214 F. Supp. 2d 864, 877 (N.D. Ill. 2002) (rejecting "Movants' argument that DOJ's knowledge, wherever and however acquired, is automatically to be imputed to RTC/FDIC"). See also *Wyler v. Korean Air Lines Co.*, 928 F.2d 1167, 1171–72 (D.C. Cir. 1991) ("There is … no basis for holding the United States liable based upon the collective knowledge of its employees. One federal agency should not be charged with knowledge of what another is doing simply because both are components of the same federal government.") (internal quotation marks omitted).

None of the cases that Defendants cite stand for the proposition that the knowledge of the FTC should be imputed to the Bureau. Defendants first quote from *S & E Contractors, Inc. v. United States*, 406 U.S. 1 (1972), which considered whether an agency's adjudication of a contract dispute with a private party bound the rest of the federal government. In doing so, Defendants omit the Court's important prefatory statement that fair dealing "entails *in the present context* treating the government as a unit rather than as an amalgam of separate entities." *Id.* at 10 (emphasis added). Thus the Court was not laying down a general principle, nor was it even discussing the imputation of knowledge between agencies.[13] Defendants next turn to *United States v. Twenty-Seven Parcels of Real Property*, 236 F.3d 438, 440–41 (8th Cir. 2001), in which

[13] In the same passage, Defendants characterize the Supreme Court's decision in *Gabelli v. SEC*, 133 S. Ct. 1216 (2013), as "suggesting that 'the knowledge of one [agency could be] attributed to all.'" Mem. at 12. Instead, the Court merely noted in dicta that the question, "is the knowledge of one [agency] attributed to all?" was one of several that a court hypothetically might face in deciding when an agency "knew or reasonably should have known" of fraud. 133 S. Ct. at 1223.

the court did not distinguish between the Drug Enforcement Administration, which investigated the case, and the Department of Justice, which prosecuted it. Defendants are apparently unaware that these are not separate agencies. Rather, the DEA is an office within DOJ. See U.S. Department of Justice, *Org. Chart*, www.justice.gov/agencies/chart. The decision never discusses the concept of imputing knowledge. Defendants get no further relying on *United States v. $515,060.42 in U.S. Currency*, 152 F.3d 491, 502 (6th Cir. 1998), which found an action untimely based on what the IRS and FBI had discovered together during the course of a long-running joint investigation. Far from imputing, or even discussing, knowledge between separate agencies, the court simply relied on both agencies' direct knowledge of the facts underlying the alleged violation. The case offers no support for Defendants' argument.

There are additional problems with Defendants' legal theory as applied to this case. They attach a copy of the Bureau's memorandum of understanding with the FTC but fail to establish how the existence of this document supports their assertion that "[i]nformation known to the FTC *must* be imputed to the Bureau." Mem. at 13 (emphasis added). That assertion does not hold up under scrutiny. For example, it is not reasonable to infer from the subpoena and the MOU—especially when they are read in the Bureau's favor—either that Intercept was the target of the FTC's investigation or, assuming it was not, that the Bureau should be considered constructively aware of all evidence the FTC might gather from third parties during the course of an investigation. Defendants' insinuation that the FTC and the Bureau will somehow collude to evade their respective statutes of limitations by trading cases is likewise a red herring, and Defendants do not contend that such conduct took place here. That argument also overlooks the fact that the FTC has no statute of limitations when seeking equitable relief under 15 U.S.C. § 53(b), *FTC v. Instant Response Systems, LLC*, No. 13 Civ. 00976, 2014 WL 558688, at *3

(E.D.N.Y. Feb. 11, 2014); *FTC v. Real Wealth, Inc.*, No. 10-0060-CV-W, 2011 WL 3206887, at *3 (W.D. Mo. July 8, 2011), and thus would have little cause to hand over its files to another agency after having invested the time and resources to build a case.

In the end, Defendants can identify no facts that would establish that the FTC—let alone the Bureau—knew of Intercept's illegal conduct with respect to AMG. Even if Defendants could establish such facts, they offer no explanation why the FTC's limited knowledge about the conduct of one Defendant with one client during a specific time period would constitute "discovery" of the violations asserted in this matter. And even if they had offered such an explanation, Defendants' legal argument rests on a fatally flawed and wholly novel theory for which they can cite not a single supporting case.[14] Any one of these problems would be enough on its own to warrant denial of Defendants' motion. Taken together, they make clear that Defendants have not met their burden at this stage.

**D. The Bureau's structure is constitutional.**

Finally, Defendants contend that this case must be dismissed because the Bureau is unconstitutional. According to Defendants, the Bureau Director's for-cause removal protection, the agency's funding outside the annual appropriations process, and the single-Director leadership structure render the Bureau Director unaccountable to the President, Congress, or "other agency leaders," in violation of the separation of powers. Mem. at 38–39. This contention—which has been rejected by every court thus far to have addressed it[15]—fails. Well-established precedent makes clear that these features leave the Bureau fully accountable in the ways the Constitution demands. And Defendants' contention that these challenged features

[14] The Bureau is not seeking in this action to impose liability for conduct that occurred before July 21, 2011, the designated transfer date on which many of the Bureau's authorities took effect. See, e.g., 12 U.S.C. § 5561 note. Cf. Mem. at 15 n.11. The Bureau's ability to exercise its authorities with respect to conduct by others occurring before that date is not at issue in this case.

somehow "combine" to produce a separation-of-powers violation finds no support in the Constitution's text or judicial precedent.

*For-Cause Removal*. Longstanding Supreme Court precedent forecloses Defendants' contention that the President's ability to remove the Bureau Director only for cause, see 12 U.S.C. § 5491(c)(3), impermissibly prevents the President from faithfully executing the laws. In *Humphrey's Executor v. United States*, the Supreme Court approved identical for-cause removal protections for FTC members. 295 U.S. 602, 621–22, 632 (1935). As the Court later reaffirmed, the power to remove such officials for cause gives the President "ample authority to assure that the [official] is competently performing his or her statutory responsibilities"—and such for-cause removal limitations thus do not "interfere impermissibly with [the President's] constitutional obligation to ensure the faithful execution of the laws." *Morrison v. Olson*, 487 U.S. 654, 692–93 (1988); see also *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 509 (2010) (concluding that "a single level of good-cause tenure" preserved sufficient presidential oversight).

Defendants claim that such removal protections, though permissible for the FTC, are not permissible for the Bureau because the Bureau is headed by a single Director rather than a multimember commission. Mem. at 41. But nothing in *Humphrey's Executor* suggests that the FTC's multimember structure had any bearing on the constitutionality of its for-cause removal protections. See *Humphrey's Executor*, 295 U.S. at 626–32 (discussing FTC's statutory responsibilities, and not its commission structure, in approving constitutionality of removal protections). Indeed, Defendants' theory makes no sense, for the Bureau's single-Director structure only *increases* the President's power by enabling him to identify more easily the

[15] *CFPB v. ITT Educ. Servs., Inc.*, No. 14-cv-00292, 2015 WL 1013508, at *7–14 (S.D. Ind. 2015); *CFPB v. Morgan Drexen, Inc.*, 60 F. Supp. 3d 1082, 1086–92 (C.D. Cal. 2014).

official responsible for any problems. Accord *Morgan Drexen*, 60 F. Supp. 3d at 1088 ("[I]f the President had needed to fully revamp the leadership of the FTC at that time [of *Humphrey's*], he would have been required to affect five separate for cause removals, while only one is required in order to change the leadership of the CFPB.").

*Funding*. Defendants fare no better contending that Congress cannot "rein in" the Bureau because the Bureau Director "independently controls the Bureau's funding." Mem. at 42–43. This contention grossly mischaracterizes the Bureau's funding. *Congress* established funding for the Bureau by authorizing it to obtain funds reasonably necessary to carry out its mission from the combined earnings of the Federal Reserve System, up to specified annual limits. 12 U.S.C. § 5497(a). And Congress retains full power to change that funding pursuant to the ordinary legislative process. Defendants' contention that "Congress has no authority to review" the Bureau's budget is likewise erroneous. Mem. at 42. Although the CFPA limits review by the House and Senate *Appropriations Committees*, 12 U.S.C. § 5497(a)(2)(C), nothing in the Act prevents Congress as a whole, either House of Congress, or any other committee from reviewing the Bureau's funding. And, of course, Congress remains fully able to "rein in" the Bureau by passing legislation to alter its authority, change its structure, or displace its regulations.

To the extent that Defendants mean to suggest that the Constitution prevented Congress from funding the Bureau in the way it did, their contention falls flat. It is well established that Congress may fund agencies as it chooses, either through annual appropriations bills or through some other mechanism.[16] See *American Fed'n of Gov't Emps., AFL-CIO v. Fed. Labor Relations*

[16] Consistent with this well-established authority, Congress has likewise provided other financial regulators with indefinite funding outside the annual appropriations process. See 12 U.S.C. § 16 (Office of the Comptroller of the Currency); § 243 (Federal Reserve Board); § 1755 (National Credit Union Administration); § 1817(b) (Federal Deposit Insurance Corporation); § 4516

*Auth.*, 388 F.3d 405, 409 (3d Cir. 2004) (explaining that "Congress may … decide not to finance a federal entity with appropriations," but rather through some other funding mechanism); *AINS, Inc. v. United States*, 56 Fed. Cl. 522, 539 (Fed. Cl. 2003) (holding that Congress may authorize an agency to obtain and use funds from a specified source "without first appropriating the funds as it does in typical appropriation and supplemental appropriation acts"); see also *Morgan Drexen, Inc.*, 60 F. Supp. 3d at 1089 (approving Bureau's funding); *ITT Educ. Servs.*, 2015 WL 1013508, at *12 (same).

*Single Director Leadership*. Finally, Defendants complain that the Bureau's single-director leadership structure "raises significant separation of powers concerns." Mem. at 39. But Defendants do not—and cannot—identify any constitutional provision that even remotely suggests that an agency's power cannot be vested in a single individual. Defendants object that the Director does not answer to "other agency leaders," *id.*, but nothing in the Constitution requires agency leaders to be accountable to other agency leaders. Rather, they must be accountable to the President—and, as explained above, the Bureau Director is. Defendants' vague assertion that it is "dangerous" to vest power in a single person likewise misses the mark, for the Director can exercise only the power that Congress grants him by statute, and his exercise of that power is subject to oversight by both the President and the courts, consistent with our constitutional scheme.

*Combination.* Perhaps recognizing that each feature they challenge is wholly constitutional, Defendants urge that, on a "holistic" analysis, the Bureau's features "combine" to create a separation-of-powers violation. Mem. at 39. But Defendants offer no explanation for why the Bureau's otherwise-constitutional features violate the Constitution when combined.

(Federal Housing Finance Agency); 12 U.S.C. § 1462a(i) (2010) (former Office of Thrift Supervision).

Defendants attempt to rely on *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), but that case is wholly inapposite. There, the Court confronted two layers of for-cause removal protection—members of the Public Company Accounting Oversight Board could be removed only for cause by the Securities and Exchange Commission (SEC), and SEC members in turn could be removed by the President only for cause. *Id.* at 486–87. These two layers of removal protection, when combined, unconstitutionally "subvert[ed] the President's ability to ensure that the laws are faithfully executed" because they meant that "[n]either the President, nor anyone directly responsible to him, nor even an officer whose conduct he may review only for good cause, has full control over the Board." *Id.* at 498, 496.

The Bureau's features, by contrast, do not combine to diminish the President's or any other branch's power. Both the President and Congress retain their full authorities under the Constitution—and Defendants utterly fail to explain how the Bureau's combination of features nonetheless violates the separation of powers. Unable to identify a constitutional provision that the Bureau's structure violates, Defendants instead emphasize the supposed "uniqueness" of the Bureau's structure. Mem. at 43. But the Supreme Court has made clear that "[o]ur constitutional principles of separated powers are not violated … by mere anomaly or innovation." *Mistretta v. United States*, 488 U.S. 361, 385 (1989). To prevail, Defendants must show that the Bureau's structure—whether unique or not—actually violates some separation-of-powers principle. They cannot make that showing.

## III. Conclusion

For the reasons discussed above, the Court should deny Defendants' motion to dismiss.

Dated: August 29, 2016 Respectfully Submitted,

Attorneys for Plaintiff

Consumer Financial Protection Bureau:

ANTHONY ALEXIS
Enforcement Director

CARA PETERSEN
Deputy Enforcement Director for Litigation

JAMES SUGARMAN
Assistant Deputy Enforcement Director for Litigation

*/s/ Kevin E. Friedl*

KEVIN E. FRIEDL (NY Bar #5240080)
KIRSTEN IVEY-COLSON (DC Bar #470102)
RICHA S. DASGUPTA (DC Bar #500509)
Enforcement Attorneys
1700 G Street NW
Washington, DC 20552
(202) 435-9268 (Friedl)
(202) 435-7354 (Ivey-Colson)
(202) 435-7549 (Dasgupta)
Kevin.Friedl@cfpb.gov
Kirsten.Ivey-Colson@cfpb.gov
Richa.Dasgupta@cfpb.gov