**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

**Eastern Division**

| | | |
|---|---|---|
| Consumer Financial Protection Bureau, | : | |
| Plaintiff, | : | CIVIL ACTION |
| v. | : | No. 16-144 |
| Intercept Corporation d/b/a Intercept EFT, Bryan Smith, and Craig Dresser, | : | |
| Defendants. | : | |

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR**
**MOTION TO DISMISS THE COMPLAINT**

## I. Introduction

The Consumer Financial Protection Bureau ("CFPB" or "Bureau") brings unfairness claims under the Consumer Financial Protection Act ("CFPA") against Intercept and its founders Bryan Smith and Craig Dresser based on the Defendants' alleged failure to adequately police the activities of certain unspecified merchants, which the CFPB contends defrauded their customers in some largely unspecified way. The Bureau seeks to ground its unfairness theory in violations by Defendants of "industry rules and guidelines"—i.e., those promulgated by the National Automated Clearing House Association ("NACHA"), *see* Compl. ¶¶ 38, 57–82—but misreads the relevant industry rules and tellingly fails to allege that NACHA ever found any violation by Defendants of its rules. Because the Bureau's Opposition fails to meaningfully engage with this fundamental deficiency in its theory of liability, or to adequately

address the other defects raised by Defendants and amicus,[1] this Court should dismiss the Complaint with prejudice.

## II. Argument

### A. The Bureau's Claims are Time-Barred

As stated at length in Defendants' opening brief, the Bureau's claims are predicated entirely on facts known to the government as early as November 2012 in connection with a FTC lawsuit brought against former merchants of Intercept. The Bureau's unfairness claims rely on precisely the same information produced by Intercept to the FTC as part of that lawsuit, information that the FTC properly did not conclude warranted raising an unfairness claim against the company or its principals.[2] The CFPA imposes a three-year statute of limitations on the government, commencing from the date it discovers a possible violation of the CFPA, i.e., possesses actual or constructive knowledge of the facts sufficient to bring a cause of action. Here, discovery occurred at the latest on November 20, 2012; as such, the Bureau's claims were time-barred no later than November 20, 2015, well before the filing of the instant Complaint on June 6, 2016.[3]

---

[1] Amicus TPPPA is a not-for-profit association of federally regulated banks and payment processors with superior expertise in the rules governing payment processing. Intercept is, of course, a member of the organization, and has assisted its leadership in the past. The TPPPA advocates for itself, however, and any insinuation to the contrary, *see* Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("Opp.") at 9 n.4, should be disregarded. The merits of the TPPPA's description of the NACHA Rules speak for themselves, and it is worth noting that the Bureau's Opposition does not seriously challenge amicus' observation that the Bureau mischaracterized the import of NACHA's "1% rule" throughout its Complaint.

[2] Defendants do not (and did not) concede that Intercept's processing for the AMG lenders warranted action by the FTC, *see* Opp. at 31.

[3] The Bureau urges the Court to defer its ruling on this question, arguing that the statute of limitations bar "typically" is asserted as an affirmative defense, that dismissal is appropriate only when "it appears from the face of the complaint that the limitation period has run," and that Defendants rely on extrinsic documents. Opp. at 30–31. The Bureau mischaracterizes the law. The Eighth Circuit has explicitly and repeatedly stated that the "face of the complaint" includes not only the complaint's allegations, but also "public records and materials embraced by the complaint," *C.H. Robinson Worldwide, Inc. v. Lobrano*, 695 F.3d 758, 764 (8th Cir. 2012), which the subpoena and certification relied on by Defendants clearly are. Memorandum of Law in Support of Defendants' Motion to

1. *Defendants Have Met Their Burden to Show the Government's Knowledge by November 2012*

The Bureau disputes that Defendants have adequately established the government's actual knowledge of Intercept's processing on behalf of the AMG lenders by November 2012, suggesting that although (i) the FTC demanded under penalty of law that Intercept produce documents relating to its return rates, customer complaints, and underwriting, and (ii) an Intercept representative certified under penalty of perjury that the requested production was made on November 20, 2012, those documents may not have been produced, or perhaps, somehow, failed to reveal the AMG lenders' return rates, customer complaints, and underwriting. Opp. at 31. The Bureau declines to offer any evidence of its counterfactual, instead resting entirely on its claimed right to demand that the Court draw all reasonable inferences in its favor. *Id.* But without offering a shred of evidence to support its position, or making any effort to challenge the Defendants' showing, the Bureau fails to establish its entitlement to any inference. *See Smithrud*, 746 F.3d at 397 (non-moving party entitled to only "reasonable inferences" in its favor).

2. *The FTC's Knowledge in 2012 Triggered the Running of the Statute of Limitations*

The Bureau devotes the remainder of its argument to challenging the notion that the FTC's knowledge should be imputed to the Bureau, notwithstanding the fact that the Bureau is a successor to the FTC, the two agencies share responsibility for bringing "unfairness" claims, and are obligated under federal law to coordinate their enforcement activities. Opp. at 32–34. The cases it cites, however, hardly support its contention of a "general rule" against imputation. Rather, they indicate a general rule that imputation *is warranted* when there is "some

---

Dismiss the Complaint ("Mot. to Dismiss") at 6–7. Moreover, courts routinely dismiss time-barred actions on a motion to dismiss. *See, e.g.*, *Smithrud v. City of St. Paul*, 746 F.3d 391 (8th Cir. 2014).

relationship" between the agencies; indeed, only where two agencies have "clearly delineated duties" is imputation inappropriate. *Wyler v. Korean Air Lines Co.*, 928 F.2d 1167, 1172 (D.C. Cir. 1991) (distinguishing *In re "Agent Orange" Product Liability Litigation*, 597 F. Supp. 740 (E.D.N.Y. 1984)) (refusing to impute knowledge of Air Force aircraft trackers to FAA air traffic controllers where the former monitored military aircraft and the latter civilian).[4]

For the reasons stated above, and in the Defendants' opening brief, *see* Mot. to Dismiss at 13–15 (describing the agencies' "regulatory overlap"), there is no plausible dispute that the FTC and Bureau have "some relationship" and that they share a duty to enforce the consumer protection laws. *See, e.g.*, David Vladeck (Director, FTC Bureau of Consumer Protection), *Looking forward to a long and productive relationship*, FTC BUSINESS BLOG (Jan. 23, 2012, 1:21 p.m.), https://www.ftc.gov/news-events/blogs/business-blog/2012/01/looking-forward-long-productive-relationship (in announcing the Memorandum of Understanding between the two agencies, welcoming the CFPB as a "another cop on the beat in the financial marketplace" and describing the agencies as "working hand-in-hand to protect consumers since the CFPB came into existence"). As such, the Bureau's insistence to the contrary falls flat.

In light of the agencies' close relationship, and the FTC's knowledge by November 2012 of the information on which the Bureau's claims are predicated, the Complaint must be dismissed in its entirety.[5]

---

[4] The Bureau's remaining cases fare no better. The court in *United States ex rel. Zissler v. Regents of the Univ. of Minn.*, 992 F. Supp. 1097 (D. Minn. 1998) grounded its conclusion against imputation expressly on the language of the statute of limitations provision at issue in the case. That limitations provision, unlike 12 U.S.C. 5564(g)(1), explicitly ruled out imputation by tolling the statute of limitations until "an official of the United States charged with the responsibility to act in the circumstances" actually possessed the requisite knowledge. And the two agencies in question in *FDIC v. Wabick*, 214 F. Supp. 2d 864 (N.D. Ill. 2002), unlike the FTC and CFPB, had no relationship, much less an obligation to coordinate their enforcement of identical claims under federal law. *See In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. at 796.

[5] The Bureau ultimately hedges its bets by arguing that even if the Bureau's claims pertaining to the AMG lenders are time-barred, there is no basis for barring claims as to Intercept's other clients. Opp. at 32. That tactical retreat is

B. The Bureau has Failed to Plead an Unfairness Claim

1. *The Bureau's Complaint Fails to Satisfy the Rule 8 Pleading Standard*

In their opening brief, Defendants charged the Bureau with failing to plead sufficient allegations concerning the merchants alleged to have harmed consumers and the nature of their misconduct, explaining that in the absence of these fundamental allegations, the Bureau neither (i) meets its burden of alleging that consumers suffered any injury nor (ii) furnishes Defendants with "fair notice" of its theory, sufficient to permit Defendants to challenge it as a matter of law. Mot. to Dismiss at 16–21.

In response, the Bureau argues that bare allegations asserting, for example, that "[d]efendants have caused consumers substantial monetary loss by debiting money from consumers' bank accounts on behalf of clients engaged in unlawful practices" are "adequate[]" to satisfy the Rule 8 standard, even in the absence of any description of the "client" or the "unlawful practice[]." Opp. at 18–19. And in the event they are not, the Bureau contends that it has provided at least *some* detail as to a handful of Intercept's 68,000 clients and their allegedly unlawful practices. *Id.* at 21–22.

The Bureau is wrong on both counts. The Complaint explicitly names only one merchant: AMG. The AMG allegations, however, are drawn from the 2012 FTC lawsuit, and uniformly time-barred.[6] *See supra* Section II.A. And cryptic references to unnamed merchants

---

not well-taken, though, as 12 U.S.C. § 5564(g)(1) imposes an obligation on the government, upon receiving notice of an alleged wrong, to exercise diligence in uncovering related violations. Mot. to Dismiss at 10–11.

[6] And, in at least one respect, verifiably false. As Defendants noted in their opening brief, they could not have "learned in the spring of 2012 that the FTC had filed a lawsuit against [the AMG lenders] . . . alleg[ing] that AMG operated under a sham ownership structure," because the FTC's April 2, 2012 complaint contains no such allegation. Mot. to Dismiss at 18 n.14. In response, the Bureau insists its allegation was not a "misrepresent[ation]," because what it meant was that the FTC made such an argument in a February 13, 2013 brief. Opp. at 21 n.11. The Bureau fails to explain, however, how Defendants could learn by the spring of 2012 the contents of a brief filed nearly a year later (or how an argument in a brief properly could be characterized as an "alleg[ation]" in a "lawsuit").

and unspecified "illegal conduct" that the Bureau glibly suggests Intercept "presumably" can identify on its own, Opp. at 21–22, neither represent the level of notice required by Rule 8, nor satisfy the Bureau's obligation to allege *plausibly* that consumers were defrauded and therefore suffered injury. *See* Mot. to Dismiss at 16–21.[7] When a cause of action is contingent on a showing of illegality, it should go without saying that a complaint must, at a minimum, identify the laws that were purportedly broken, by whom, and by what means; indeed, the CFPB recognizes this requirement in its other enforcement actions. *Id.* at 17 n.13. Remarkably, the Bureau disagrees with this proposition here, but offers no relevant precedent in support.[8] In any event, whatever showing the Bureau has mustered with respect to AMG and a handful of unidentified merchants does nothing to support any claim relating to Intercept's remaining 67,995 merchants, about which nothing of substance is alleged.

Finally, it is not enough to say that Defendants may still make certain arguments, even if others are foreclosed by the Complaint's opacity, or that Defendants may defer raising their legal arguments until after discovery. Opp. at 21–23. The law is clear that the Defendants may challenge the legal sufficiency of the Bureau's complaint at the motion to dismiss stage; as

[7] *See also C.N. v. Willmar Pub. Sch.*, 591 F.3d 624, 634 (8th Cir. 2010) (upholding dismissal of minor's substantive due process claim against teacher because "the complaint simply asserts that on unspecified dates and under circumstances not described, [teacher] allegedly mistreated unidentified disabled children in a variety of ways": "Such vague allegations neither provide [defendants] with fair notice of the nature of [plaintiff's] claims and the grounds upon which those claims rest nor plausibly establish [plaintiff's] entitlement to any relief").

[8] The Bureau relies principally on an order issued by the Magistrate Judge in *CFPB v. All American Check Cashing, Inc.*, which involved a challenge to a CFPB complaint on the ground that the Bureau had failed to identify the particular transactions and consumers at issue in the lawsuit. *See CFPB v. All American Check Cashing, Inc.*, No. 16-cv-356, slip. op. at 2 (S.D. Miss. July 15, 2016) (citing Defendants' Motion for a More Definite Statement) ("Ultimately, the Complaint must rise and fall upon proof of actual transactions and actual customers.") (emphasis in original). That order has no bearing here, as Defendants have not sought details regarding particular debit transactions or loans, nor have they sought the identities of affected consumers; rather, they seek the identity of the merchants and a description of their alleged wrongdoing, so as to challenge as a matter of law whether the merchants' consumers suffered injury, an essential element of an unfairness claim under the CFPA. *Twombly* makes clear that such information is required by Rule 8, and, indeed, the Bureau provided it in *All American Check Cashing*. *See, e.g.*, Complaint ¶¶ 19–23, 36–40, *All American Check Cashing*, No. 16-356 (May 11, 2016) (identifying the state lending laws at issue and describing in detail how the named lenders violated them).

such, the Bureau simply may not scatter blanks throughout its complaint in the hope of filling them in during discovery. *See, e.g.*, *Grosz v. Lassen Cmty. College Dist.*, No. 07-697, 2007 U.S. Dist. LEXIS 90896, at *18–19 (E.D. Cal. Dec. 11, 2007) ("To permit plaintiffs to 'hide the ball' by not providing vital facts would read the 'fair notice' requirement out of Rule 8(a) and would seriously undermine the rule's goal of encouraging expeditious resolution of disputes."). The Bureau had ample opportunity during its 16-month investigation to identify the merchants that purportedly engaged in wrongdoing and the laws they violated. Absent such basic information, the Bureau's Complaint must be dismissed.

2. *The Bureau Fails to Allege that Consumers' Injuries were Not Reasonably Avoidable*

The Complaint also fails to allege that Defendants engaged in the type of marketplace-subverting conduct necessary to show that consumers could not have avoided their injuries. In its Opposition, the Bureau points to FTC cases in which merchants debited a consumer account without the consumer's knowledge and in the absence of proof of authorization. Opp. at 23–24.[9] The Complaint does not plausibly allege that such conduct took place here.[10] To the contrary, the Bureau appears to rely principally on AMG and other unnamed lenders, who contracted with consumers pursuant to a written lending agreements and whose business was actively pursued by consumers. Unlike the consumers in the FTC cases, these

[9] *See, e.g.*, Complaint ¶¶ 8–11, *FTC v. Interbill*, No. 06-1644 (D. Nev. Dec. 26, 2006) (describing Interbill's role in processing payments for a company engaged in telemarking fraud by billing consumers for services never provided); *FTC v. Neovi*, 589 F. Supp. 3d 1104, 1108–11 (S.D. Cal. 2008) (basis of the enforcement action was defendants' establishment of a check payment system that allowed fraudsters to access and use without authorization consumers' banking information).

[10] The closest the Bureau comes is its allegation in ¶ 42 (stating that an unnamed auto title lender attempted to debit consumers without the proper authorization). A solitary example does not provide plausible support for the Bureau's sweeping conclusion that consumers were subjected to unavoidable harm, *see Smithrud*, 746 F.3d at 397, particularly when the allegation itself indicates that Intercept and its bank identified and resolved the matter on their own, preventing injury to any consumer.

consumers chose to do business with these merchants and agreed to their terms; as such, the rule of *IFC Credit* applies to bar the Bureau's claims. Mot. to Dismiss at 26–27.

The Bureau also argues that consumers could not reasonably avoid harm because certain merchants were allegedly acting in violation of the law. Opp. at 25.[11] Initially, the Bureau's reliance on these supposed violations of state and federal law—which it declines to identify except in obscure terms—underscores the deficiencies in the CFPB's pleading: the Bureau claims the right to defend its unfairness claim on violations of the law, but denies Defendants the opportunity to meaningfully challenge their applicability. *See supra* Section II.B.1. But in any event, the Bureau's argument fails to address the fundamental fact that even if merchants' loan products violated state law, the Bureau does not (presumably because it cannot) allege that any merchant's loan contract misrepresented the interest rate that consumers would be charged, or that consumers, upon reviewing the interest rate to be charged, were not free to decline any loan agreement on that basis. As such, the Complaint must be dismissed.

C. Intercept, Smith, and Dresser are Not Subject to Liability under the CFPA

1. *Intercept is Not a Covered Person*

The Complaint alleges that Intercept provides processing services only to *businesses*—not consumers—and contains no allegations whatsoever that the company's services were "provided for use by consumers primarily for personal, family, or household purposes." As such, the Bureau fails to allege three critical elements of the "covered person"

[11] It bears noting that with one exception, each of the practices the Bureau contends were "illegal," and therefore support an unfairness claim, were effectively sanctioned in 2012 by the FTC—an entity authorized both then and now to bring unfairness claims—as part of the FTC's litigation with AMG. That is, the FTC entered into a stipulated injunction filed with a district court that required certain changes to AMG's loan products, but otherwise allowed AMG to make loans to consumers residing in states where the lenders were not licensed, at rates that exceeded state interest caps, with no requirement that the AMG lenders modify any aspect of their ownership structure so as to correct what the government describes (today) as a "sham" ownership arrangement. Order Entering Stipulated Preliminary Injunction and Bifurcation, *FTC v. AMG Servs. Inc.*, No. 12-536 (Dec. 27, 2012).

definition: (i) that Intercept provides processing services "for use by consumers"; (ii) that those services are used "primarily for personal, family, or household purposes"; and (iii) that Intercept "provides payments or other financial data processing products or services to a consumer." 12 U.S.C. § 5481(5)(A), (15)(A)(vii). The Bureau challenges—unsuccessfully—all three points.

*First*, the Bureau argues that it has met its obligation to allege that Intercept provided services used "primarily for personal, family, or household purposes" because the Complaint contains allegations stating that Intercept processed for "consumer" lenders. Opp. at 6–9. This is a frivolous contention, as the Bureau well knows, as it relies on matters outside the pleadings to make its point and ultimately seeks leave to amend the Complaint should the Court reject its argument. *See id.* at 9. To be a covered person, Intercept's services must be (i) "provided for use by consumers" (ii) "primarily for personal, family, or household purposes." 12 U.S.C. § 5481(5)(A). The Bureau attempts to elide these two distinct statutory requirements by contending that any service used by a consumer "necessarily mean[s]" that it was used "primarily for personal, family, or household purposes." Opp. at 8; *see also id.* at 9 (reframing "personal, family, or household purposes" as "consumer purposes"). But the CFPA does not define the term "consumer" in this way, *see* 12 U.S.C. § 5481(4) (defining "consumer" simply as "an individual or an agent, trustee, or representative acting on behalf of an individual"); rather, it explicitly distinguishes between consumers, i.e., individuals and persons acting on their behalf, who use financial products for personal purposes, and those who use them for non-personal, i.e., business purposes. 12 U.S.C. § 5481(4), (5)(A). Whether the Bureau has sufficiently alleged that Intercept's merchants served "consumers" is beside the point: it has failed to take the further step of alleging that these consumers used the merchants' products and services for non-business purposes, necessitating dismissal of the Complaint in its entirety.

*Second*, the Bureau argues that Intercept—which, as pled, provides processing services solely to other businesses—somehow also provides those same services "for use by consumers" and "to a consumer." Opp. at 9–10 (citing 12 U.S.C. § 5481(5)(A), (15)(A)(vii)). The Bureau contends that these standards are satisfied when an entity provides a product or service that in any way reaches or benefits a consumer, regardless of whether the entity has a contractual or otherwise direct relationship to the consumer. *Id.* In short, the Bureau seeks authority over pure "business-to-business" companies whose customers engage with consumers, a dramatic expansion of power for which the Bureau does not—and cannot—cite any precedent.

The implications of the Bureau's interpretation cannot be overstated. It would place within the Bureau's reach businesses that have absolutely no connection to consumer finance—a result hardly contemplated by the *Consumer Financial* Protection Act. For example, payment processors like Intercept provide services to a multitude of consumer-facing industries: grocery stores, hotels, veterinarians, as well as non-profits such as churches and hospitals. None of these businesses extend consumer financial products or services. According to the Bureau's theory, however, by offering their customers the incidental ability to pay for products or services via ACH or credit card, or by using a processor to pay their employees via direct deposit, these merchants would render Intercept—but not themselves—a "covered person" under the CFPA. *See* Kate Berry, *CFPB Makes "Choke Point-Esque" Move Against Payment Processors*, THE AMERICAN BANKER (Aug. 10, 2016), attached as Exhibit A. As such, Intercept—but again, not its merchants—would thus be tasked with first learning the local, state, and federal laws and regulations specific to the industries of its 68,000 merchants, and then ensuring that its merchants' consumer interactions comport with those laws, despite having no visibility into the consumer relationship and without knowing any relevant information about the consumer,

including his or her address, income, credit history and, in many cases, name. NACHA Operations Rules & Guidelines, App'x 3 (2013) (describing the minimal data included within ACH files). Worse still, the Bureau's expansive interpretation would apply to all the industries referenced in the eleven enumerated categories of section 5481(15)(A).

Not surprisingly, in light of these consequences, the Bureau's radical interpretation is not supported by the statutory text or by case law. The only court to have interpreted § 5481(15)(A)(vii)'s "provid[e] . . . to a consumer" language rightfully was not swayed by the Bureau's position. In *Universal Debt*, several payment processors argued that they were not "covered persons" because they provided services only to merchants, not consumers. The court emphasized the statutory requirement that these services must be provided "*to a consumer*," but did not conclusively decide this issue. *Universal Debt* at 46 (emphasis in original).[12] The next step in the Court's analysis was obvious, however: because a processor interacts exclusively with its merchants, it does not provide services "to a consumer."[13]

Section 5481(5)(A)'s "provide[] for use by consumers" provision confirms this reading. The Bureau argues that "for use by consumers" means products and services used not only "directly" by the consumer, e.g., when processor contracts with a consumer to process credits and debits on his or her behalf, such as through a mobile payment app, but also

[12] The Bureau nonetheless contends that *Universal Debt* supports its position. Opp. at 12–13. When interpreting the "service provider" provision, the *Universal Debt* court concluded that an independent sales organization (Frontline) "provide[d] . . . a material service to" covered persons (certain debt collectors) by "processing their applications and assisting them in obtaining payment processing accounts." *Universal Debt* at 49–50. Intercept, by contrast, does not "assist[]" its merchants' customers or otherwise interact with them in any respect whatsoever, a point the Complaint concedes. *Universal Debt*'s reasoning therefore is of no help to the Bureau.

[13] In the end, the Bureau's novel definition of a "covered person" is too clever by half. According to the Bureau, "when payment processors transmit *legitimate* credit and debit requests that were *authorized* by consumers," they "provide the service of convenient and fast electronic payment processing both 'to' and 'for use by' consumers regardless of whether they do so directly or via third-party arrangements." Opp. at 10 (emphasis added). But the Bureau claims throughout its Complaint and Opposition that its theory is premised on the Defendants' alleged processing of illegal and fraudulent transactions that were *not* authorized by consumers. *See, e.g.*, Compl. ¶ 1; Opp. at 23–26. Accordingly, even under the Bureau's own terms, it has not alleged that Intercept is a "covered person."

"indirectly," i.e., when Intercept processes payments for a merchant on behalf of the merchant's customers. Opp. at 10. But related text within § 5481 rules out the Bureau's broader reading: § 5481(15)(A)(iv) provides that a "financial product or service" includes "engaging in deposit-taking activities, transmitting or exchanging funds, or otherwise acting as a custodian of funds or any financial instrument for use by or on behalf of a consumer." By distinguishing financial instruments used by a consumer from those used "on behalf of" a consumer, Congress signaled its intention that the expression "for use by consumers" should carry its natural, more narrow meaning. Because Intercept's merchants are the actual "users" of Intercept's processing services, *see* Compl. ¶¶ 26–37, the CFPB fails to allege that Defendants are "covered persons."[14]

2. *Intercept is Not a Service Provider*

The Bureau debates Intercept's "ministerial" role, arguing that the company's activities "involved judgment and discretion about issues such as return rates and other signs of fraud, ¶ 38, and investigating potential clients, ¶¶ 39, 111-113" and that the company "created and offered" the Xcelerated Returns system, which was designed to prevent unauthorized transactions from entering the ACH Network. Opp. at 14–15. But Intercept does not "offer or

[14] The CFPB's remaining statutory arguments are also lacking. The Bureau takes the position that any time the verb "provide" is unqualified, it is deemed to be modified by "directly or indirectly." In support, it relies on cases interpreting irrelevant statutes that happen to contain the word "provide," *see* Opp. at 10 n.5, and CFPA provisions that do not contain the word "provide," *see id.* at 10. Moreover, the use of "directly" in the CFPA provisions cited by the Bureau—§§ 5481(15)(A)(vii)(I) and 5517—is not evidence that Congress' omission of the term in § 5481(15)(A)(vii) was meaningful. *Id.* at 10–11. As the text and legislative history make clear, both sections exempt from the Bureau's jurisdiction certain practices traditionally employed by small businesses that offer credit to consumers purchasing non-consumer financial products. *See* S. Rep. 111-176, at 170–71 (2010) (Section 5517(a) "allows a merchant to extend credit to a consumer for the purchase of a nonfinancial good or service without coming under the authority of the Bureau under this title. This has been described as allowing local merchants to 'extend a tab' to a customer"); *id.* ("[T]he Committee intends to exclude persons and businesses such as dentists, doctors, and small Main Street retailers that simply allow their customers to pay bills over time from the new authority of the Bureau."). The use of "direct" in these provisions was therefore intended to narrowly conscribe the statutory exemption; it does not affect the plain meaning of § 5481(15)(A)(vii) and certainly does not compel an interpretation of that subsection that would expand the Bureau's jurisdiction over entities that have no connection whatsoever to consumers. Similarly, the inclusion in § 5481(15)(A)(vii) of the industry-specific exemption applicable to web-hosting companies does not support the Bureau's argument because those companies provide their services directly to consumers and other businesses alike.

provide" underwriting and monitoring services to its merchants; rather, it offers payment processing services. In any event, these activities are dictated by NACHA rules and federal law, and so meet the definition of "ministerial" that the Bureau employs. *Id.* at 15 (citing Compl. ¶ 38). Intercept's use of the Xcelerated Program—an automated computer-based screening system, *see* Compl. ¶¶ 65–68—is similarly ministerial because it operates free from human intervention and is required by the NACHA rules.[15] *See* NACHA Operating Guidelines, § II, Ch. 10 at OG 46 (2012) (prohibiting the reinitiation of certain returned transactions into the ACH system), attached as Exhibit B.[16]

D. The Bureau Failed to Allege that Smith and Dresser Substantially Assisted Intercept's Alleged Unfairness Violation.

The Complaint does not plausibly allege that Smith and Dresser "knowingly or recklessly" provided "substantial assistance" to Intercept, as required by 12 U.S.C. § 5536(a)(3). The Bureau initially suggests defining the statutory term "reckless" by reference to authority that do not interpret § 5536(a)(3) or its parallel in the Securities Act, 15 U.S.C. § 78t. Opp. at 26. Ultimately, though, the Bureau suggests that the "extreme departure" standard is practically no different than the Bureau's proffered standard. *Id.* at 27. Accordingly, the Court should apply the "extreme departure" standard, as articulated in the Eighth Circuit cases cited in Defendants'

[15] The Bureau also questions why Congress would explicitly designate payment processors as service providers in § 5481(26)(A)(ii) only to, the Bureau contends, exclude them with the exception set forth in § 5481(26)(B)(i). Opp. at 14. This argument overstates Defendants' position. The § 5481(26)(B)(i) exception applies only to processors serving a multitude of businesses. Processors that, unlike Intercept, provide their services largely to merchants engaged in consumer finance would remain subject to the CFPA, a sensible result for the Consumer Finance Protection Act. Moreover, processors otherwise exempted from the CFPA's definition of "service provider" could—under certain circumstances—remain subject to the statute to the extent their activities "substantially assist" violations of the CFPA, *see* 12 U.S.C. § 5536(a)(3).

[16] The foregoing reasoning similarly establishes that Smith and Dresser are not "covered persons." *See also* Mot. to Dismiss at 30–31 & n.22. Smith and Dresser also are not "related persons," as the Bureau does not—and cannot—dispute that in the absence of a "covered person," there can be no "related persons" pursuant to 12 U.S.C. § 5481(25). Opp. at 16–17. Moreover, by failing to argue that Smith and Dresser are service providers, as was suggested in the Complaint, *see* Mot. to Dismiss at 31 n.23, the Bureau has conceded that point.

opening brief, and hold that the Bureau has not plausibly alleged that Smith or Dresser acted with the requisite *mens rea* or "substantially assisted" Intercept's alleged CFPA violation.

E. The Bureau's Structure Violates the Separation of Powers.

The combined effect of the Bureau's structural deficiencies—i.e., the Director's power to enforce eighteen federal statutes without being answerable to the President, Congress, or other agency leaders—violates the Constitution's separation of powers mandate. Contrary to the Bureau's assertion, the Supreme Court's recent decision in *Free Enterprise* perfectly illustrates how a separation of powers violation results when an agency possesses structural elements that in isolation may be constitutional, but when combined most certainly are not.[17]

The Bureau next argues that its single-Director structure is not problematic because the President could revamp the Bureau's leadership more easily than a multi-member commission. Opp. at 36–37. This might be true if there were no restrictions on President's ability to replace the Director. But the President may terminate the Director only for serious transgressions—i.e., "inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. § 5491(c). Assuming the Director does not engage in such serious conduct, he has the unilateral power to operate the Bureau as he pleases, unlike members of multi-member commissions, whose proposals must be vetted and approved by others, thereby ensuring the agency will operate in a "non-partisan or bipartisan" manner. Mot. to Dismiss at 39–40.

[17] The D.C. Circuit held as much in a case involving whether a statute that allowed AMTRAK to draft and approve railroad safety standards improperly delegated legislative power to a private entity. *Ass'n of Am. R.Rs. v. U.S. Dep't of Transp*., 721 F.3d 666, 672–73 (D.C. Cir. 2013), *vacated on other grounds*, 135 S. Ct. 1225 (2015). The government contended that the statute was constitutional because the Supreme Court had held that two elements of the statute were constitutional, albeit in cases where the Court considered only one of those features. The D.C. Circuit disagreed, stating that "even if the government is right that the [statute] merely synthesizes elements approved [by two Supreme Court cases], that would be no proof of constitutionality." In other words, "just because two [or more] structural features raise no constitutional concerns independently does not mean Congress may combine them in a single statute." The Supreme Court reversed on the ground that AMTRAK was not a private entity and therefore did not consider the separation of powers issue. 135 S. Ct. at 1228.

The Bureau further defends its structure by stating the obvious—that Congress can pass "legislation to alter [the Bureau's] authority, change its structure, or displace its regulations." Opp. at 37. If the ability of Congress to amend federal statutes and regulations were a basis for denying a separation of powers challenge, no federal agency could ever be unconstitutional on that ground.[18] Similarly, the Bureau contends that the Director is limited by the powers granted to him by CFPA and "his exercise of that power is subject to oversight by both the President and the courts." *Id.* at 38. This argument again reflects a misunderstanding of the separation of powers doctrine, which is wholly independent from whether the Bureau is acting within the bounds of its organic statute.

## III. Conclusion

In light of the foregoing, and for the reasons stated in Defendants' opening brief, the Court should dismiss the Complaint against Intercept, Smith, and Dresser with prejudice.

Dated: September 12, 2016

Respectfully submitted,

*__/s/ Michael T. Andrews__*
Michael T. Andrews (ND #05516)
David J. Hauff (ND #04145)
Anderson, Bottrell, Sanden & Thompson
4132 30th Ave SW, Suite 100
PO Box 10247
Fargo, ND 58106-0247
(701) 235-3300
mandrews@andersonbottrell.com
dhauff@andersonbottrell.com

Jay A. Dubow
Richard J. Zack (admitted *Pro Hac Vice*)
Matthew Homberger (admitted *Pro Hac Vice*)
Pepper Hamilton LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
(215) 981-4000
zackj@pepperlaw.com
dubowj@pepperlaw.com
hombergerm@pepperlaw.com

*Attorneys for Defendants*

[18] For the same reasons, it is immaterial that the entire Congress retains a role in negotiating and enacting appropriations bills. Opp. at 37.