IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Consumer Financial Protection Bureau,<br><br>                        Plaintiff,<br><br>vs.<br><br>Intercept Corporation, d/b/a InterceptEFT, Bryan Smith, individually, and as owner and president of Intercept Corporation, and Craig Dresser, individually and as owner and CEO of Intercept Corporation,<br><br>                        Defendants. | Civil Case No. 3:16-cv-144<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THE COMPLAINT** |

## INTRODUCTION AND SUMMARY OF HOLDING

Before the court is DEFENDANTS' MOTION TO DISMISS THE COMPLAINT.[1] Because the complaint[2] fails to allege facts sufficient to support a plausible claim upon which relief can be granted, the Motion to Dismiss the Complaint is **GRANTED** and the case is **DISMISSED WITHOUT PREJUDICE.**

## POSTURE OF THE CASE

Plaintiff, Consumer Financial Protection Bureau ("the CFPB"), filed a complaint against Defendants, Intercept Corporation, Bryan Smith, and Craig Dresser (collectively "the Intercept defendants"), containing two causes of action which alleged violations of the Consumer Financial Protection Act ("the CFPA").[3] Defendants filed a motion to dismiss the complaint[4] under Rule 12 of the Federal Rules of Civil Procedure on the ground that the

---

[1] Doc. #18.

[2] Doc. #1.

[3] Doc. #1.

[4] Doc. #18.

Complaint failed to state a plausible claim. The issues were fully briefed by the parties. In addition, the court received a brief from *Amicus Curiae*, Third Party Payment Processors. The motion came on for a hearing on February 27, 2017. Attorneys Richard Zach, Mike Andrews, and David Hauff appeared on behalf of the Intercept defendants. Attorneys Kevin Friedl, Jenelle Dennis, and Richa Shyam Dasgupta appeared for the CFPB. Attorney Keith Barnett appeared for *Amicus Curiae*. The court heard arguments from the parties and the *amicus*.

## FACTS

Under Rule 12 the court considers and accepts the facts alleged in the complaint as true. The CFPB is an independent agency of the United States set up to regulate the exchange of consumer financial products or services under federal consumer financial laws.[5] It has the authority to pursue litigation to enforce those laws.[6] Intercept is a third party payment processor in the business of processing the electronic transfer of funds through the Automated Clearing House ("ACH") network on behalf of its clients.[7] Bryan Smith is Intercept's president and owns fifty percent of its shares.[8] Craig Dresser is the CEO of Intercept and owns the remaining fifty percent of its shares.[9] Intercept is a "covered person" and a "service provider" under the CFPA.[10] Smith and Dresser are "related persons"

---

[5] Doc. #1, ¶ 7; 12 U.S.C. § 5491(a).

[6] Doc. #1, ¶ 7; 12 U.S.C. § 5481(14), 5564 (a) and (b).

[7] Doc. #1, ¶ 8.

[8] Doc. #1, ¶ 12.

[9] Doc. #1, ¶ 19.

[10] Doc. #1, ¶¶ 9 and 10; 12 U.S.C. § 5481(15)(A)(vii) and 5481(26)(A)(ii).

under the CFPA because of their status as officers of Intercept.[11]

As a third party payment processor, Intercept provides its clients with access to banks in order to facilitate the debiting and crediting of funds electronically from consumer bank accounts. Intercept's clients include consumer lenders, auto title lenders, sales finance companies, and debt collectors.[12] Businesses and individuals utilize third party processors like Intercept when they are unable to establish their own relationships with banking institutions or because it is more administratively convenient.[13]

Intercept's clients are known as "Originators."[14] When an Originator sends a request to Intercept, Intercept conveys the request to its own bank, which is known as the "Originating Depository Financial Institution" or "ODFI".[15] The ODFI then forwards the debit or credit request to an ACH operator, who transmits the request to the recipient's bank, known as the "Receiving Depository Financial Institution" or "RDFI".[16] The RDFI then credits or debits the recipient's account and sends the money back to Intercept through the ODFI.[17] Intercept remits the debit amount back to its client and charges the client fees for its services.[18]

---

[11] Doc. #1, ¶ ¶ 16 & 23; 12 U.S.C. § 5481(25)(c).

[12] Doc. #1, ¶ 26.

[13] Doc. #1, ¶ 29.

[14] Doc. #1, ¶ 30.

[15] Doc. #1, ¶ 32.

[16] Doc. #1, ¶ ¶ 33-34.

[17] Doc. #1, ¶ 35.

[18] Doc. #1, ¶ 36.

According to the complaint:

> In a typical transaction that Intercept undertakes on behalf of a lender or debt collector, the client instructs Intercept to withdraw loan repayments from the borrower's bank account, directing Intercept on which bank to contact, the payment schedule to use, and the amount to withdraw. Intercept instructs its bank to contact the borrower's bank to withdraw the money. The borrower's bank debits the account and remits it to Intercept's bank, and Intercept then transfers the money to its client.
> Industry rules and guidelines emphasize the responsibility of all ACH participants, including third party payment processors like Intercept, to monitor merchant return rates and other suspicious activity to detect and prevent fraud in the ACH network.
> Defendants, however, have processed payments for many clients even in the face of numerous indicators that those clients were engaged in fraudulent or illegal transactions. Even though they knew or should have known of this illegal behavior, Defendants continued to process for these companies anyway. Defendants have ignored red flags, including concerns from ODFIs about the lawfulness of the transactions Intercept was processing, complaints from customers, high return rates, and law enforcement actions against its clients. Intercept's due diligence procedures when signing up clients have also been perfunctory, and it has ignored indicia of problems that were revealed through even it minimal due diligence.[19]

Intercept is alleged to have ignored warnings from ODFIs of possible illegal activity by its clients, of debits unauthorized by consumers, of potential indicia of fraud by its clients, of discrepancies in dates and amounts debited, and of other possibly suspicious activity.[20]

> For example, an ODFI complained to the Defendants that one of its clients, an auto title lender, which was debiting varying amounts from consumers' accounts multiple times, did not have the contractual right or proper consumer authorization to do so, stating that it was "not ok [for the] merchant to us[e] the ACH to 'sneak' attack a consumer's account, [as] it will only draw regulatory attention."[21]

---

[19] Doc. #1, ¶ ¶ 37-39.

[20] Doc. #1, ¶ ¶ 40-41.

[21] Doc. #1, ¶ 42.

If an ODFI raised concerns or terminated its relationship with Intercept, Intercept would find another ODFI to process transactions for the same clients who were the subject of the concerns.[22] Intercept is alleged to have not properly investigated when ODFIs expressed concerns about high return rates for some of its clients.[23] Numerous consumers have complained about Defendants' processing activities.[24] "Despite all of these warning signs from ODFIs and consumers, Defendants continued payment processing for these clients without investigation or consequence."[25] Consumers did not have access to the same warning signs about Intercept's clients.[26] According to the complaint, the defendants did not properly monitor or respond to high return rates.[27] NACHA, a trade association governing the use of the ACH system, establishes standards to which Intercept is expected to adhere.[28] Intercept's clients "unauthorized returns" rates have only stayed below the NACHA guideline amount because of Intercept's use of a fee-based "Xcelerated Returns" program, which prevents transactions form being processed through the ACH network.[29] In 2011 and 2012, Intercept and its clients generated unusually and unacceptably high return rates.[30] Defendants have ignored law enforcement activity relating to its clients'

---

[22] Doc. #1, ¶ 44.

[23] Doc. #1, ¶ ¶ 47-49.

[24] Doc. #1, ¶ ¶ 50-54.

[25] Doc. #1, ¶ 55.

[26] Doc. #1, ¶ 56.

[27] Doc. #1, ¶ 57 *et seq*.

[28] Doc. #1, ¶ ¶ 61-63.

[29] Doc. #1, ¶ ¶ 65-70.

[30] Doc. #1, ¶ ¶ 76-82.

activity, including a Federal Trade Commission lawsuit against AMG Services, Inc., which Defendants knew about in the spring of 2012.[31]

Intercept did not properly investigate "red flags" during its clients' application process, instead using a "5-Star-Risk Level Rating" to merely determine the client's ability to pay.[32] This rating did not include indicators of fraud, illegal activity, consumer disputes, BBB ratings, law enforcement actions, high return rates, requests for proof or authorization, or "failure to supply satisfactory information" in the application.[33]

## DISCUSSION

At a minimum a complaint must give defendants fair notice of the grounds for the claim and at least a general indication of what the litigation involves.[34] Although the complaint need not contain detailed factual allegations, it must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."[35] Formulaic recitations of the elements of a claim or assertions lacking factual enhancement are not sufficient.[36] To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[37] "Factual allegations must

---

[31] Doc. #1, ¶¶ 82-97.

[32] Doc. #1, ¶¶ 98-113.

[33] Doc. #1, ¶ 113.

[34] Topchian v. JPMorgan Chase Bank, N.A., 760 F.3d 843, 848 (8th Cir. 2014).

[35] Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009).

[36] Id. at 678.

[37] Id. at 678 (citing Bell Atlantic Corp. v. Twombley, 550 U.S. 544, 570 (2007).

be enough to raise a right to relief above the speculative level[.]"[38] In other words, the facts alleged in the complaint must be plausible, not merely conceivable.[39]

The court must review the facts alleged, "not the legal theories of recovery or legal conclusions identified" in the complaint, "to determine whether the pleading party provided the necessary notice and thereby stated a claim in the manner contemplated by the federal rules." The court will not dismiss merely because the factual allegations do not support a legal theory advanced in the complaint, but must instead review the complaint to determine if the allegations support relief on any possible legal theory.[40] The court "'will not mine a [lengthy] complaint searching for nuggets that might refute obvious pleading deficiencies.'"[41]

The complaint contains two counts, both based in the CFPA's prohibition of covered persons or service providers engaging "in any unfair, deceptive, or abusive act or practice."[42] First, it alleges that Intercept Corporation, Bryan Smith, and Craig Dresser, as "covered persons" under the Consumer Financial Protection Act ("the CFPA") engaged in unfair acts and practices in violation of the Act. Secondly, it alleges that Bryan Smith and Craig Dresser, as "related persons" under the CFPA, provided substantial assistance to Intercept's violations of the CFPA.

Although dates indicated in the complaint would suggest that at least some of the

---

[38] Bell Atlantic Corp. v. Twombley, 550 U.S. 544, 555 (2007).

[39] Id. at 570.

[40] Id. at 849.

[41] Neubauer v. FedEx Corporation, 849 F.3d 400, 404-05 (8th Cir. 2017) (citing Quintero Community Ass'n Inc. v. F.D.I.C., 792 F.3d 1002, 1009 (8th Cir. 2015)).

[42] 12 U.S.C. § § 5531, 5536(a)(1)(B).

alleged acts or practices are likely outside of the CFPA's three-year statute of limitations[43], the current record does not support a finding that plaintiff's claims are time-barred as a matter of law. As such, a time bar analysis does not support the motion to dismiss. It is also clear that the complaint sufficiently alleges facts that, if proven, would support a finding that defendants are "covered persons", "service providers", or "related persons" under the CFPA.

The analysis therefor hinges on whether the complaint adequately states causes for "unfair, deceptive, or abusive acts or practices." The CFPA provides that it is unlawful for "(1) any covered person or service provider – . . . to engage in any unfair, deceptive, or abusive act or practice."[44] An act or practice is "unfair" under the CFPA only if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers, and . . . such substantial injury is not outweighed by countervailing benefits to consumers or to competition."[45] An act or practice cannot be considered "abusive" under the CFPA unless it "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or . . . takes unreasonable advantage of – (A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service; (B) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or (C) the reasonable reliance by the consumer on a covered person to act in the interests

---

[43] 12 U.S.C. § 5564(g).

[44] 12 U.S.C. § 5536(a)(1)(B).

[45] 12 U.S.C. § 5531(c)(1).

of the consumer."[46]

A close review of the complaint yields a conclusion that the complaint does not contain sufficient factual allegations to back up its conclusory statements regarding Intercept's allegedly unlawful acts or omissions. While the complaint indicates that Intercept was required to follow certain industry standards, it fails to sufficiently allege facts tending to show that those standards were violated. Although the complaint contains several allegations that Intercept engaged in or assisted in unfair acts or practices, it never pleads facts sufficient to support the legal conclusion that consumers were injured or likely to be injured. Nothing in the complaint allows the defendants or the court to ascertain whether any potential injury was or was not counterbalanced by benefits to the consumers at issue.

The complaint lacks factual allegations that would support a finding that Intercept interfered with consumers' ability to understand the terms of their dealings with Intercept's clients or that would support a finding that Intercept took unlawful advantage of consumers.

The complaint simply does not sufficiently identify particular clients whose actions provided "red flags" to Intercept or how Intercept's failure to act upon those "red flags" caused harm or was likely to cause harm to any identified consumer or group of consumers. Although the CFPB strongly urges this court to find that the complaint's factual detail is sufficient to allow defendants to recognize the specific clients,[47] the complaint does not provide the court with sufficient information or factual detail to analyze whether it is

---

[46] 12 U.S.C. § 5531(d).

[47] Doc. #28, pp. 28-29.

sufficient to state a claim for relief.  A complaint containing mere conclusory statements without sufficient factual allegations to support the conclusory statements cannot survive a motion to dismiss.[48]  The defendants' motion to dismiss, under Rule 12(b)(6) of the Federal Rules of Civil Procedure, for failure to state a claim is granted.

The court deems it unnecessary to decide the issue of the constitutionality of the CFPB at this time.  Should the CFPB decide to renew this action in this court or another court, the issue may be addressed appropriately at that time.

## CONCLUSION

The MOTION TO DISMISS is **GRANTED**.  This case is hereby **DISMISSED WITHOUT PREJUDICE.**

**IT IS SO ORDERED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated this 17th day of March, 2017.

>             /s/   Ralph R. Erickson
> Ralph R. Erickson, District Judge
> United States District Court

---

[48] Neubauer v. FedEx Corporation, 849 F.3d 400, 404 ("Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.").  The court is aware of Consumer Financial Protection Bureau v. NDG Financial Corp., Slip Copy, No. 15-cv-5211, 2016 WL 7188792, *13 (S.D.N.Y. 2016), a case in which Chief Judge McMahon acknowledged: "The CFPA does not require the CFPB to identify individual consumers in its complaint, and Fed. R. Civ. P. 8 does not require any plaintiff to identify the proof that undergirds a complaint's allegations.").  The court notes, however, that the "First Amended Complaint" at Doc. #47 in that case alleged specific fraudulent actions by the defendants, including threatening actions against consumers which they could not legally maintain and alleged admissions by the defendants that supported the claims.  The complaint in the New York case was not as deficient in factual allegations as the complaint in this case.  Further, notwithstanding its lack of identifying specific consumers, it contained factual details to back up its allegations of wrongdoing.